UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF NEW YORK, INC., MICHAEL GOLFO, AND CHRISTINA CURRY, on behalf of themselves and all others similarly situated, | No. 18-CV-5792 (PAE) |
| Plaintiffs, | |
| -against- | |
| THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF TRANSPORTATION, BILL DE BLASIO, in his official capacity as Mayor of the City of New York, and POLLY TROTTENBERG, in her official capacity as Commissioner of the New York City Department of Transportation, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**<u>ORAL ARGUMENT REQUESTED</u>**

DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017-5621
Tel:  (212) 644-8644
Fax:  (212) 644-8636
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF RELEVANT FACTS ............................................................. 2

    A.   How Blind Pedestrians Cross City Streets.............................................. 2

    B.   APS Assist These Tasks By Providing Crossing Information In
        Audible And Vibro-Tactile Format. ....................................................... 3

    C.   New York City's Failure to Install APS Endangers Blind and Low
        Vision Pedestrians.................................................................................. 4

        1.   History of the City's APS Program. ........................................... 4

        2.   Plaintiffs and Class Members Are Unable to Safely And
            Independently Navigate NYC Intersections Without APS....................... 6

    D.   The City Has Failed to Install APS Even Though Nearly All Of Its
        Crosswalk Signals Have Been Replaced or Upgraded, Multiple
        Times...................................................................................................... 7

        1.   New Signals Are Installed Without APS. ................................... 7

        2.   From 2000 to 2004, the City Replaced Every Pedestrian
            Crossing Signal Without Installing APS...................................... 8

        3.   In 2011, the City Replaced More Than Half of Pedestrian
            Crosswalk Signals With Countdown Clocks, Without
            Installing APS. ............................................................................ 8

        4.   Capital Projects and Street Improvement Projects To
            Improve Pedestrian Safety That Replace or Alter Existing
            Signalized Intersections Are Consistently Completed
            Without Installing APS. .............................................................. 8

        5.   Since 2013, the City Has Upgraded 3,951 Intersections To
            Give Sighted Pedestrians a "Head Start" For Their Safety,
            Without Installing APS. .............................................................. 9

        6.   Exclusive Pedestrian Phases Are Similarly Dangerous to
            Blind Pedestrians, and Not One Is Accessible to the Blind. ..................... 10

III. LEGAL STANDARD........................................................................................ 10

IV.  ARGUMENT ..................................................................................................... 11

A.      THE CITY'S FAILURE TO INSTALL APS AT 96.6% OF NEW YORK CITY'S INTERSECTIONS DENIES BLIND PEDESTRIANS MEANINGFUL ACCESS TO CITY INTERSECTIONS IN VIOLATION OF THE ADA AND SECTION 504 ................................................................................................ 12

     1.     The Rarity of APS in NYC Denies People with Visual Disabilities Meaningful Access to its Pedestrian Crossings. .................... 14

     2.     Plaintiffs' Unsafe and Time-Consuming Attempts to Overcome the Inaccessibility of Crossing Signals Are Further Evidence They Are Denied Meaningful Access. ........................ 16

B.      THE CITY HAS FAILED TO MAKE PEDESTRIAN CROSSWALK SIGNALS WHICH HAVE BEEN ALTERED AND UPGRADED ACCESSIBLE TO THE MAXIMUM EXTENT FEASIBLE, IN VIOLATION OF THE ADA'S AND SECTION 504'S ANTIDISCRIMINATION PROVISIONS .............................. 17

     1.     Each Year New York City Installs 100-120 New Signals Without Making Those Installations Accessible With APS. .................... 18

     2.     Defendants Have Completed Multiple, Inaccessible, Large-Scale Replacements of All Pedestrian Crossing Signals. ......................... 19

     3.     The City Regularly Undertakes Multi-Million Dollar Street Improvement and Capital Projects That Can Alter and Reconfigure Entire Intersections To Improve Pedestrian Safety Without Making Them Accessible. ................................................ 20

     4.     Defendants Have Installed Hundreds of LPIs and EPPs Without Making Them Accessible With APS. ......................................... 21

C.      THE CITY'S FAILURE TO INSTALL APS DEVICES DISCRIMINATES AGAINST BLIND PEDESTRIANS IN VIOLATION OF NYCHRL. .............................................................................. 23

V.     CONCLUSION .................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander v. Choate*,
   469 U.S. 287 (1985)...................................................................................................... 12

*Am. Council of Blind v. Paulson*,
   463 F. Supp. 2d 51 (D.D.C. 2006) ............................................................................... 16

*Am. Council of the Blind v. Paulson*,
   525 F.3d 1256 (D.C. Cir. 2008) ................................................................................... 16

*Boureima v. N.Y.C. Human Res. Admin.*,
   128 A.D.3d 532 (N.Y. App. Div. 2015) ...................................................................... 24

*Bronx Indep. Living Servs. v. Metro. Transp. Auth.*,
   358 F. Supp. 3d 324  (S.D.N.Y. 2019) ........................................................................ 21

*Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*,
   980 F. Supp. 2d 588 (S.D.N.Y. 2013) ......................................................................... 24

*Celeste v. E. Meadow Union Free Sch. Dist.*,
   373 F. App'x 85 (2d Cir. 2010) ................................................................................... 17

*Civic Ass'n of Deaf of N.Y.C., Inc. v. Giuliani*,
   970 F. Supp. 352 (S.D.N.Y. 1997) .................................................................. 17, 20, 21

*Cohen v. City of Culver City*,
   754 F.3d 690 (9th Cir. 2014) ....................................................................................... 15

*Crescenzi v. City of New York*,
   --- F. 3d ----, No. 18-10002, 2019 WL 4865826 (2d Cir. Oct. 3, 2019)....................... 2

*Disabled in Action v. Bd. of Elec. in City of N.Y.*,
   752 F.3d 189 (2d Cir. 2014) ........................................................................................ 13

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*,
   635 F.3d 87 (3d Cir. 2011) .......................................................................................... 21

*Helen L. v. DiDario*,
   46 F.3d 325 (3d Cir. 1995) .......................................................................................... 14

*Henrietta D. v. Bloomberg*,
   331 F. 3d 261 (2d. Cir. 2003) ................................................................................ 11, 15

*Kinney v. Yerusalim*,
   9 F.3d 1067 (3rd Cir. 1993) .................................................................................... 15, 18

*Loeffler v. Staten Island Univ. Hosp.*,
  582 F.3d 268 (2d Cir. 2009) ........................................................................ 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................... 10

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
  715 F.3d 102 (2d Cir. 2013) ........................................................................ 23

*Phillips v. City of New York*,
  66 A.D.3d 170 (1st Dep't 2009) .................................................................. 24

*Roberts v. Royal Atlantic Corp.*,
  542 F.3d 363 (2d Cir. 2008) ................................................................. 17, 22

