Index No.  18 CV 5792 (PAE)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN COUNCIL OF THE BLIND OF
NEW YORK, INC., MICHAEL GOLFO, AND
CHRISTINA CURRY, on behalf of themselves and
all others similarly situated,

                Plaintiffs,

-against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF TRANSPORTATION, BILL
DE BLASIO, in his official capacity as Mayor of
the City of New York, and POLLY
TROTTENBERG, in her official capacity as
Commissioner of the New York City Department of
Transportation,

                Defendants.

**DEFENDANTS' MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*
*Tel:  (212) 356-2187*

SHERYL NEUFELD,
MICHELLE GOLDBERG-CAHN,
PAMELA A. KOPLIK,
GLENNE FUCCI
   Of Counsel.
December 5, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS AND APPLICABLE LAW ...................................................... 3

    Title II of The Americans With Disabilities Act ................................................................ 3

        1.   The Standard under Title II of the ADA is "Meaningful Access," Not "Equal Access" ................................................................................................ 5

        2.   The Requirements under Section 35.150(a) of Title 28 of the Code of Federal Regulations .................................................................................... 6

        3.   The Requirements under Section 35.151(a) of Title 28 of the Code of Federal Regulations .................................................................................... 7

    History of APS In New York City .................................................................................... 8

ARGUMENT ........................................................................................................................ 10

    I.       MEANINGFUL ACCESS DOES NOT MEAN INSTALLATION OF APS AT EVERY INTERSECTION WITH A PEDESTRIAN SIGNAL .................................... 10

    II.      DOT HAS RECENTLY ADOPTED A POLICY REQUIRING THE INSTALLATION OF APS AT NEWLY SIGNALIZED INTERSECTIONS, IN CAPITAL PROJECTS AND IN STREET IMPROVEMENT PROJECTS ...................................................... 13

    III.     PLAINTIFFS' EXCEEDINGLY BROAD DEFINITION OF WHAT CONSTITUTES AN "ALTERATION" UNDER THE ADA IS UNSUPPORTED AND CONTRARY TO PREVAILING INTERPRETATION ........................................................... 14

    IV.     PLAINTIFFS' CLAIM UNDER THE NEW YORK CITY HUMAN RIGHTS LAW SIMILARLY FAILS .................................. 21

CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Choate,*
469 U.S. 287 (1985)......................................................................5

*American Assoc. of People with Disabilities v. Harris,*
647 F.3d 1093 (11th Cir. 2011) ....................................................11

*Blackwell v. City and County of San Francisco,*
506 Fed. Appx. 585 (9th Cir. 2013).............................................11

*Brooklyn Ctr. For Indep. Of Disabled v. Bloomberg,*
980 F. Supp.2d 588 (S.D.N.Y. 2013) ...........................................21

*Civic Ass'n. of the Deaf of N.Y. City, Inc. v. City of New York,*
2011 U.S. Dist. LEXIS 90645 (S.D.N.Y. August 15, 2011).................5, 6

*Colon-Rodriguez v. New York City Dep't of Corr.,*
2009 U.S. Dist. LEXIS 131723 (S.D.N.Y. March 27, 2019) .................1

*Equal Rights Center v. District of Columbia,*
741 F.Supp.2d 273 (D.D.C. 2010)...........................................11, 19

*Fulton v. Goord,*
591 F.3d 37 (2d Cir. 2009) ............................................................4

*Greer v. Richardson Independent School Dist.,*
471 Fed. Appx. 336 (5th Cir. 2012).............................................11

*Henrietta D. v. Bloomberg,*
331 F.3d 261 (2d Cir. 2003) ......................................................4, 5

*Jenkins v. City of New York,*
478 F.3d 76 (2d Cir. 2007) ............................................................1

*Kinney v. Yerusalim,*
9 F.3d 1067 (3d Cir. 1993).............................................................21

*Lewis v. Cont'l Bank Corp.,*
494 U.S. 472 (1990)......................................................................14

*Lincoln CERCPAC v. Health and Hosps. Corp.,*
147 F.3d 165 (2d Cir. 1998) ..........................................................5

*Mary Jo C. v. NY State & Local Ret. Sys.*,
   707 F.3d 144 (2nd Cir. 2013) ...................................................................................4

*Noel v. New York City Taxi & Limousine Comm'n*,
   687 F.3d 63 (2d Cir. 2012) ......................................................................................4

*North Carolina v. Rice*,
   404 U.S. 244 (1971)................................................................................................14

*Pascuiti v. New York Yankees*,
   87 F.Supp.2d 221 (S.D.N.Y. 1999) ............................................................6, 10, 11

*Purcell v. New York City Police Department*,
   2017 U.S. Dist. LEXIS 175161 (E.D.N.Y. Oct. 23, 2017).......................................1

*Roberts v. Royal Atl. Corp*,
   542 F.3d 370 (2d Cir. 2008) ...................................................................................19

*Russello v. U.S.*,
   464 U.S. 16 (1983)..................................................................................................19

*Scharff v. County of Nassau*,
   2014 U.S. Dist. LEXIS 74787 (E.D.N.Y. June 2, 2014.) ........................................15

*Tennessee v. Lane*,
   541 U.S. 509 (2004)..................................................................................................4

**Statutes**

29 U.S.C. § 794(a) ..............................................................................................................4