*Scharff v. County of Nassau*,
  No. 10-CV-4208(DRH)(AKT), 2014 WL 2454639 (E.D.N.Y. June 2, 2014) ............ 11, 13, 25

*Cayuga Indian Nation of N.Y. v. Cuomo*,
  730 F. Supp. 485 (N.D.N.Y. 1990) ............................................................. 11

*Tennessee v. Lane*,
  541 U.S. 509 (2004) .................................................................................... 15

**Statutes**

29 U.S.C. § 794 ................................................................................................ 1

29 U.S.C. § 794(a) .................................................................................... 11, 17

42 U.S.C. § 12101(b)(1) ................................................................................ 25

42 U.S.C. § 12131(1)(A) & (B) .................................................................... 11

42 U.S.C. § 12131(2) .................................................................................... 11

42 U.S.C. § 12132 .............................................................................. 1, 11, 17

N.Y.C. Admin. Code § 8-102(9) ............................................................ 12, 24

N.Y.C. Admin. Code § 8-102(18) ................................................................ 24

N.Y.C. Admin. Code § 8-107(4)(a) ............................................................. 24

N.Y.C. Admin. Code § 8-107(17) ................................................................ 24

N.Y.C. Local Law No. 85, § 1 (2005) ......................................................... 23

N.Y.C. Local Law No. 85, § 7 (2005) ......................................................... 23

**Other Authorities**

H.R. Rep. No. 101-485, pt. 3 (1990), reprinted in 1990 U.S.C.C.A.N. 445.....................18, 23

Manual on Uniform Transportation Control Devices 4E.09(3)(D) ............................................ 22

Public Rights of Way Accessibility Guidelines R105.5 .............................................................. 18

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................................... 10

**Regulations**

28 C.F.R. § 35.130(a)....................................................................................................................... 11

28 C.F.R. § 35.130(b)(1)(i)-(iii) .................................................................................................... 13

28 C.F.R. § 35.150 ............................................................................................................................ 1

28 C.F.R. § 35.151 ............................................................................................................................ 1

28 C.F.R. § 35.150(a).................................................................................................................. 11, 12

28 C.F.R. § 35.151(b) ............................................................................................................. 17, 19, 21

28 C.F.R. § 35.160 (a)(1)-(b)(1) .............................................................................................. 13, 14

28 C.F.R. §§ 35.149-151 ................................................................................................................. 11

34 C.F.R. § 104.23(b) ................................................................................................................ 1, 17

## I.  INTRODUCTION

New York City has over 13,200 signalized intersections with signals for sighted pedestrians that convey critical safety information: WALK or DON'T WALK. Yet only 443 of those 13,200 intersections—3.4%—have Accessible Pedestrian Signals ("APS") that convey this information to blind people. Defendants' failure to provide crossing information in an accessible format unlawfully denies blind and low vision pedestrians their independence to navigate city streets safely: to visit friends and family; go to work, school, or home; or shop or do business.

Plaintiffs move for partial summary judgment on one issue: whether the City of New York's ("the City"), New York City Department of Transportation's ("DOT"), Mayor Bill De Blasio ("Mayor"), and Commissioner Polly Trottenberg's ("Commissioner") (collectively "Defendants" hereinafter) long-standing failure to install APS violates both federal and city law. The Court has three independent bases for a finding of liability against Defendants, all amply supported by record evidence, and any one of which is sufficient to rule for Plaintiffs.

First, by providing APS at only 3.4% of intersections, Defendants deny residents of New York City with visual disabilities the "benefits of the services, programs, or activities of a public entity" in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq*., 28 C.F.R. § 35.150 ("ADA") and, because Defendants receive federal financial assistance, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. ("Section 504").

Second, the City's failure to install APS when it installs new signals, or renovates and replaces old signals, violates the anti-discrimination mandates of both the ADA and Section 504 that require new and renovated facilities to be made accessible to the maximum extent feasible. 28 C.F.R. § 35.151 [ADA]; 34 C.F.R. § 104.23(b) [Section 504].

Third, the City's actions violate the New York City Human Rights Law's ("NYCHRL") prohibitions against discrimination based on disability.

1

## II. STATEMENT OF RELEVANT FACTS

New York City is a pedestrian city, with a robust public transit system that usually includes walking on one or both ends of the trip. *See* Joint Statement of Undisputed Facts, ECF No. 91 ("JSF") ¶ 9. "[W]alking is the primary means of getting around for many of the 8.5 million people who call the City home (not to mention the City's 60 million annual visitors)." *Crescenzi v. City of New York*, --- F. 3d ----, No. 18-10002, 2019 WL 4865826, *1 (2d Cir. Oct. 3, 2019). Pedestrian crosswalk signals are an integral part of the transportation network that enables New Yorkers, commuters, and visitors to traverse the streets safely. *See* JSF ¶ 9.

New York City's population density combines with its vehicle density and high background noise levels to make pedestrian street crossings challenging for those with visual disabilities who rely on their hearing or other senses. JSF ¶ 10; Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("SOF") ¶ 3. Cars present the biggest threat to pedestrians, but bicycles (manual and electric) and hybrid cars pose added danger to pedestrians who are blind because they are nearly impossible to hear. SOF ¶¶ 4-5. Pedestrians like the named Plaintiffs and Class Members face particular challenges and dangers when crossing New York City streets.

## A.  **How Blind Pedestrians Cross City Streets.**

All pedestrians perform four tasks when crossing streets: 1) locating the edge of the street and crossing point; 2) aligning to cross; 3) deciding when to cross; and 4) maintaining alignment while crossing. SOF ¶ 6. Pedestrians must simultaneously keep track of other people around them, vehicular traffic, the slope and crown of the street and gutter, and other factors. SOF ¶ 7.

Blind pedestrians usually navigate without visual cues. The traditional strategy for locating the street and crosswalk for blind and low vision pedestrians is to stop when they encounter a curb or detectable warning surface and assume the crosswalk is at that location. SOF

¶ 8. Nearly half the time the pedestrian either cannot locate the crossing point or crosses at the wrong place, especially where an intersection has offset curbs or crosswalks. SOF ¶¶ 9-10.

Once they locate the crossing point, blind pedestrians align themselves to cross, usually by listening to traffic moving beside the crosswalk and walking along the parallel traffic. SOF ¶ 11. However, identifying the correct audible cues when there are cars, buses, trucks, and nearly silent bicycles and hybrid cars, can be difficult, and result in veering into traffic. SOF ¶ 12.

Next and most importantly, a blind or low vision pedestrian must decide when to begin crossing and make it to the correct location on the opposite side of the street. SOF ¶ 13. The traditional technique is to listen for vehicles to stop on the street being crossed and for cars to begin moving in the lanes closest to the crosswalk (the "parallel surge" of traffic) and walk aligned with that sound to reach the other side.[1] *Id.* The pedestrian assumes when parallel traffic is moving, she has the WALK signal. SOF ¶ 14. However, this is essentially a guess, with somewhere between a 50/50 and two-thirds success rate. *Id.* These challenges are even more pronounced for deafblind pedestrians, who may not receive much, or any, audible information for street crossing. SOF ¶ 15.