42 U.S.C. § 12131(1)(A) ....................................................................................................4

42 U.S.C. § 12132................................................................................................................4

Code 8-102.........................................................................................................................21

New York City Admin. Code § 19-188 .........................................................................8, 9

New York City Admin. Code 19-199.1 .........................................................................9, 10

New York City Admin. Code 19-199.1(c)(2)(vi) .............................................................10

New York City Admin. Code 19-199.1(c)(3)(iii) .............................................................10

**Regulations**

28 C.F.R. 35.104 .....................................................................................................10, 14, 15

28 C.F.R. 35.150(a) ......................................................................................................*passim*

28 C.F.R. § 35.104...........................................................................................................10

28 C.F.R. § 35.151 ...................................................................................................*passim*

**Other Authorities**

H.R. Rep. No. 101-485, pt. 3, 64 (1990), reprinted in 1990 U.S.C.C.A.N. 445...........................20

Manual on Uniform Traffic Control Devices ...................................................8, 12, 18

NYS DOT's Highway Design Manual ...................................................................19

National Cooperative Highway Research Program's ("NCHRP's") Accessible
   Pedestrian Signals: A Guide to Best Practices ........................................................8

Unenacted Draft Proposed Rights-of-Way Guidelines....................................15, 16, 17

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

AMERICAN COUNCIL OF THE BLIND OF NEW
YORK, INC., MICHAEL GOLFO, AND CHRISTINA
CURRY, on behalf of themselves and all others
similarly situated,

No. 18-CV-5792 (PAE)

Plaintiffs,

-against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF TRANSPORTATION, BILL DE
BLASIO, in his official capacity as Mayor of the City
of New York, and POLLY TROTTENBERG, in her
official capacity as Commissioner of the New York
City Department of Transportation,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants the City of New York, the New York City Department of Transportation ("DOT"),[1] Bill De Blasio and Polly Trottenberg, (collectively the "City" or "defendants") submit this memorandum of law in opposition to plaintiffs' motion for partial summary judgment.[2]

## PRELIMINARY STATEMENT

In this class action, Plaintiffs—one organization that works with blind and low-vision individuals and two individuals with vision disabilities—allege that the City's program for

---

[1] DOT and its Commissioner are not suable entities because "[t]he New York City Charter provides that suits shall be brought in the name of the City of New York and not in that of any agency." *Purcell v. New York City Police Department*, 2017 U.S. Dist. LEXIS 175161, at *3 (E.D.N.Y. Oct. 23, 2017) (holding that because "[p]laintiff may not sue a City agency, her claims against the NYPD are dismissed…"); *see also Colon-Rodriguez v. New York City Dep't of Corr.*, 2009 U.S. Dist. LEXIS 131723, at * 9-10 (S.D.N.Y. March 27, 2019); *Jenkins v. City of New York*, 478 F.3d 76, 93 n. 19 (2d Cir. 2007).

[2] Defendants' request for permission to cross-move for partial summary judgment was denied, without prejudice, by Court Order dated November 19, 2019. Dkt No. 101.

installation and maintenance of Accessible Pedestrian Signals ("APS") violates Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") and the New York City Human Rights Law ("NYCHRL").   Via the instant motion for partial summary judgment, plaintiffs seek a judgment declaring that the City's APS program violates the ADA, the Rehabilitation Act, and the NYCHRL.

As discussed below, Plaintiffs' motion should be denied because the City, when "viewed in its entirety," is accessible for blind and low-vision individuals. The standard applicable to ADA claims against the government is set forth under Section 35.150(a)(1) of the Title 28 of the C.F.R., which provides that a "service, program, or activity" provided by a public entity must be readily accessible "when viewed in its entirety." Based on this standard, the City is not required to install Accessible Pedestrian Signals at every intersection that contains pedestrian signals. Meaningful access does not mean installation of APS at every intersection in the City with a pedestrian signal. Plaintiffs' motion must also be denied because requiring the installation of APS at all intersections with pedestrian signals constitutes an undue financial and administrative burden. Notably, New York City is the most heavily signalized city in the United States and the installation of APS is only one small piece of DOT's statutory mandate.   Clearly the cost of implementing such a scheme, in a City with numerous competing demands on its economic resources, poses extreme funding challenges.

Furthermore, Plaintiffs' motion should be denied as moot insofar as it pertains to the City's obligations under Title II's mandates for new construction and alterations as applied to new pedestrian signal installations, capital projects and street improvement projects.   DOT has recently adopted a policy requiring the installation of APS at newly signalized intersections, in capital projects and in street improvement projects involving existing pedestrian signals. By

Memorandum dated October 21, 2019, DOT memorialized that policy to writing, clarifying for other city agencies their obligation to install APS at newly signalized intersections and whenever signal work involving the replacement of signal poles is carried out ("APS Policy"). In accordance with the APS Policy, going forward, all new pedestrian signal installations, and newly initiated capital projects and street improvement projects ("SIPs") involving existing signals at which signal poles are being relocated or replaced, will include APS.