**B.**    **APS Assist These Tasks By Providing Crossing Information In Audible And Vibro-Tactile Format.**

APS enable blind and low vision pedestrians to receive the same information from crosswalk signals as sighted pedestrians. JSF ¶ 14. Modern APS units emit a soft sound every second to assist the blind pedestrian in locating the APS device ("locator tone") and, by extension, the crossing point. JSF ¶ 16. Once located, the APS device has a raised, tactile arrow button that points at the crosswalk it is synced with, so that the pedestrian can align herself to the

---

[1] While some blind and low vision pedestrians (less than 5%) travel with a dog guide, dog guides do not make decisions about the route or when to the cross the street. The handler makes that decision and gives the dog commands to direct their travel and movement. SOF ¶ 18.

crosswalk. JSF ¶ 15. With APS, blind pedestrians begin crossing from the appropriate crossing point 97% of the time. SOF ¶ 17.

The pedestrian presses the arrow button, activating a verbal "Wait" message. JSF ¶ 17. When the WALK signal is on, the APS emits either a rapid tone (between 8-10 ticks per second) or a speech message to alert her she may begin her crossing. JSF ¶ 18. With APS, blind and low vision pedestrians crossed during the WALK interval 97-99% of the time, compared with 50-67% without APS, and are more likely to finish crossing in time. SOF ¶¶ 14, 17.

**C.    New York City's Failure to Install APS Endangers Blind and Low Vision Pedestrians.**

Defendants deny hundreds of thousands of pedestrians the ability to safely navigate city streets by failing to install and maintain APS. Approximately 200,000 New Yorkers have visual disabilities, not including commuters and visitors.[2] SOF ¶ 2. Yet only 443 of New York City's 13,200 signaled intersections—3.4%—incorporate APS technology today. JSF ¶¶ 11, 14, 19. This exclusion puts blind pedestrians at serious risk of physical injury every day they move about the City as part of their day-to-day lives. JSF ¶¶ 25, 58, 73-74; SOF ¶¶ 26, 28, 33-34, 44-45, 54-56, 78-81.

1.    History of the City's APS Program.

The first APS in New York City was installed in Queens in 1957, and as of 2003, there were approximately 12 APS citywide. JSF ¶¶ 82-85, 87. DOT's APS Program started around 2003 or 2004. JSF ¶ 88. In 2004, DOT received approximately 200 requests for APS, mostly from organizations that work with blind and low vision constituents. JSF ¶ 89. On August 24,

---

[2] On July 22, 2019, the Court certified a class of "all blind and low vision New York City pedestrians who are persons with disabilities as defined by the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law, and who use signalized pedestrian street intersections in New York City." SOF ¶ 1.

4

2010, eleven such organizations, writing jointly as the Pedestrians for Accessible and Safe Streets Coalition ("PASS"), wrote a letter to Mayor Michael Bloomberg explaining that the lack of APS in New York City and frequent inaccessible renovations were unlawful, and put blind pedestrians in danger every day. SOF ¶¶ 27-31. PASS asked the City to install APS at all new and altered intersections, citing to street modifications like lane reconfigurations, signal timing changes, countdown clocks, bike lanes, pedestrian islands and sidewalk extensions, and pedestrian plazas. SOF ¶¶ 28-31. However, the community's requests had little effect: as of November 1, 2011, over a year after the PASS letter was sent, there were only 20 intersections equipped with APS, eight more than in 2003. JSF ¶ 96.

Eventually, DOT developed a Prioritization Tool, a worksheet that evaluates the specific characteristics of an intersection and assigns numerical values to rate the complexity of the crosswalk to a blind pedestrian. JSF ¶¶ 113, 117. The Prioritization Tool was adapted from the National Cooperative Highway Research Program ("NCHRP"), a research program under the Transportation Research Board overseen by the National Academy of Sciences, and authored in part by Plaintiffs' expert, Janet Barlow. JSF ¶ 114. DOT evaluates all APS requests with the Prioritization Tool, and the top-ranked intersections are put in the queue to be designed and installed until the funding cap is reached. JSF ¶ 123. As of June 2019, approximately 1,600 intersections (approximately 12% of signalized intersections in NYC) have been evaluated and ranked using the Prioritization Tool. JSF ¶ 129.

DOT installed APS at only 25 intersections per year from 2012-2016, 75 per year from 2016-2018, and 150 per year from 2018 to the present. JSF ¶¶ 95, 101, 105-107. Any remaining ranked intersections stay in the queue until they are top-ranked. JSF ¶¶ 126-127. New APS requests are added all the time, which may outrank previous requests, and thus intersections can

remain in the queue for years. JSF ¶ 127. As just one example, on December 11, 2013, Plaintiff

Christina Curry requested APS at three intersections near her office and the New York State

Commission for the Blind. JSF ¶ 40. Of these three intersections, one was installed in 2016,

another is currently being installed six years later, and the last still does not have APS. JSF ¶¶ 41,

42, 44. Similarly, in 2013 a blind Staten Islander requested APS on behalf of seven people with

visual disabilities at three intersections that have still not been installed. SOF ¶ 69.

2. <u>Plaintiffs and Class Members Are Unable to Safely And Independently Navigate NYC Intersections Without APS.</u>

The members and constituency of the American Council of the Blind of New York, Inc.

("ACBNY") and Class Representatives Christina Curry and Michael Golfo are endangered by

the City's failure to install APS. ACBNY has members who are blind and deafblind, and

regularly utilize crosswalks to traverse the city but need APS to do so safely and independently.

JSF ¶¶ 2, 4, 21-22; SOF ¶¶ 34-38, 43-48, 50.

Plaintiffs and Class Members are put in danger every time they must utilize a signalized

intersection without APS. ACBNY's members and constituents, including Michael Golfo and

Christina Curry, have both nearly been hit by cars when crossing intersections without APS. JSF

¶¶ 25, 58, 74. In one terrifying incident at a signalized intersection lacking APS, Mr. Golfo

crossed against the light into four lanes of traffic. JSF ¶ 73. When he felt and heard traffic going

by himself and his dog, he ran across the intersection with his dog and hoped that they were not

killed. JSF ¶ 73. Additionally, Class Members have been grabbed by well-meaning strangers

attempting to help them across the street, which can be disorienting, frightening, and denies them

their independence. JSF ¶¶ 26, 59, 77; SOF ¶¶ 43, 52. Mr. Golfo's and Ms. Curry's experiences

are representative of other ACBNY members and constituents. JSF ¶¶ 25, 58, 73; SOF ¶ 41.