Plaintiffs' motion should also be denied because Plaintiffs' exceedingly broad definition of what constitutes an "alteration" under the ADA is unsupported and contrary to law. Plaintiffs' mistakenly allege that any change to an existing pedestrian signal results in the requirement to install APS at the intersection containing that signal, even signal timing changes. Plaintiffs' mischaracterize both the legal impact of the United States Access Board's Proposed Rights-of-Way Guidelines ("PROWAG"), and even the PROWAG's actual position regarding what type of alterations give rise to the recommendation to install APS.

Plaintiffs' claim under the NYCHRL fails for the same reasons that their ADA and Rehabilitation Act claims fail. The "accommodation" that Plaintiffs seek – the installation of APS at all intersections with pedestrian signals – is not reasonable due to the financial and administrative burdens involved and the undue hardship upon Defendants.

As a result, there is no legal merit to Plaintiffs' claims and the Plaintiffs are not entitled to summary judgment as to liability as a matter of law.

## STATEMENT OF FACTS AND APPLICABLE LAW

### Title II of the Americans with Disabilities Act

The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and

activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Mary Jo C. v. NY State & Local Ret. Sys.*, 707 F.3d 144, 152 (2nd Cir. 2013) (quoting *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004)). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II defines "public entity" to include state and local governments, such as the City. *See* 42 U.S.C. § 12131(1)(A).

Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). While there are subtle differences between the ADA and the Rehabilitation Act, the standards adopted by Title II of the ADA for state and local government services are generally the same as those required under Section 504 of the Rehabilitation Act. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

To state a prima facie claim under either Title II of the ADA or the Rehabilitation Act, a plaintiff must allege: "(1) that [she] is a 'qualified individual' with a disability; (2) that [she] was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to [her] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012).

1. **The Standard under Title II of the ADA Is "Meaningful Access," Not "Equal Access"**

Pursuant to Title II of the ADA, in considering a claim against a public entity, the relevant measure is not "equal access," but whether the plaintiff is able to obtain "meaningful access." *Henrietta D. v. Bloomberg*, 331 F.3d at 275.  This concept was explained in *Civic Ass'n. of the Deaf of N.Y. City, Inc. v. City of New York*, 2011 U.S. Dist. LEXIS 90645, (S.D.N.Y. August 15, 2011), where the court reasoned as follows:

> Case law stresses that the ADA and [Rehabilitation Act] do not require equal results. The ADA and [Rehabilitation Act] prohibit discrimination against the disabled in the provision of public services, but the statutes neither guarantee "any particular level of [services] for disabled persons, nor assure maintenance of service previously provided." *Lincoln CERCPAC v. Health and Hosps. Corp.*, 147 F.3d 165, 168 (2d Cir. 1998). In addition, the statutes do not guarantee disabled persons "equal results" from the provision of a public service or benefit. *Alexander, 469 U.S. at 304* ("The [Rehabilitation] Act does not, however, guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed."); see also *Henrietta D., 331 F.3d at 274* (stating that Second Circuit cases applying the [Rehabilitation Act] "speak simply in terms of helping individuals with disabilities access public benefits to which both they and those without disabilities are legally entitled... ; the cases do not invite comparisons to the results obtained by individuals without disabilities"). …

*Civic Assoc. of the Deaf* at *30-31.

"In formulating the meaningful access standard, the Supreme Court explicitly rejected the position that all conduct that had a disparate impact on disabled persons violated the Rehabilitation Act, noting 'two powerful but countervailing considerations - the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds.'" *Civic Assoc. of the Deaf* at *28-29 (quoting *Alexander v. Choate,* 469 U.S. 287, 299 (1985)).  The

"meaningful access" standard thus struck a balance between these two legitimate goals." *Civic Assoc. of the Deaf at* \*28-29.

   2. **The Requirements under Section 35.150(a) of Title 28 of the Code of Federal Regulations**

The responsibilities of public entities under Title II of the ADA are explained in greater detail under the implementing regulations, contained under Part 35 of Title 28 of the C.F.R.

Pursuant to Section 35.150 of Title 28 of the C.F.R., a "service, program, or activity" operated by a public entity must be "readily accessible" when such service, program, or activity is "viewed in its entirety." Section 35.150(a) provides, in part, as follows:

> A public entity shall operate each service, program, or activity so that the service, program, or activity, **when viewed in its entirety, is readily accessible** to and usable by individuals with disabilities. … (Emphasis added.)

28 C.F.R. § 35.150(a); *Pascuiti v. New York Yankees,* 87 F.Supp.2d 221, 223 (S.D.N.Y. 1999) (holding that Title II of the ADA provides that "the service, program, or activity must be readily accessible when viewed in its entirety").

The ADA regulations also contain different requirements depending upon whether the public entity's facilities at issue are existing facilities, newly constructed facilities, or altered facilities. With regard to existing facilities, public entities are generally excused from making fundamental alterations, and from having to bear undue financial and administrative burdens. 28 C.F.R. § 35.150(a), (b).

Section 35.150(a) of Title 28 of the C.F.R., which speaks to existing facilities, contains, *inter alia*, the following limitations:

> This paragraph **does not**
>
> (1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

(2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.....(Emphasis added.)

## 2. **The Requirements under Section 35.151 of Title 28 of the Code of Federal Regulations**

In contrast, newly constructed facilities "shall be designed and constructed in such manner that the facility . . . is readily accessible to and usable by individuals with disabilities," unless where a public entity can demonstrate that it is "structurally impracticable" to meet these requirements. 28 C.F.R. § 35.151(a)(1)–(2). Finally, when a public entity alters a facility in a manner "that affects or could affect the usability of the facility," the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b).