Denied the benefit of APS, Plaintiffs and Class Members go to great lengths in an attempt to mitigate these dangers. In order to cross streets safely at intersections without APS, Class Members like Mr. Golfo and Ms. Curry try to cross in crowds and wait several lights—sometimes as long as twenty minutes—to make sure they are crossing with others. JSF ¶¶ 24, 55, 75. This is risky, as sometimes they realize too late that the person they are following is jaywalking against the light. JSF ¶¶ 56, 76. They also avoid walking by taking buses and getting out a stop early or a stop late in order to avoid particularly unsafe intersections, or even take longer routes. JSF ¶¶ 27, 61, 80. For example, Ms. Curry, who uses a forearm crutch, sometimes walks downstairs and underground through subway stations instead of on surface streets, even though this takes more time and energy. JSF ¶ 57. Class Members also take taxis or paratransit, even though the former is expensive and the latter must be arranged at least twenty-four hours in advance, is notoriously unreliable, impractical for short trips, and can take at least twice as long as the bus. JSF ¶¶ 28, 60, 78-79; SOF ¶ 51.

**D.      The City Has Failed to Install APS Even Though Nearly All Of Its Crosswalk Signals Have Been Replaced or Upgraded, Multiple Times.**

Defendants almost never install APS as part of new installations or alterations of existing crosswalk signals. Instead, they install a fixed number per year determined by budget allocation.

1.      New Signals Are Installed Without APS.

Up to and including the present, DOT has almost never required the installation of APS when a new traffic signal was installed. JSF ¶ 132. DOT typically installs 100-120 new traffic signals per year. JSF ¶ 135. From 1990 to 2014, no intersections where a new traffic signal was installed included APS at the same time. JSF ¶ 133. Beginning in 2014 and through the present, DOT evaluates all new signalized intersections using the Prioritization Tool and ranks that intersection for future APS installation. JSF ¶ 134. Because until this lawsuit was filed in 2018

7

Defendants only installed 75 APS per year compared with 100-120 new intersections per year, New York City was becoming *less* accessible as retrofits did not keep up with new installations.

    2.    <u>From 2000 to 2004, the City Replaced Every Pedestrian Crossing Signal Without Installing APS.</u>

Defendants have periodically implemented large-scale upgrades to pedestrian crossing signals without making those upgrades accessible to blind persons. During the period from 2000 to 2004, the City changed its "WALK" and "DON'T WALK" text pedestrian signals to new signals with displays of a person walking and red-orange hand in accordance with the MUTCD. JSF ¶ 137. The City replaced approximately 85,000 signals at 100% of signalized intersections but did not install APS at the same time. JSF ¶ 137. A blind pedestrian cannot receive the WALK and DON'T WALK information from a pedestrian signal without APS. JSF ¶ 138.

    3.    <u>In 2011, the City Replaced More Than Half of Pedestrian Crosswalk Signals With Countdown Clocks, Without Installing APS.</u>

The City commenced a second significant crosswalk signal upgrade in 2011 and once again omitted APS. Between 2012 and 2014, the City has upgraded crosswalk signals at approximately 7,500 intersections with "countdown clocks" that tell sighted pedestrians how much time they have to cross. JSF ¶ 141. These countdown clocks are at over half of signalized intersections, but DOT did not install APS when it replaced those signals. JSF ¶¶ 142-144. The countdown clock information is unavailable to blind pedestrians without APS. JSF ¶ 143.

    4.    <u>Capital Projects and Street Improvement Projects To Improve Pedestrian Safety That Replace or Alter Existing Signalized Intersections Are Consistently Completed Without Installing APS.</u>

Capital Street Projects ("Capital Projects") are major street reconstruction, ranging from milling and repaving to full reconstruction of the roadbed, sidewalks, and utilities. JSF ¶ 178. Capital Projects are generally planned, funded, and initiated by DOT, and constructed by the Department of Design and Construction ("DDC") on DOT's behalf. Similarly, Street

Improvement Projects ("SIPs"), sometimes called "in-house capital projects," are DOT projects intended to enhance pedestrian safety. JSF ¶ 171. Some involve the installation of medians, bike lanes, or other street changes that require the installation or alteration of pedestrian signals, or lengthen or shorten the crossing distance. SOF ¶ 74. About half of SIPs involve some level of signal work, including the installation of new signals. SOF ¶ 75; JSF ¶¶ 174-176.

Defendants have never had any policies surrounding when a Capital Project or SIP affecting an intersection triggers any requirement to install or evaluate for APS. JSF ¶¶ 175, 177, 185-86. Even though many Capital Projects and SIPs include major signal reconstruction work, from 2009 through September 10, 2019, the City included APS at only 14 of its 779 SIPs (less than 2%). JSF ¶ 173.

5. Since 2013, the City Has Upgraded 3,951 Intersections To Give Sighted Pedestrians a "Head Start" For Their Safety, Without Installing APS.

Leading Pedestrian Intervals ("LPIs") are signal timing changes added to signalized intersections in order to give pedestrians a head start to begin crossing the street before cars make turns across the crosswalk. JSF ¶ 145. LPIs force turning cars to yield by allowing pedestrians to occupy the crosswalk prior to the light turning green. SOF ¶ 78. The LPI information about when the WALK phase is on is unavailable to blind pedestrians without APS. JSF ¶ 146.

Blind pedestrians find intersections with LPIs particularly challenging because there is no "parallel surge" of traffic to indicate to them that the WALK signal is on. SOF ¶ 79. Because blind pedestrians encountering an LPI wait for a parallel surge, they tend to cross later than other pedestrians, and may be left with insufficient time to safely clear the intersection before opposing traffic has a green light. *Id.* For these reasons, blind pedestrians have lobbied Defendants and public officials for years to include APS with all new LPIs. SOF ¶¶ 30, 81. DOT

has long been aware of the dangers LPIs present to blind pedestrians, describing them as "mysterious and confusing," "dangerous," "unsafe," and "an equity/safety issue." JSF ¶¶ 147-150; SOF ¶¶ 82.

Despite these dangers, from 1990 to 2018, LPI intersections were not even evaluated or ranked for APS. In 2018, DOT began evaluating all LPI intersections using the Prioritization Tool and ranking them for future APS installation. JSF ¶ 161. As of August 16, 2019, only 113 (less than 3%) of 3,951 LPI intersections had APS. JSF ¶¶ 158-159.

6.     <u>Exclusive Pedestrian Phases Are Similarly Dangerous to Blind Pedestrians, and Not One Is Accessible to the Blind.</u>

An Exclusive Pedestrian Phase ("EPP"), also known as Barnes Dance, is an intersection where all the red lights for traffic and all the WALK signals for pedestrians are illuminated at the same time. JSF ¶ 163. These are even more difficult for blind pedestrians than LPIs, because there is no parallel surge of traffic at all to act as an audible cue. JSF ¶¶ 164-166; SOF ¶¶ 83-86. Without APS, a blind pedestrian cannot discern when the WALK signal is on or when it is safe to begin crossing. JSF ¶ 167. As with LPIs, DOT has long been aware of the dangers of EPPs because of complaints from the community, and its own Policy Analyst for Accessibility & ADA Coordinator has pushed for including APS at all EPPs. JSF ¶¶ 164-166; SOF ¶¶ 85-86. However, as of June 30, 2019, 98 intersections have EPPs, and not one has APS. JSF ¶ 169.