**History of APS in New York City**

The City has been steadily increasing its commitment to add additional APS to the streets of New York City.  Although the City began installing APS at some intersections decades ago, DOT's formal APS installation program did not begin until in or around 2004 when DOT began installing APS at signalized intersections in the City.  *See* Joint Statement of Undisputed Facts (Dkt No. 91)("JSF") at ¶¶ 87-97. At that time, there was no formal program for designating intersections for APS, and installations were completed based on requests received by DOT.  JSF ¶ 93.

In 2011, DOT approved the use of a new, modern pushbutton APS from a company named Polara that complied with the Manual on Uniform Traffic Control Devices ("MUTCD").[3] JSF ¶ 94.  This replaced the older "birdcalls" from overhead speakers that were louder and used different calls for each crossing. JSF ¶ 94.

In 2012, the New York City Council passed a law requiring the City to install APS at 25 locations per year (Local Law 21 of 2012, New York City Admin. Code ("Admin. Code") § 19-188). The law also required that DOT issue annual reports on its APS program. This law went into effect on April 17, 2012. JSF ¶ 95.

---

[3] MUTCD contains standard, guidance, option and support statements relating to all traffic control devices, including pedestrian signals, installed on any public streets, highways, bikeways, or private roads open to public travel.  JSF ¶ 82.  DOT's APS installations adhere to the technical guidelines of the MUTCD, which is publically available on-line at https://mutcd.fhwa.dot.gov/, and the National Cooperative Highway Research Program's ("NCHRP's") Accessible Pedestrian Signals: A Guide to Best Practices, which can be downloaded at http://www.trb.org/Publications/Blurbs/164696.aspx.

In 2014, the New York City Council passed Local Law 60 of 2014 amending Section 19-188 of the Admin. Code.  The law required the City to install APS at 75 intersections annually. This law went into effect on January 1, 2016.[4] JSF ¶ 101.

In an effort to increase the pace of APS installations, DOT was able to appropriate funding to increase the projected number of intersections to be installed with APS to more than the amount required under Local Law 60 of 2014. In the recent Fiscal Year 2020 Adopted Budget, DOT received funding to install an additional 235 APS across fiscal years 2020 and 2021, plus 305 APS per year for three years starting in City fiscal year 2021. JSF ¶ 107.

In or about July 1, 2019, DOT instituted a policy of requiring the installation of APS when a new traffic signal was installed in tandem with the installation of that traffic signal.  JSF ¶ 132. *See also* Defendants' Responses to Plaintiffs' Second Set of Requests for Admissions at Response To Request For Admission No. 16, a copy of which is annexed to the Koplik Decl. as Exhibit E.  By inter-agency Memorandum dated October 21, 2019, DOT clarified this policy with other City agencies, including, the New York City Department of Design and Construction, the New York City Department of Environmental Protection, the New York City Department of Parks and Recreation, the New York City Department of Buildings, among others. Koplik Decl. ¶ 4(a) and Exhibit A; Declaration of Joshua Benson ("Benson Decl.") ¶¶ 7-8.

Most recently, on November 19, 2019, the Mayor signed a new safe streets legislation into law, which amended Title 19 of the Admin. Code to add a new section 19-199.1 ("Safe

---

[4] Admin. Code 19-188 contains other requirements regarding the installation of APS, and states, in relevant part: "The department shall establish an accessible pedestrian signals program. As part of this program, the department shall identify intersections where accessible pedestrian signals may be installed based on guidelines, including, but not limited to, those set forth in the most recent version of the manual on uniform traffic control devices. The department, after consultation with the mayor's office for people with disabilities and with advocates for and members of the visually impaired community, shall identify intersections which reflect the greatest crossing difficulty for persons with visual impairments."

Streets Legislation"). *See* Int. No. 1557-A annexed to Declaration of Pamela A. Koplik ("Koplik Decl.") as Exhibit B..  Pursuant to the new law, the City is required to issue and implement a five-year master plan containing various benchmarks.  As to APS, the master plans due by December 1, 2021 and due by December 1, 2026, must include the benchmark to "install accessible pedestrian signals at no fewer than 2,500 intersections, with installation of such signals at no fewer than 500 intersections during each year of such plan." Admin. Code 19-199.1(c)(2)(vi); Admin. Code 19-199.1(c)(3)(iii).

## ARGUMENT

I. **MEANINGFUL ACCESS DOES NOT MEAN INSTALLATION OF APS AT EVERY INTERSECTION WITH A PEDESTRIAN SIGNAL**

Plaintiffs misconstrue the "meaningful access" requirement to mean equal access. Plaintiffs' Mem at 13 ("deny ...equal benefit"). The ADA regulations applicable under Title II were discussed in *Pascuiti*, a matter in which the plaintiffs brought suit against the City, the New York City Department of Parks and Recreation and the New York Yankees, claiming that Yankee Stadium was not accessible to individuals with disabilities. *Pascuiti,* 87 F.Supp.2d at 222.  The court agreed with the City that the implementing regulations of Title II of the ADA provide that,

> the service, program, or activity must be readily accessible "when viewed in its entirety," **the Court must look at the accessibility of the Stadium as a whole, not at individual elements**. … The regulations make clear that § 35.150(a) does not "necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." 28 C.F.R. §35.150(a)(1). The regulations define "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104. **Thus, the City is not required to make each**

> **portion of the Stadium readily accessible; the issue is whether the Stadium, when viewed in its entirety, is readily accessible.** This is known as the "program access" requirement. *See* Preamble to Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services (the "Title II Preamble"), 28 CFR Pt. 35, App. A, at 492 (explaining program access requirement). ... (Emphasis added.)