## III.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

When a plaintiff demonstrates that there is no genuine issue of material fact as to the defendant's liability, the court may grant partial summary judgment on liability and later address remedies. *See Cayuga Indian Nation of N.Y. v. Cuomo*, 730 F. Supp. 485, 493 (N.D.N.Y. 1990).

## IV.   ARGUMENT

Defendants have violated Title II of the ADA's and Section 504's prohibitions against discrimination.[3] Title II and Section 504 provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 [ADA]; 29 U.S.C. § 794(a) [Section 504]. *See also* 28 C.F.R. § 35.130(a). Further, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

There is no dispute that Plaintiffs, who are blind or deafblind, are "qualified individuals" with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2); JSF ¶¶ 2-4. Nor is there any dispute that the City can be held liable for failures to accommodate persons with disabilities as it is a "public entity." 42 U.S.C. § 12131(1)(A) & (B). Additionally, the City concedes that pedestrian crosswalk signals are both a "service, program, or activity" and also City "facilities" within the meaning of 28 C.F.R. §§ 35.149-151. Atkinson Decl., Ex. 20 at 4; *see also Scharff v. County of Nassau*, No. 10-CV-4208(DRH)(AKT), 2014 WL 2454639, *7 (E.D.N.Y. June 2, 2014) (holding that the installation and maintenance of crossing signals is a service, program, or activity within the meaning of Title II, and that the devices themselves are also facilities).

---

[3] "[ADA and Section 504] claims [are generally treated] identically."  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d. Cir. 2003).

Coverage under the NYCHRL is also well established because the City, as the entity responsible for providing and maintaining pedestrian street crossing signals for the general public, is a "provider of public accommodation." *See* N.Y.C. Admin. Code § 8-102(9) (stating that a provider of public accommodation is "[any] provider[], whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind).

 The only questions are whether Defendants have violated these statutes by failing to install an adequate number of APS to enable a blind pedestrian to safely navigate the city streets, and by failing to install APS when renovating or replacing existing, pedestrian crossing and traffic signals. The answer to both questions is unequivocally yes.

A.    **THE CITY'S FAILURE TO INSTALL APS AT 96.6% OF NEW YORK CITY'S INTERSECTIONS DENIES BLIND PEDESTRIANS MEANINGFUL ACCESS TO CITY INTERSECTIONS IN VIOLATION OF THE ADA AND SECTION 504.**

The City's failure to fulfill its programmatic access duty under 42 U.S.C. § 12132 is plain from the strikingly low percentage of intersections equipped with APS. A public entity is required to operate existing facilities such that each "service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). A city discriminates against individuals with disabilities when it fails to provide "meaningful access" to its benefits, programs, services, or existing facilities. *Alexander v. Choate*, 469 U.S. 287, 299 (1985). For blind pedestrians to safely and independently navigate New York City's signalized intersections, and thus have meaningful access, Defendants must install APS citywide.

Additionally, ADA's implementing regulations prohibit public entities from providing people with disabilities with inferior access to its aids, benefits, or services. People with disabilities must neither be "den[ied] the opportunity to participate in or benefit from the aid, benefit, or service" in question, nor be "provided with an aid, benefit, or service that is not as

effective in affording equal opportunity (…)." 28 C.F.R. § 35.130(b)(1)(i)-(iii). Public entities

must also "ensure that communications with … members of the public … are as effective as

communications with others," by "furnish[ing] appropriate auxiliary aids and services where

necessary to afford individuals with disabilities, including … members of the public, an equal

opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public

entity." 28 C.F.R. § 35.160 (a)(1)-(b)(1). Moreover, APS are required at all signalized

intersections by the Draft Accessibility Guidelines for Pedestrian Facilities in the Public Right-

of-Way ("PROWAG"), the guidance created by the U.S. Access Board to interpret the ADA's

requirements to public rights-of-way, including crosswalks, and provide minimum standards for

compliance. 76 Fed. Reg. 44663 at R209.1 (July 26, 2011) (to be codified at 36 C.F.R. 1190).[4]

Not only do visual-only pedestrian crossings deny blind pedestrians an equal benefit, but

they can mean life and death. The remarkably low percentage of APS citywide endangers Class

Members attempting to safely and independently navigate New York City. Defendants must

eliminate barriers to the full integration of people with disabilities into daily life, and

"[i]ndividuals may be deprived of meaningful access to public programs due to architectural

barriers or a public entity's failure to modify existing facilities and practices." *Disabled in Action

v. Bd. of Elec. in City of N.Y.*, 752 F.3d 189, 197 (2d Cir. 2014). The coping mechanisms and

workarounds blind pedestrians employ to participate in daily life are further evidence that they

are denied meaningful access.

---

[4] Though PROWAG has not yet been adopted and promulgated as a final rule, "the ADA and Rehabilitation Act
may nevertheless presently require the installation of APS." *Scharff*, 2014 WL 2454639, at *12 (E.D.N.Y. June 2,
2014). In the interim, the Federal Department of Transportation has recognized PROWAG as "the current best
practice in accessible pedestrian design under the Federal Highway Administration's Federal-aid (504) regulation."
SOF ¶¶ 22-23.

1.       The Rarity of APS in NYC Denies People With Visual Disabilities Meaningful
         Access to its Pedestrian Crossings.

That 96.6% of New York's intersections are inaccessible to blind pedestrians is

undisputed evidence that the City has failed to provide Class Members meaningful access to its

pedestrian crosswalk signals. Without APS, blind and low vision pedestrians are unable to locate

the crossing point; orient themselves correctly to the crosswalk; receive information about when

the WALK or DON'T WALK signals are on; and locate the opposite corner when crossing. They

must risk their safety to engage in daily activities. The ADA and Section 504 were passed to

prevent this type of discrimination, and are "intended to insure that qualified individuals receive

services in a manner consistent with basic human dignity." *Helen L. v. DiDario*, 46 F.3d 325,

335 (3d Cir. 1995).

Plaintiffs and Class Members are denied accessible and safe intersections every day

because of the rarity of APS. Mr. Golfo worked for eleven years in Manhattan near Penn Plaza

where, until 2016, there was only one APS in the vicinity. JSF ¶ 66. He saw his doctors on York

Ave, where the entire stretch from 59th Street to 92nd Street has only one APS. JSF ¶¶ 68-69.