*Pascuiti*, 87 F.Supp.2d at 223; *see also Blackwell v. City and County of San Francisco*, 506 Fed. Appx. 585, 586 (9th Cir. 2013) ("Public entities are not 'require[d] . . . to make each of its existing facilities accessible to and usable by individuals with disabilities[.]' 28 C.F.R. § 35.150(a)(1). Rather, public entities must operate existing facilities 'so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.' 28 C.F.R. § 35.150(a)"); *Greer v. Richardson Independent School Dist.*, 471 Fed. Appx. 336, 341 (5th Cir. 2012) ("When considering ADA compliance for such existing structures, the touchstone is not the facility's technical compliance with the ADAAG, but is instead 'program accessibility.'; *American Assoc. of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011) ("Existing facilities need not be altered if the public 'service, program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. Id. § 35.150(a)(1).'"); *Equal Rights Center v. District of Columbia*, 741 F.Supp.2d 273, 284 (D.D.C. 2010) (holding that "the ultimate question in evaluating a Title II claim is whether, taken as a whole, the State or local government's 'program' is readily accessible to individuals with disabilities.")

As in *Pascuiti*, the Court should look to the accessibility of the City as a whole, not to each individual intersection. The issue is whether the City when viewed in its entirety is accessible and not whether each individual intersection is equipped with APS. The City's steadily increasing commitment to installing APS in and around the City, including the recent

Safe Streets Legislation, which mandates benchmarks of APS installations at no fewer than 500 intersections during each year over five years (2500 APS installations in each five year period), is clearly a substantial commitment to providing meaningful access to blind and visually impaired pedestrians.

Moreover, requiring the City to install APS at every signalized intersection (which is approximately 13,200 intersections) may constitute an undue financial and administrative burden based upon current market conditions and DOT's current funding appropriations.   28 C.F.R. 35.150(a); Benson Decl. ¶¶ 17-18.   While DOT did not make a formal written statement pursuant to 28 C.F.R. 35.150(a)(3) concluding that financial and administrative burdens exist in providing APS at every signalized intersection, clearly the cost of implementing such a scheme poses extreme funding challenges. Benson Decl. ¶ 17. Were the City to be required to install APS at every signalized intersection with pedestrian control signals, the estimated cost, not taking into account the rise in material and labor cost over time, would be approximately $870,000,000 (13,000 intersections x $61,000 average cost to install APS plus 10% in-house design, contract oversight and maintenance).   Benson Decl. ¶ 18.   In a city with multiple competing financial demands anything more would be an obvious hardship.   Indeed, even putting cost aside, DOT has determined by consulting with current contractors that perform APS installations that increasing APS installation to approximately 300 intersections per year is the maximum capacity of the contractors at this point in time.[5] Benson Decl. ¶ 16. Furthermore, the City believes that the benchmarks under the Safe Streets Legislation, which would result in APS installation at

---

[5] It is not yet known how DOT will reconcile the benchmark contained in the Safe Street Legislation with its analysis of market capacity at this time.   DOT currently contracts with vendors to install APS in compliance with MUTCD and does not perform this work in-house.

10,000 additional signalized intersections in the City over 20 years would constitute "meaningful access" for blind and visually impaired pursuant to the ADA.

## II.   DOT HAS RECENTLY ADOPTED A POLICY REQUIRING THE INSTALLATION OF APS AT NEWLY SIGNALIZED INTERSECTIONS, IN CAPITAL PROJECTS AND IN STREET IMPROVEMENT PROJECTS

DOT's policy regarding the installation of APS at signalized intersections has been gradually evolving despite the existence of this lawsuit.  Indeed, as set forth above, the City has been steadily increasing its commitment to add additional APS to the streets of New York City. DOT has recently adopted a policy of requiring the installation of APS when a new traffic signal is installed in tandem with the installation of that traffic signal. Benson Decl. at ¶ 6.  By Memorandum dated October 21, 2019, DOT memorialized that policy to writing, clarifying for other city agencies their obligation to install APS at newly signalized intersections and whenever signal work involving the replacement of signal poles is carried out. Benson Decl. at ¶ 7; Koplik Decl. ¶ 4(a) and  Exhibit A.  In accordance with the APS Policy, going forward, all newly initiated capital projects and street improvement projects ("SIPs") involving existing signals at which signal poles are being relocated or replaced, will include APS. Benson Decl. at ¶ 14.  In accordance with the APS Policy, DOT retrofits existing signals every year based on prioritization ranking conducted by DOT following the general principles of the MUTCD and NCHRP APS prioritization tool.  This ranking process is not used for new signals or signal work requiring replacement of signal poles.  Benson Decl. at ¶ 15.