Ms. Curry lives more than 20 blocks from an APS, and there was not one near her office until

2014. JSF ¶¶ 36-37, 39. With only 3% coverage, Class Members are unlikely to encounter any

APS on a day-to-day basis, let alone enough to ensure safe routes across multiple crossings.

Defendants have not "take[n] appropriate steps to ensure that communications with … members

of the public," i.e. their ubiquitous pedestrian crosswalk displays, are equipped with audible and

tactile formats as "appropriate auxiliary aids and services." 28 C.F.R. § 35.160 (a)(1)-(b)(1).

The handful of APS signals currently installed do not come close to enough to provide

Class Members meaningful access to Defendants' pedestrian street crossing service.

"Recognizing that failure to accommodate persons with disabilities will often have the same

practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility." *Tennessee v. Lane*, 541 U.S. 509, 531 (2004). Similarly, Section 504 "requires some degree of positive effort to expand the availability of federally funded programs to handicapped persons otherwise qualified to benefit from them." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 275 (2d Cir. 2003) (quoting *Rothschild v. Grottenthaler*, 907 F.2d 286, 292-93 (2d Cir. 1990)). The dearth of APS stand in stark contrast to the 13,200 intersections with street crossing signals that Defendants have provided to sighted pedestrians to make crossing New York City's busy streets both easier and safer.

Blind and low vision New Yorkers are excluded from pedestrian crossings without APS in the same way that wheelchair users were excluded from sidewalks without curb cuts. In *Kinney v. Yerusalim*, 9 F.3d 1067, 1069 (3rd Cir. 1993), the Third Circuit stated that "[w]ithout curb cuts, people with ambulatory disabilities simply cannot navigate the city; activities that are commonplace to those who are fully ambulatory become frustrating and dangerous endeavors." Inaccessible pedestrian crossings, just like obstructed sidewalks, "exclude disabled persons from ordinary communal life and force them to risk serious injury to undertake daily activities." *Cohen v. City of Culver City*, 754 F.3d 690, 700 (9th Cir. 2014). Where there is no APS, blind pedestrians must choose among guessing when the WALK light is on, and potentially crossing in front of cars, trucks, buses, and bikes; becoming stranded on the corner; or rely exclusively on door-to-door transportation, which can be inconvenient, expensive, and impractical. This is precisely the sort of "subtle discrimination stemming from thoughtlessness and indifference that the ADA aims to abolish." *Id.* (internal quotation marks and citation omitted).

As with curb cuts, the lack of APS is "a primary obstacle to the smooth integration of those with disabilities into the commerce of daily life." *Kinney*, 9 F.3d at 1069.  Meaningful

access requires far more than the status quo: for Class Members, that "commerce of daily life" has become a dangerous, time-consuming, and expensive endeavor without APS.

    2.    <u>Plaintiffs' Unsafe and Time-Consuming Attempts to Overcome the Inaccessibility of  Crossing Signals Are Further Evidence They Are Denied Meaningful Access.</u>

The myriad ways in which Plaintiffs have attempted to overcome these obstacles— relying on strangers to follow or guide them across the street, taking circuitous routes to avoid especially dangerous intersections, and avoiding public sidewalks altogether—are further evidence that they lack meaningful access to pedestrian crossing signals.

The D.C. Circuit addressed a similar issue when the American Council of the Blind challenged the inaccessibility of paper currency: though it was "designed for the sighted," that design "means that millions of visually impaired individuals are dependent on the kindness of others … in using U.S. currency. Such dependence … constitutes a denial of meaningful access to U.S. currency that is not remedied by use of existing coping mechanisms." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259 (D.C. Cir. 2008); *see also Am. Council of Blind v. Paulson*, 463 F. Supp. 2d 51, 59 (D.D.C. 2006) ("It can no longer be successfully argued that a blind person has 'meaningful access' to currency if she cannot accurately identify paper money without assistance."). The same is true here: there is no meaningful access where crossing signals, designed for sighted pedestrians, are inaccessible and unusable to blind persons.

Defendants can hardly argue they have complied with any reasonable interpretation of federal accessibility requirements when, at the time this lawsuit was filed, the City was not even installing enough APS to keep up with new signals. At that rate, the signalized intersections of the New York City would *never* become fully accessible. The City's post-lawsuit commitment to 305 installations per year for two years is an improved first step, but were that rate to continue, and if accounting for new intersections, it would take *70 years* before the City's crosswalks were

fully accessible—nearly three generations. That is far longer than the ADA permits, and considerably too long for Class Members to be denied their independence and safety.

**B.**     **THE CITY HAS FAILED TO MAKE PEDESTRIAN CROSSWALK SIGNALS WHICH HAVE BEEN ALTERED AND UPGRADED ACCESSIBLE TO THE MAXIMUM EXTENT FEASIBLE, IN VIOLATION OF THE ADA'S AND SECTION 504'S ANTIDISCRIMINATION PROVISIONS.**

The City has embarked on ambitious programs to upgrade thousands of pedestrian crosswalk signals for sighted pedestrians without making those improvements accessible to blind pedestrians in violation of the ADA's and Section 504's anti-discrimination mandates. *See* 42 U.S.C. § and 29 U.S.C. § 794(a). The ADA and Section 504 require that when existing facilities are altered, public entities must make the altered portion of the facilities readily accessible to and usable by persons with disabilities to the "maximum extent feasible."[5] *See* 28 C.F.R. § 35.151(b) [ADA]; 34 C.F.R. § 104.23(b) [Section 504]. Failure to make these alterations accessible is discrimination, separate and distinct from the exclusion or denial of the benefit of a service, program, or activity. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). *See also Celeste v. E. Meadow Union Free Sch. Dist.*, 373 F. App'x 85, 89–90 (2d Cir. 2010) (construction of inaccessible bus shelter violates ADA, separate and apart from program access violation). The statutes treat existing facilities differently from alterations because "mandating changes to existing facilities could impose extraordinary costs. New construction and alterations, however, present an immediate opportunity to provide full accessibility." *Civic Ass'n of Deaf of N.Y.C., Inc. v. Giuliani*, 970 F. Supp. 352, 359 (S.D.N.Y. 1997) (internal quotation and citation omitted).

---

[5] Feasibility is defined as technical feasibility, not economic feasibility. *See Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 371 (2d Cir. 2008) (holding that the ADA's "'maximum extent feasible' requirement" under Title III "does not ask the court to make a judgment involving costs and benefits.... The statute and regulations require that such facilities be made accessible even if the cost of doing so—financial or otherwise—is high.").