Plaintiffs' allegation, therefore, that the City's failure to install APS when it installs new signals, or renovates and replaces old signals violates the American with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504") and the New York City Human Rights Law ("NYCHRL") falls flat and is rendered moot.  Federal jurisdiction is limited to

"actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).

Federal courts do not have jurisdiction "to decide moot questions or abstract propositions,"

because "moot questions require no answer." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).

As such, Plaintiffs fail to establish that they are entitled to summary judgment as a matter

of law insofar as it relates to newly signalized intersections, capital projects and SIPs.

## III.   PLAINTIFFS' EXCEEDINGLY BROAD DEFINITION OF WHAT CONSTITUTES AN "ALTERATION" UNDER THE ADA IS UNSUPPORTED AND CONTRARY TO PREVAILING INTERPRETATION

Plaintiffs' mistakenly allege that any change to an existing pedestrian signal results in the

requirement to install APS at the intersection containing that signal, even signal timing changes

including, the implementation of exclusive pedestrian phases ("EPPs") and leading pedestrian

intervals ("LPIs"), or the swapping of a pedestrian signal head lens to install countdown clocks

or to add a symbol of a walking person and an upraised hand.  Plaintiffs allege that since such

changes "affect the usability of the facility involved," they trigger the need to install APS.

Plaintiffs' Memorandum of Law In Support of Plaintiffs' Motion for Summary Judgement

("Plaintiffs' Mem.") at 18-23.  This exceedingly broad interpretation is unsupported and contrary

to prevailing interpretation.

The C.F.R. does not provide specific guidance regarding what constitutes an alteration

under 28 C.F.R. § 35.151 to a service.  Indeed 28 C.F.R. § 35.151 speaks to alterations of

"facilities" (and not alterations to "services") and distinguishes "paths of travel" that contain a

"primary function" and those which do not. While, Defendants are <u>not</u> arguing that pedestrian

traffic signals and APS are not "facilities" pursuant to the ADA,[6] the precise parameters of what

---

[6] 28 C.F.R. 35.104 defines "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking

constitutes an alteration to the "facility" of a pedestrian traffic signal to trigger the need to install APS is far from clear.  Even borrowing from the definition of "facility" contained in 28 C.F.R. 35.104, which Defendants do not concede includes APS,[7] the term "facility" cannot possibly mean that it includes every single street intersection in New York City.  Also unclear is whether the street qualifies as a "path of travel," and therefore, whether an analysis needs to be made regarding whether the not the pedestrian traffic signal on the path of travel affects the usability of or access to an area of a facility that contains a "primary function" or not.  Defendants are not aware of these issues being addressed by the Courts.

The United States Access Board (the "Access Board"), an independent federal agency charged with developing advisory information for and technical assistance to public entities, has created the Proposed Rights-of-Way Guidelines ("PROWAG"), does seem to generally propose a requirement for APS installation where existing pedestrian crossing signals are located.  *See* PROWAG at R209.1.[8]  However, these proposed regulations, which were published in the Federal Register on July 26, 2011,[9] do not yet have the force of law, as they have not formally been adopted by the Department of Justice. It is not known when, or indeed *if*, the PROWAG will ever be adopted.  *See* Defendants' Responses and Objections to Plaintiffs' Rule 56.1 Statement of Undisputed Facts at ¶ 22. Thus, any proposed requirements in the PROWAG are

---

[7] lots, or other real or personal property, including the site where the building, property, structure or equipment is located." *See*, *also*, *Scharff v. County of Nassau*, 2014 U.S. Dist. LEXIS 74787 (E.D.N.Y. June 2, 2014.)

[7] While *Scharff* does hold that APS are "facilities" under the ADA, it is only one District Court decision.

[8] The PROWAG can be found on-line at https://www.access-board.gov/guidelines-and-standards/streets-sidewalks/public-rights-of-way/proposed-rights-of-way-guidelines.    (Last accessed on December 5, 2019).

[9] On February 13, 2013, the Access Board issued a notice to supplement the draft PROWAG to address shared use paths. *See* Defendants' Responses and Objections to Plaintiffs' Rule 56.1 Statement of Undisputed Facts at ¶ 22

not law and Plaintiffs cannot use PROWAG to establish their entitlement to judgment as a matter of law.

Despite the fact that this case turns heavily on the interpretation of what constitutes an "alteration" under the law, Plaintiffs' gloss over the definition of "alteration" pursuant to the unenacted PROWAG. "Plaintiffs' Mem." at p. 18.  The full general definition of "alteration" pursuant to the PROWAG is set forth at R105.5, and states:

> A change to a facility in the public right-of-way that affects or could affect pedestrian access, circulation, or use. **Alterations include, but are not limited to, resurfacing, rehabilitation, reconstruction, historic restoration, or changes or rearrangement of structural parts or elements of a facility** (emphasis supplied).

Moreover, as to APS, the PROWAG at R209.2 gives specific guidance as to what constitutes an alteration, stating:

> **R209.2 Alterations.** Existing pedestrian signals shall comply with R209.1 when the signal controller and software are altered, or the signal head is replaced.