An "alteration within the meaning of the regulations is a change that affects the usability of the facility involved." *Kinney v. Yerusalim*, 9 F.3d 1067, 1072 (3rd Cir. 1993) (internal quotation marks omitted). The phrase "affects usability" is defined broadly, i.e., "if an alteration renders a street more 'usable' to those presently using it, such increased utility must also be made fully accessible to the disabled …." *Id.* at 1072–73. Congressional intent confirms this expansive interpretation: "Usability should be broadly defined to include renovations which affect the use of a facility, and not simply changes which relate directly to access." H.R. Rep. No. 101-485, pt. 3, 64 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 487. Similarly, PROWAG defines an alteration as one that "affect or could affect pedestrian access, circulation, or use." PROWAG R105.5. The ADA struck the bargain that existing facilities did not need to be fully accessible overnight but "subsequent changes to a facility [must] be undertaken in a non-discriminatory manner" so those changes are "available to all." *Kinney*, 9 F. 3d at 1073.

Here, Defendants' failures to install and maintain APS when it installs new signals and alters or upgrades existing signals, violate both the letter and intent of the law.

1.   Each Year New York City Installs 100-120 New Signals Without Making Those Installations Accessible With APS.

DOT discriminates against blind people every time it installs new traffic and pedestrian signals and does not include APS. DOT typically installs 100-120 new traffic signals per year. JSF ¶ 135. From 1990 to 2014, no intersections where a new traffic signal was installed included APS at the time of installation. JSF ¶ 133. Starting in 2014, the DOT began ranking new signals using the Prioritization Tool—in direct contradiction to the NCHRP Guide that says prioritization is inappropriate for new and altered intersections because of the mandates under federal disability laws to install APS as a matter of course. JSF ¶¶ 119-121.

The current policy is not only patently illegal, but wastes money: DOT's 30(b)(6) witness, Joshua Benson, noted in a 2018 email that installing APS at the same time as new signals rather than retrofitting existing signals could save the City up to 30%. SOF ¶ 76. In the 27 years since the ADA went into effect, between 2,700 and 3,240 new signals were installed without APS to make them accessible to the maximum extent feasible.

       2.     <u>Defendants Have Completed Multiple, Inaccessible, Large-Scale Replacements of All Pedestrian Crossing Signals.</u>

DOT further discriminates against people with visual disabilities every time it performs alterations that affect the usability of the signal and/or intersection without also installing APS. Alterations that affect the usability of the signal and/or intersection are required to be made accessible to the maximum extent feasible. 28 C.F.R. § 35.151(b). Yet the City has replaced every pedestrian display on multiple occasions since 2000 without also installing APS.

Defendants replaced every pedestrian signal in the early 2000s when the City changed its "WALK" and "DON'T WALK" text pedestrian signals to new signals with pictures of a person walking and red-orange hand in accordance with the MUTCD. JSF ¶ 137. This made the intersection and its crossing signals more "usable" to pedestrians, by improving the "clarity of communication" to pedestrians, particularly to those who do not speak English, on when the WALK phase is on. SOF ¶ 70. Yet this increased clarity of communication is not accessible to pedestrians who cannot see the signal display. SOF ¶ 71.

The City commenced a second significant crosswalk signal upgrade in 2010, that again omitted APS. Defendants initiated a two-year retrofit period to add "countdown clocks" that tell sighted pedestrians how much time they have left to cross. JSF ¶ 141. These upgrades improved the usability of intersections because they enable pedestrians to "make informed choices about

19

whether it is safe to cross or whether to accelerate their crossing." SOF ¶ 73. These benefits are unavailable to blind and low vision pedestrians without APS. JSF ¶ 143.

These physical replacements of displays to improve pedestrian access and safety are precisely the kind of alterations and changes the ADA intended government entities to make accessible. In *Civic Ass'n of Deaf of N.Y.C., Inc.*, 970 F. Supp. at 359, the Court held that the replacement of a one-button emergency call box that was replaced with a two-button emergency call box was a "'change' to the physical and functional structure of the equipment, and thus constitutes an 'alteration' within the meaning of the ADA." The replacement affected the usability of the emergency alarm system, just as the pedestrian head replacements affect the usability of the pedestrian crossing signals.

The City replaced all pedestrian crossing signals with the WALK/DON'T WALK displays, as well as 7,500 (more than half) with countdown clocks, but did not install APS at the time of these upgrades. JSF ¶¶ 137, 141; SOF ¶ 72. Had the City installed APS at the time of these alterations, every intersection in New York City would be equipped with APS today, rather than less than 4%.

> 3. The City Regularly Undertakes Multi-Million Dollar Street Improvement and Capital Projects That Can Alter and Reconfigure Entire Intersections To Improve Pedestrian Safety Without Making Them Accessible.

Defendants' disregard for the ADA's alteration mandate is even more egregious in the context of Capital Projects, major street reconstruction projects generally planned and funded through DOT but constructed by DDC, and Street Improvement Projects, sometimes called "in-house capital projects." JSF ¶¶ 171, 178. Some involve the installation of medians, bike lanes, or other street changes that require the installation or alteration of pedestrian signals, or lengthen or shorten the crossing distance. SOF ¶ 74. About half of SIPs involve some level of signal work, including the installation of new signals. SOF ¶ 75; JSF ¶¶ 174-176.

Defendants have never required that a Capital Project or SIP affecting an intersection be equipped with APS. JSF ¶¶ 177, 186. DOT's Policy Analyst for Accessibility, Quemuel Arroyo, raised the issue of including APS in all Capital Projects in 2015 in light of PROWAG's requirements and because it would save approximately $10,000 per intersection (30% or "significantly higher" savings). SOF ¶ 76. Yet since 2009 and through September 10, 2019, the City has completed 779 SIPs, but only 14 (less than 2%) included the installation of APS at affected intersections. JSF ¶ 173. Intersections that are part of a Capital Project or SIP are not even always evaluated for APS using the Prioritization Tool. JSF ¶¶ 175, 177, 185.

Such extensive projects are firmly within the ambit of alterations contemplated by 28 C.F.R. § 35.151(b). Moving or altering signals, modifying crosswalks, adding medians or bike lanes with signals, or lengthening and widening the crossing distance are clearly "alterations" that affect the usability of the intersection. Where a municipality invests large sums of money to replace or upgrade a facility, as is often the case with transportation facilities, it is obligated to make those alterations accessible. *See, e.g., Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, 358 F. Supp. 3d 324, 331 (S.D.N.Y. 2019) (renovation of subway station that replaced stairs was an "alteration[]" triggering vertical accessibility obligations under analogous transportation regulations); *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 635 F.3d 87, 90–91 (3d Cir. 2011) (same). If the replacement of a sidewalk box is an alteration, surely the complete reconfiguration of an intersection is as well. *See Civic Ass'n of Deaf of N.Y.C., Inc.*, 970 F. Supp. at 359.