While clearly the PROWAG does not limit the definition of "alteration," the examples given in the definition do not seemingly rise to signal timing changes or the swapping of a lens as Plaintiffs suggest.  Indeed, the Access Board gives further guidance in its "Technical Assistance Q & A to Alterations Projects" in which it determines that the addition of a countdown clock display to an existing installed system, for example, does <u>not</u> give rise to the need to install APS, as follows:

> Question: The pedestrian signals in a corridor are being replaced with new combined count-down signals. Must APS be included in the new system?
>
> Answer: Yes. The installation of a new system is an alteration that requires compliance with the new construction guidelines to the maximum extent feasible. **However, the addition of a new**

feature, such as a countdown face or larger display, to an existing installed system does not require that the scope of work be expanded to include other features.

Question: Count-down signal displays are being added to the existing pedestrian signal heads at an intersection, but the software and signal controller are not being altered. Must APS be installed?

Answer: **No, simply adding a display to the existing WALK/DON'T WALK signal would not involve the system changes needed to implement APS**.

*See* https://www.access-board.gov/guidelines-and-standards/streets-sidewalks/public-rights-of-way/background/revised-draft-guidelines/technical-assistance-q-a-for-alterations-projects (Emphasis supplied)(Last accessed on December 5, 2019). Were the City required to install APS wherever a countdown clock is installed – which as stated above is not even suggested by the Access Board – would mean requiring the installation of APS at approximately 57% of signalized intersections in New York City. Declaration of James Celentano ("Celentano Decl.")¶ 19. While the cost of this would not rise to the estimated $870,000,000 to install APS at all signalized intersections (Benson Decl. ¶ 18), 57% of that estimate would be an estimated cost of approximately $500,000,000.

Plaintiffs' mischaracterize both the legal impact of the PROWAG, and even the PROWAG's actual position regarding what type of alterations give rise to the recommendation to install APS. Notably, in New York City, when installing a countdown clock, there are no physical alterations or software changes made to the traffic signal other than the replacement of the lens within the pedestrian signal head. Celentano Decl.¶ 18. There is no excavation of the roadway or sidewalk, no installation of new conduit, cable, foundations, poles, signal heads, or other physical changes or work. Celentano Decl. ¶ 18. Plaintiffs' further mischaracterize the installation of countdown clocks and the installation of symbol of a walking person and upraised hand as "replacements" of pedestrian crossing symbols. *See* Plaintiffs' Mem. at Topic Heading,

- 17 -

Argument (B)(2).  Moreover, when the City replaced the pedestrian signal lens (or display) inside the pedestrian signal head that previously displayed "WALK" and "DON'T WALK" text with ones that display a symbol of a walking person and an upraised hand in accordance with the MUTCD, there were no physical alterations or software changes made to the traffic signal other than the replacement of the lens within the pedestrian signal head. Celentano Decl. ¶ 22. There is no excavation of the roadway or sidewalk, no installation of new conduit, cable, foundations, poles, signal heads, or other physical changes or work. Celentano Decl. ¶ 22. Since these type of changes do not involve the sort of structural work involved in the installation of APS, they should not be deemed "alterations" triggering the requirement to install APS at a signalized intersection.  Were the City to be required to install APS wherever the pedestrian signal lens inside the pedestrian signal head was replaced, would mean requiring the installation of APS at virtually all signalized intersections in New York City. (Celentano Decl. ¶ 20), at an estimated cost of $870,000,000. Benson Decl. ¶ 18.

Likewise, for the implementation of a Leading Pedestrian Interval ("LPI"), there are no physical alterations made to the traffic signal - only uploading the new phasing plan.  Celentano Decl. ¶ 9. Similarly, no physical alterations to the traffic signal are required to implement Exclusive Pedestrian Phases ("EPPs"), only uploading the new phasing plan to the ASTC. Celentano Decl. ¶ 14. Plaintiffs acknowledge that MUTCD 4E.09(3)(D) identifies LPIs and EPPs as characteristics meriting merely *"consideration"* of APS, but relegate that admission to a footnote. Plaintiffs' Mem. at fn. 6. Plaintiffs are simply wrong in their unsupported assertion that the implementation of LPIs and EPPs makes intersections "more dangerous" to blind or low vision pedestrians.  Plaintiffs' Mem. at 23.  Indeed, contrary to Plaintiffs' allegations, all pedestrians benefit from LPIs, even if they do not begin crossing during the LPI phase and even

when crossing at crosswalks that do not have an LPI phase (Benson Decl. ¶ 22) and an EPP can enhance safety for all pedestrians (Benson Decl. ¶ 26). Were the City to be required to install APS wherever an LPI is implemented would mean requiring the installation of APS at approximately 4,000 intersections in New York City (or at approximately 30% of signalized intersections) at a cost of approximately $260,000,000. Celentano Decl. at ¶ 10; (Benson Decl. ¶ 18).[10] .

Moreover, Plaintiffs' reliance on *Roberts v. Royal Atl. Corp*, 542 F.3d 370 (2d Cir. 2008) that even a relatively inexpensive or localized modification to an existing facility may be deemed an alteration (Plaintiffs' Mem. at 22), is misplaced. Plaintiffs' Mem. at 22. That case involved a Title III public accommodation, not a public services, programs, and activities, which are the subject of Title II. Title III prohibitions are more extensive and specific. *Equal Rights Center*, 741 F.Supp.2d at 284. As stated in *Equal Rights Center*, had Congress wished to subject State and local government programs to the identical exacting rules of accessibility imposed on private entities in Title III, it could have easily done so. It did not. *See Equal Rights Center*, 741 F.Supp.2d at 284, citing *Russello v. U.S.*, 464 U.S. 16, 23 (1983).