4.   Defendants Have Installed Hundreds of LPIs and EPPs Without Making Them Accessible With APS.

Signal timing changes that alter the ways in which pedestrians use intersections are similarly changes that require the installation of APS to make them accessible to blind pedestrians as contemplated by the ADA and Section 504. LPIs change signalized intersection

phases in order to give pedestrians a head start to cross the street before cars make turns across the crosswalk, forcing a yield. JSF ¶ 145. EPPs occur at intersections where all vehicular lights are red while all pedestrian lights are WALK. JSF ¶¶ 163. The information in LPIs and EPPs about when the WALK phase is on is unavailable to blind pedestrians who cannot see pedestrian crossing signals. JSF ¶¶ 146, 167.

Blind pedestrians find LPIs and EPPs particularly challenging because there is no "parallel surge" of traffic to indicate to them that the WALK signal is on. DOT has long been aware of the particular dangers LPIs and EPPs present to blind pedestrians, describing them as "mysterious and confusing," "dangerous," "unsafe," "horrible for low viz peds," and "an equity/safety issue." JSF ¶¶ 147-150, 164-166; SOF ¶¶ 81-82, 84-86. Yet APS is not installed at LPIs or EPPs when those changes are implemented. It was not until sometime in 2018 that all signalized intersections receiving an LPI were even ranked using the Prioritization Tool. JSF ¶ 161. As of August 16, 2019, there were LPIs implemented at 3,951 intersections in NYC but only 113 (less than 3%) are equipped with APS. JSF ¶¶ 158-159. As of June 30, 2019, 98 intersections have EPPs, and not one has APS. JSF ¶ 169.

These alterations affect the usability of the intersection[6] because they change the use and function of the signals. "Even a relatively inexpensive or localized modification may, however, so fundamentally change the use of a facility that we would regard it as an alteration, particularly if it affects the purpose, *function*, or underlying structure of the facility." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008) (emphasis added). After these changes, the signals

---

[6] Both the MUTCD and PROWAG anticipated that signal timing changes like these would affect the function and usability for intersections. PROWAG R209.2 states that APS are to be installed at existing signals "when the signal controller and software are altered, or the signal head is replaced." 76 Fed. Reg. 44663 at R209.2 (to be codified at 36 C.F.R. 1190). Similarly, the MUTCD 4E.09(3)(D) identifies both LPIs and EPPs as characteristics that present challenges to pedestrians with visual disabilities meriting consideration of APS. Atkinson Decl., Ex. 6.

provide a safety advantage that is, without APS, not only denied to blind pedestrians, but makes intersections *more* dangerous for them.

Together, these alterations constitute practices that discriminate against blind and low vision pedestrians by failing to consider their safety and ignoring their needs. In the case of LPIs and EPPs, these alterations actually make intersections more dangerous than to blind pedestrians than they were before. Alterations that make the service less accessible are unlawful. The ADA is "geared to the future—the goal being that, over time, access will be the rule rather than the exception." H.R. Rep. No. 101-485, pt. 3, 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 486. When passing the ADA, Congress recognized that "[i]t simply makes no sense to alter premises in a manner that does not consider access," *id.*, but the DOT has done just that by failing to include APS when it invests millions in altering its pedestrian crossing signals.

## C.   THE CITY'S FAILURE TO INSTALL APS DEVICES DISCRIMINATES AGAINST BLIND PEDESTRIANS IN VIOLATION OF NYCHRL.

In addition to Defendants' actions violating federal law, Defendants are also clearly liable for disability discrimination under the more expansive local law. NYCHRL offers significantly broader protections than similarly worded federal law, meaning the ADA and Rehabilitation Act constitute only "a *floor* below which the City's Human Rights law cannot fall." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85, § 1 (2005) ("Restoration Act"). NYCHRL must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" and be analyzed separately and independently from federal law. Restoration Act § 7; *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citation omitted).

Here, the lack of APS at the vast majority of New York City's intersections unlawfully excludes blind pedestrians from places of public accommodation in violation of § 8-107(4)(a) (it is an "unlawful discriminatory practice" for "any person, being the owner, lessee. . . . agent or employee of any place or provider of public accommodation, because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities, or privileges thereof . . . ."), denies blind pedestrians reasonable accommodations[7] (APS) for their pedestrian crossing services in violation of § 8-102(18), and has a disparate impact on blind and low vision pedestrians in violation of § 8-107(17) (providing that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter").

There is no doubt that the City, as the entity responsible for providing and maintaining pedestrian street crossing signals for the general public, is a "provider of public accommodation" within the meaning of these provisions. *See* N.Y.C. Admin. Code § 8-102(9); *Boureima v. N.Y.C. Human Res. Admin.*, 128 A.D.3d 532, 533 (N.Y. App. Div. 2015) (finding that the New York City Human Resources Administration is a "provider of public accommodations" for the purposes of the NYCHRL). It is likewise clear that public streets, where pedestrian street crossing signals are installed and made available to the general public on virtually all signalized

---

[7] NYCHRL's view of reasonable accommodation is significantly broader than federal law. *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 643 (S.D.N.Y. 2013); *Phillips v. City of New York,* 66 A.D.3d 170, 182 (1st Dep't 2009).

intersections, are places of public accommodation.[8] This public service, however, remains unavailable to blind pedestrians because while providing sighted pedestrians the safety feature of signalized crossings, Defendants fail to ensure its crossings are also accessible to the blind. Providing APS is a reasonable accommodation to those who cannot see crossing signals.

Therefore, even if the federal law did not require APS installation, NYCHRL, with its significantly broader scope, would still obligate the City to accommodate Class Members by providing them with equal access to pedestrian street crossings.

## V. CONCLUSION

Plaintiffs ask the Court to fulfill the ADA's purpose of "provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The "accommodations sections of Title II will be meaningless, and social costs will be aggravated, if people who are blind or visually impaired are not afforded the opportunities to travel safely on and between streets." *Scharff*, 2014 WL 2454639, at *7. New York City streets should be accessible to all, and Defendants' policies and practices of minimal access, extraordinarily slow incremental progress, and making alterations without APS upgrades are precisely the type of discrimination – even if just benign neglect – that these laws were meant to eliminate so that people with disabilities can participate equally and independently in society.

---

[8] Under N.Y.C. Admin. Code § 8-102(9), a place of public accommodation is any place, "whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." *See also* NYC Commission on Human Rights: Public Accommodations, *available at* http://www.nyc.gov/html/cchr/html/coverage/public-accommodations.shtml (compiling a broad list of examples of places of public accommodation, including stores, banks, medical or dental offices, government agencies, hair salons, hospitals, hotels, theaters, restaurants, schools, and taxis).

Dated:  October 21, 2019                    Respectfully submitted,
       New York, New York
                                  DISABILITY RIGHTS ADVOCATES

                                  _Torie Atkinson_

                                  Torie Atkinson
                                  Seth Packrone
                                  Michelle Caiola
                                  DISABILITY RIGHTS ADVOCATES
                                  655 Third Avenue, 14th Floor
                                  New York, NY 10117-5621
                                  Tel:  (212) 644-8644
                                  Fax:  (212) 644-8636
                                  _Attorneys for Plaintiffs_