Indeed, further guidance concerning what types of alterations trigger the requirement to install APS at existing pedestrian signals can be found in a Traffic Safety & Mobility Instruction (TSMI 15-01) published by the New York State Department of Transportation ("NYS DOT"), a copy of which is annexed to the Koplik Decl. as Exhibit D. That Instruction interprets the NYS DOT's Highway Design Manual ("HDM"), which is publically available on-line at https://www.dot.ny.gov/divisions/engineering/design/dqab/hdm (Last accessed December 5,

---

[10] Were the City to be required to install APS wherever an EPP is implemented, would mean requiring the installation of APS at approximately 100 intersections in New York City. Celentano Decl. at ¶ 15.

- 19 -

2019), to require APS at any new traffic signal and to require APS upon "major modifications" of an existing traffic signal. *See* Exhibit D to Koplik Decl. at 6. For "minor modifications" to existing traffic signals, the Instruction suggests that an upgrade to APS "should be considered." While not binding on Defendants, the New York State interpretation of what type of alteration triggers the requirement to install APS at an existing traffic signal intersection is a reasonable one.

In sum, Plaintiffs' expansive reading of the definition of "alteration" is not supported and contrary to prevailing interpretation. Furthermore, Plaintiffs' argument that Congressional intent confirms an expansive definition of alteration (Plaintiffs' Mem. at p. 18) is without merit. The support for such a statement, comments contained in H.R. Rep. No. 101-485, pt. 3, 64 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 487, are comments concerning Title III under the ADA for public accommodations and not Title II requirements at issue herein.[11]

A reasonable interpretation of what constitutes an alteration to trigger the requirement to retrofit an existing pedestrian signal with APS is whether the alteration involves the excavation of the roadway or sidewalk, the installation of new conduit, cable, foundations, poles, signal heads, or other physical changes or work. Then, it is submitted by Defendants, retrofit of the pedestrian signal with APS at the time of the alteration is appropriate and Defendants have committed to doing such. Benson Decl. ¶¶ 7-8; Koplik Decl. ¶ 4(a) and Exhibit A. Signal work that does not involve these elements is not an alteration to the portions of signals which are involved in the installation of APS. Since APS cannot feasibly be installed within the scope of

---

[11] Plaintiffs' also erroneously cite to the Title III comments contained in H.R. Rep. No. 101-485 at pt. 3, 63 in arguing that the ADA requires the installation of APS with the implementation of EPPs and LPIs (Plaintiffs' Mem. at 23). Reliance on these comments to support alleged Congressional intent regarding Title II standards is without merit.

such work, the ADA does not require APS to be installed.  *See Kinney v. Yerusalim*, 9 F.3d 1067, 1074 (3d Cir. 1993).

Therefore, Plaintiffs have not established an entitlement to summary judgment as a matter of law.

## IV.   PLAINTIFFS' CLAIM UNDER THE NEW YORK CITY HUMAN RIGHTS LAW SIMILARLY FAILS

Plaintiffs' claim under the NYCHRL fails for the same reasons that its ADA and Rehabilitation Act claims fail. Plaintiffs erroneously rely on *Brooklyn Ctr. For Indep. Of Disabled v. Bloomberg*, 980 F. Supp.2d 588 (S.D.N.Y. 2013), to argue that since the NYCHRL definition of reasonable accommodation is significantly broader than federal law, Defendants are obligated to provide Plaintiffs with "equal access to pedestrian street crossings." Plaintiffs' Mem. at 25 and fn 7.  However, Plaintiffs' fail to advise the Court that in *Brooklyn Ctr. For Indep. Of Disabled* the Court did not find, and the parties did not identify, "any relevant difference between the analysis required by the NYCHRL and the analysis required by the federal laws of the question at issue" *Brooklyn Ctr. For Indep. Of Disabled,* 980 F. Supp.2d at 643. Likewise, Plaintiffs have not identified a reason to treat the NYCHRL claim differently here.

Moreover, Plaintiffs mistakenly argue that providing APS is a "reasonable accommodation" that the City is obligated to provide.  Plaintiffs' Mem. at 25.  But strikingly absent from their analysis is the definition of "reasonable accommodation" under the NYCHRL. The NYCHRL defines reasonable accommodation as "such accommodation that can be made that does not cause undue hardship in the conduct of the covered entity's business" and lists factors to be considered such as "the nature and the cost of the accommodation;" the "overall financial resources of the [facility and/or the covered entity]" Admin. Code 8-102. Requiring installation of APS at all signalized intersections not a *reasonable* accommodation precisely

- 21 -

because of the financial and administrative burdens -- and undue hardship – that is involved.

Benson Decl. ¶¶ 17-18.

## <u>CONCLUSION</u>

**FOR THE FOREGOING REASONS, PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW**

Dated:  New York, New York
    December 5, 2019

        Respectfully submitted,

        JAMES E. JOHNSON
        Corporation Counsel
         of the City of New York
        Attorney for Defendants
        100 Church Street
        New York, New York 10007
        (212) 356-2187

By:       

        Pamela A. Koplik
        Glenne Fucci
        Assistant Corporation Counsel