UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN COUNCIL OF THE BLIND OF
NEW YORK, INC., MICHAEL GOLFO, and
CHRISTINA CURRY, *on behalf of themselves
and all others similarly situated*,

                                                Plaintiffs,

                v.

CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF TRANSPORTATION,
BILL DE BLASIO, *in his official capacity as
Mayor of the City of New York*, and POLLY
TROTTENBERG, *in her official capacity as
Commissioner of the New York City Department
of Transportation*,

                                             Defendants.

18 Civ. 5792 (PAE)

OPINION &
ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case involves a challenge under the Americans with Disabilities Act of 1990

("ADA") and related statutes to the accessibility of New York City's signalized crosswalks

to blind and low-vision pedestrians.

On behalf of a certified class of blind and low-vision New York City pedestrians,

plaintiffs—the American Council of the Blind of New York, Inc. ("ACBNY"), Michael Golfo,

and Christina Curry—have sued the City of New York, the New York City Department of

Transportation ("DOT"), Mayor Bill de Blasio, and DOT Commissioner Polly Trottenberg

(collectively, the "City" or "defendants"). Plaintiffs allege that the City has long failed to

provide non-visual crossing information at the vast majority of its signalized intersections, *i.e.*,

those which provide visual crossing information to sighted pedestrians. Plaintiffs allege that the

City's failure to accommodate blind and low-vision pedestrians violates Title II of the ADA,

42 U.S.C. § 12132; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)

("Rehabilitation Act"); and the New York City Human Rights Law, N.Y.C. Admin. Code

§ 8-107(4)(a) ("NYCHRL").

With discovery complete, plaintiffs now move for summary judgment on all claims, but solely as to liability, without yet seeking a judicial remedy. Plaintiffs principally argue that (1) the absence of non-visual crossing information at the vast majority of the City's signalized intersections denies blind and low-vision pedestrians meaningful access to those intersections and the pedestrian grid, in violation of the ADA, the Rehabilitation Act, and the NYCHRL; and (2) the City's failure to add non-visual crossing information on occasions when it has done construction at, or upgraded aspects of, the same intersections is also unlawful.

For the following reasons, the Court grants plaintiffs' summary judgment motion in principal part. Most significantly, the Court finds, on the undisputed facts, that the near-total absence at the City's signalized intersections of crossing information accessible to blind and low-vision pedestrians denies such persons meaningful access to these intersections, in violation of all three statutes cited above. The Court also grants plaintiffs' motion as to liability on their claim that the City's failure to add non-visual street-crossing information at particular intersections at which it installed new traffic signals after June 27, 2015, violates the ADA and Rehabilitation Act. The Court otherwise denies plaintiffs' motion for summary judgment. The case will now proceed promptly forward on two tracks: (1) to determine the remedy for the violations that have been established; and (2) to resolve plaintiffs' open claims.

# I.    Background

## A.    Factual Background[1]

According to the U.S. Census Bureau's 2017 American Community Survey 1-Year Estimates, among New York City's non-institutionalized population, 205,212 persons are blind or have other vision difficulties.  Atkinson Decl., Ex. 1 ("Census Community Survey") at 2. That amounts to approximately 2.4% of the City's population.  *See id.*

### 1.    The Parties

Plaintiff ACBNY is a New York non-profit corporation.  JSF ¶ 1.  Its purpose is to "support and promote the educational, vocational and social advancement of people with vision disabilities."  *Id.*  Its members include individuals with vision disabilities within the meaning of the ADA, Rehabilitation Act, and NYCHRL, including approximately 45 members in its Greater New York Chapter, which includes New York City.  *Id.* ¶¶ 2, 20.

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on the motion for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 91 ("JSF"); plaintiffs' Local Rule 56.1 statement, Dkt. 93 ("Pl. 56.1"); defendants' Local Rule 56.1 counter-statement, Dkt. 105 ("Def. 56.1"); the declaration of Lori Scharff, Dkt. 95 ("Scharff Decl."); the declaration of Christina Curry, Dkt. 96 ("Curry Decl."); the declaration of Michael Golfo, Dkt. 97 ("Golfo Decl."); the declaration of Torie Atkinson, Esq., Dkt. 98 ("Atkinson Decl."), and supporting exhibits; the corrected declaration of Joshua Benson, Dkt. 107 ("Benson Decl."), and supporting exhibits; the corrected declaration of James Celentano, Dkt. 108 ("Celentano Decl."), and supporting exhibits; and the declaration of Pamela A. Koplik, Esq., Dkt. 102 ("Koplik Decl."), and supporting exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Plaintiff Christina Curry is deaf, legally blind, and uses a forearm crutch as a mobility aid. *Id.* ¶ 3. As a result, she cannot see traffic in intersections unless it is "very close," and cannot rely on visual street signals to cross the street. *Id.* ¶ 31. Because of her visual and auditory disabilities, she requires "tactile information" to use pedestrian signals. *Id.* She lives in the Bronx and regularly walks on New York City sidewalks to commute and as a part of her job as Executive Director of the Harlem Independent Living Center. *Id.* ¶¶ 32–34, 36. She avers that during her frequent pedestrian travel throughout New York City, she risks being hit by vehicles, fears for her life, is often grabbed by well-meaning pedestrians, and uses circuitous, sometimes costly, alternatives to walking to avoid such incidents—all because she cannot use the visual traffic signals that are available to sighted pedestrians. *See id.* ¶ 60; Curry Decl. ¶¶ 9–13.

Plaintiff Michael Golfo is a blind resident of Tarrytown, New York, who previously commuted to Manhattan daily for work and now walks on New York City sidewalks about once per week to visit his doctors and friends. JSF ¶¶ 63–64. As a result of his disability, he relies on his hearing and guide dog to navigate the New York City streets. *Id.* ¶ 65. Even with these aids, Golfo finds it difficult to traverse the City; he has almost been hit by cars on many occasions while crossing the street. *Id.* ¶ 74. Like Curry, Golfo often must rely on sighted persons to help him make such crossings. *Id.* ¶¶ 75–76. He also often relies on expensive taxis or car services to navigate the City, or takes elongated routes to avoid difficult intersections. *Id.* ¶¶ 79–80.

Defendants the City of New York and the DOT are responsible for and have broad authority over the City's streets, and oversee the installation, repair, and maintenance of its traffic signals, sidewalks, crosswalks, and roadways. *Id.* ¶ 6. Each receives federal funds, including from the Federal Highway Administration ("FHWA"). *Id.* ¶ 5.

Defendant Bill de Blasio, sued in his official capacity, is Mayor of the City of New York. *Id.* ¶ 7. Defendant Polly Trottenberg, also sued in her official capacity, is Commissioner of the DOT. *Id.* ¶ 8.

### 2.      New York City's Pedestrian Landscape

New York City has the highest population density of any major American city. *Id.* ¶ 9. Walking "is a major form of transportation in the city, and access to sidewalks is an important component of city life." *Id.*

To allow pedestrians safely to navigate its sidewalks and traffic intersections, the City has installed roughly 120,000 pedestrian control signals—*i.e.*, devices informing pedestrians when to cross the street and when to wait—at about 13,200 of its 45,000 intersections. *Id.* ¶¶ 11, 13. Of those 13,200 signalized intersections, all but 443 (roughly 96.6%) communicate crossing information exclusively in a visual format, *id.* ¶ 19, with an image of a mid-stride white stick figure indicating "walk," and an upraised orange hand indicating "don't walk," *id.* ¶ 108. These visual signals are inaccessible to the blind. *Id.* ¶ 138.

### 3.      Difficulties Facing Blind Pedestrians

As the parties agree, any pedestrian attempting to cross a street must perform four tasks: (1) locate the edge of the street and crossing point; (2) align to cross the street; (3) decide when to begin crossing; and (4) maintain alignment (*i.e.*, the correct direction) while crossing the street. Pl. 56.1 ¶ 6. Those with a visual disability, however, have difficulty accomplishing each of these tasks. *Id.* ¶¶ 8–15.

Typically, a blind person traversing New York City sidewalks will stop when he or she encounters a curb or other detectable warning surface, and will assume that a crossing point is located there. *Id.* ¶ 8. However, without assistance, blind pedestrians begin crossing from outside the crosswalk (*i.e.*, in a traffic lane) nearly 30% of the time. *Id.* ¶ 9. And once blind

5

pedestrians locate a crossing point, they cannot receive the visual "walk" or "don't walk" information communicated to sighted individuals by the standard pedestrian control signals described above. JSF ¶ 138. Instead, they generally must rely on other cues, such as fellow pedestrians' movements or the sound of traffic parallel to the crosswalk, to ascertain when it is safe to walk. Pl. 56.1 ¶¶ 13–14. But picking the correct audible cues out of many traffic lanes can be difficult. *Id.* ¶¶ 11–12. That difficulty is often compounded, especially in the City, by idiosyncratic crosswalk architecture and quiet traffic such as hybrid cars and bicycles. *Id.* As a result, the assumption that a pedestrian has the "walk" signal when parallel traffic is moving is unreliable, leading blind pedestrians to attempt to cross the street against moving traffic up to half the time. *Id.* ¶ 14. Likewise, when following sighted pedestrians, a blind person might not realize that those pedestrians were in fact jaywalking until they hear onrushing traffic. *See* JSF ¶¶ 56, 76.

As a result, absent any accommodations, pedestrians with visual disabilities often encounter danger, inconvenience, and humiliation while attempting to use the City's crosswalks. Unable to reliably locate crosswalks or time their crossing, they risk being hit by cars, JSF ¶¶ 25, 58, 73–74, and becoming stranded in the middle of intersections, *id.* ¶ 73, and may be unwillingly grabbed by strangers hoping to assist them, *id.* ¶¶ 26, 59, 77; *see also* Scharff Decl. ¶ 18 ("I feel that I and every other blind and deafblind pedestrian are taking our lives into our hands every time we walk out into the community."). They are often forced to take longer, less convenient routes than they otherwise would to avoid troublesome intersections, JSF ¶¶ 27–28, 57, may wait up to 20 minutes at a single intersection to make sure they are crossing with other pedestrians, *id.* ¶¶ 24, 55, 75, and may forgo walking altogether in favor of more expensive, but safer, transit methods, such as taxis or car services, *id.* ¶¶ 27, 60, 79; Golfo Decl. ¶¶ 2, 9 ("These

experiences are inconvenient, frustrating, often humiliating, and deny me my dignity and independence.").  Alternatively, rather than undertaking such fraught excursions, they may simply decline to participate in activities or visit portions of the City at all.  *See* Golfo Decl. ¶ 8.

### 4.    Accessible Pedestrian Signals

Accessible Pedestrian Signals ("APS") are devices that communicate "walk" and "don't walk" signals to pedestrians in a non-visual format, through audible tones, speech messages, and/or vibrating surfaces.  JSF ¶ 14.  According to plaintiffs' expert, Janet M. Barlow, APS greatly increase blind pedestrians' ability to safely cross intersections.  Pl. 56.1 ¶¶ 14, 17.

Where installed in New York City, APS function as follows.  At an intersection with APS, devices on each street corner emit a soft "locator tone" every second, which allows blind and low-vision pedestrians to locate them when they approach the intersection.  JSF ¶ 16.  Each device also has a pushbutton with a raised arrow pointing at the crossing with which it is associated.  *Id.* ¶ 15.  Because each APS device points to a specific crosswalk from each side of the street, a standard four-cornered intersection equipped with APS typically requires two devices per curb, and eight per intersection.  *See id.*

When an APS button is pressed, the device responds with an audible speech message.  *Id.* ¶ 17.  If the visual "walk" signal is not on for the crosswalk associated with that APS device, the device audibly says "wait."  *Id.*  If, on the other hand, pedestrians do have a "walk" signal for the relevant crosswalk, then the APS device either says "walk sign is on" or emits a rapid ticking sound.  *Id.* ¶ 18.  The pushbutton itself also vibrates, to alert pedestrians who are both deaf and blind that it is safe to walk.  *Id.*  APS thus inform blind individuals, solely through audio and tactile cues, both where and when to cross the street safely.

### 5.     New York City's APS Program

The City installed its first APS device in 1957, but as of 2003 had only added about a dozen throughout the City.  JSF ¶¶ 87–88.  Around 2004, the DOT established an informal APS Program, pursuant to which it installed APS upon request, but only near organizations or programs that served large numbers of blind and low-vision persons.  *Id.* ¶¶ 90, 93, 111.

Each year between 2004 and 2011, the DOT received more requests for APS than it installed.  *Id.* ¶ 109.  It chose among these requests without any formal ranking system.  *Id.*

Beginning in 2011, however, the DOT developed a Prioritization Tool for ranking these requests.  *Id.* ¶ 113.  The Prioritization Tool is a "worksheet completed by traffic engineers," which evaluates the characteristics of an intersection, including its "geometry, crossing width, the presence of bike lanes or signal timing changes, traffic volume, and proximity to high-pedestrian areas," and determines that intersection's priority for the installation of APS.  *Id.*[2] Each characteristic is assigned a numeric score, with features that make a crosswalk more challenging for blind pedestrians producing a higher score.  *Id.* ¶ 117.  Cost is not a factor in this ranking process.  *Id.* ¶ 125.  Once the DOT evaluates an intersection, it generally enters its ranking into the City's database with other ranked locations, to determine how it compares with other intersections.  *Id.* ¶ 118.  Because newly ranked intersections may be ranked as higher priorities than ones already on the list, a ranked intersection may remain on the ranking list for years.  *Id.* ¶¶ 127–128.  The DOT does not appear to maintain a policy for deciding which intersections to rank at any given time, but today it evaluates and ranks at least all intersections for which it receives a new APS request.  Pl. 56.1 ¶ 65; JSF ¶ 121.  As of June 2019, the DOT had ranked approximately 1,600 intersections using the Prioritization Tool.  JSF ¶ 129.

---

[2] The Prioritization Tool was adapted from a similar tool developed by the National Cooperative Highway Research Program, overseen by the National Academy of Sciences.  JSF ¶ 114.

In 2012, the New York City Council passed a law requiring the City to install APS at 25 locations per year. *Id.* ¶ 95.  Between 2012 and 2015, the DOT installed APS at slightly more than 25 locations each year, bringing the total number of intersections with APS to 131 by November 1, 2015. *Id.* ¶¶ 97–100.

In 2014, the New York City Council passed a new law requiring the City to install APS at 75 intersections annually, effective January 1, 2016. *Id.* ¶ 101.  Between 2016 and 2018, the DOT installed APS at slightly more than 75 intersections each year, raising the total number of the City's intersections with APS to 371 by 2019. *Id.* ¶¶ 102–104.

Since 2019, the DOT has received appropriations to install more APS than are required under City law, with funding to install APS at 150 intersections per year in 2019–2020, 235 per year in 2020–2021, and 305 per year in 2021–2024. *Id.* ¶¶ 106–107.  As of September 10, 2019, 443 intersections within New York City were equipped with APS. *Id.* ¶ 108.

Further, in November 2019, after plaintiffs had moved for summary judgment in this lawsuit, the New York City Council passed, and the Mayor signed, a law—the "Safe Streets Legislation"—mandating "master plans" for city streets, sidewalks, and pedestrian spaces. *See* N.Y.C. Admin. Code § 19-199.1; Koplik Decl., Ex. B.  That law requires the DOT to issue a five-year master plan every five years, beginning December 1, 2021, and by December 1 of every fifth year thereafter.  N.Y.C. Admin. Code § 19-199.1(b)(2), (c).  It further sets certain benchmarks that each master plan must include. *Id.* § 19-199.1(c)(2).  For both the 2021 and 2026 master plans, the law requires the DOT to set, as a benchmark, the installation of APS at no fewer than 2,500 intersections within the next five years, with installation of such signals at no fewer than 500 intersections during each year of the plan. *Id.* § 19-199.1(c)(2)(vi), (3)(iii).  Thus, in sum, the 2019 Safe Streets Legislation requires the installation of APS at 5,000

intersections by 2031.  The legislation does not, however, appear to allocate funding or resources to meet these goals.  *See* Def. Mem. at 12 n.5.

On October 21, 2019—the day plaintiffs moved for partial summary judgment—the DOT also issued a memorandum entitled "Accessible Pedestrian Signals Policy."  Koplik Decl., Ex. A ("2019 APS Memo").  That memorandum purports to "clarify" the City's existing policy regarding the installation of APS.  *Id.* at 1.  First, it states that "[e]ach newly approved signal will be designed and constructed with APS."  *Id.*[3]  Second, it provides that APS will be installed whenever either a Capital Street Project or Street Improvement Project ("SIP")[4] involves the relocation or reconstruction of any traffic signal pole foundation.  *Id.* at 2.

### 6.    Installing APS

Even at intersections that already have pedestrian control signals, the process of installing APS is more burdensome than merely affixing a pushbutton unit to the signal.  Because most intersections do not have extant signals at all the locations necessary to effectively install APS, "[t]he vast majority of locations require at least one or two new poles per corner."  Celentano Decl. ¶ 6(f).  Installing such poles requires the excavation of part of the sidewalk, cutting into the roadway to install conduits and signal cables, and the installation of new foundation poles, as well as restoration of the roadway, sidewalk, and roadway markings.  *Id.* ¶ 6(e)–(k).  As a result, according to the DOT's 30(b)(6) witness, the average cost per intersection to install APS

---

[3] As discussed below, that policy reverses the City's historic practice, which was generally not to do so.  Between 1990 and 2014, no new traffic-signal installations included APS.  JSF ¶ 133. Beginning in 2014, the DOT began *ranking* new traffic signals for the addition of APS, but continued to install new signals at a faster rate than it was adding APS.  *Compare id.* ¶ 135 (between 100 and 120 new traffic signals each year), *with id.* ¶¶ 95–104 (between 26 and 83 new intersections equipped with APS each year since 2014).

[4] These terms are defined and discussed more fully below.

averaged approximately $60,930 in 2018.  Benson Decl. ¶ 17.  For the 85 intersections that were

equipped with APS in 2018, the total cost was $5.18 million.  *Id.*

### 7.     Upgrades to Pedestrian Signals Other than APS

Over the years, the City has improved and modified various aspects of its streets, pedestrian

signals, and crosswalks, while not simultaneously installing APS.  As discussed more fully

below, plaintiffs allege that making such improvements without also including APS violates the

ADA and Rehabilitation Act.  The Court briefly describes each type of modification.

#### a.     New Signal Installations

In a typical year, the City installs between 100 and 120 traffic signals.  JSF ¶ 135.

Between 1990 and 2014, none of these installations included APS.  *Id.* ¶ 133.  Between 2014

and 2019, the City ranked new traffic signals using the Prioritization Tool, but did not

consistently include APS with newly constructed signals.  *Id.* ¶ 132.  As of July 2019, DOT

purports to have adopted a policy requiring the installation of APS whenever a new traffic signal

is installed.  *See* 2019 APS Memo at 1.

#### b.     Capital Street Projects and SIPs

Capital Street Projects, or "Capital Projects," are major reconstruction projects, which

can range from repaving to full reconstruction of a roadbed, sidewalks, and utilities, among other

eclectic projects.  JSF ¶ 178.  They are planned, funded, and initiated by the DOT, but actually

constructed by the Department of Design and Construction ("DDC") on the DOT's behalf.  *Id.* ¶ 179.

A SIP is generally of a similar scale—and can include redesigning or reconfiguring

intersection geometry, adding or removing lanes of traffic, adding or removing traffic and

pedestrian control signals, and adding or removing bike lanes or crosswalks.  *Id.* ¶ 171.  They

may also include "some level of signal work."  *Id.* ¶ 174.  SIPs are carried out within the DOT,

without the involvement of the DDC, *id.* ¶ 171, and, unlike Capital Projects, do not involve the

full reconstruction of a roadbed or the utility lines underneath, *see* Benson Decl. ¶ 13. Even though "a good majority" of all SIPs involve "some level of signal work," Atkinson Decl., Ex. 3 ("Celentano Tr.") at 48, only 14 of the 778 SIPs completed between 2009 and 2019 included the installation of APS at the intersection(s) affected, JSF ¶ 173.

In the 2019 APS Memo, the DOT purports to have clarified its policy that it will install APS whenever a Capital Project or SIP involves the relocation or reconstruction of any traffic signal pole foundation. *See* 2019 APS Memo at 2.

### c.    *Signal Lens Replacements*

Before 2000, New York City's pedestrian crossing signals displayed textual messages reading "walk" and "don't walk" to indicate whether pedestrians should or should not cross the street. JSF ¶ 137. Between 2000 and 2004, the DOT replaced the displays in every pedestrian signal in the City to instead show a mid-stride white stick figure, signaling "walk," and an upraised orange hand, signaling "don't walk." *Id.* ¶¶ 137, 139. According to the DOT's 30(b)(6) witness, the City undertook that project to improve the "clarity of communication" to pedestrians, especially for those who do not speak English, but did not also install APS at the same time. Pl. 56.1 ¶ 70; Atkinson Decl., Ex. 2 ("Benson Tr.") at 63. The DOT has conceded that the clarity provided by such a display "is not available to pedestrians who cannot see the display." Def. 56.1 ¶ 71; Benson Tr. at 64. Unlike APS installation, the replacement of a signal lens requires only the removal of one lens and the attachment of a new one. It does not involve any construction with regard to the sidewalk, roadway, or any electrical cables or conduits. Celentano Decl. ¶¶ 21–22.

Similarly, between 2012 and 2014, the DOT replaced over half of the City's pedestrian signal displays to include a "countdown clock" indicating how much time a pedestrian has to finish crossing the street. JSF ¶ 141. As with the signal lenses discussed above, the City did not

concurrently add APS.  *Id.* ¶ 142.  The benefit of a flashing visual countdown clock is not available to blind pedestrians.  *Id.* ¶ 143.  The installation of countdown clocks also involves only removing one lens from the crossing signal and attaching a new one.  It does not involve any other physical alterations to the traffic signal or excavation of any roadway or sidewalk. Celentano Decl. ¶¶ 17–18.

> d.   *Leading Pedestrian Intervals and Exclusive Pedestrian Phases*

The City has also implemented two forms of timing changes at certain intersections, which give pedestrians additional time to cross the street without any vehicles entering the intersection.

First, a Leading Pedestrian Interval ("LPI") is a "signal timing treatment" that gives pedestrians an advanced "walk" sign for about seven to 10 seconds before the parallel vehicular traffic signal turns green.  JSF ¶ 145.  This allows pedestrians to enter a crosswalk before turning vehicles have an opportunity to do so.  It thereby "makes pedestrians more visible to drivers and discourages motorists from aggressively turning before pedestrians begin crossing."  Benson Decl. ¶ 22.  The DOT's 30(b)(6) witness avers that the safety benefits of LPIs inure to sighted and blind pedestrians alike because an LPI is a "training tool" that reminds motorists to "exercise greater caution when driving around pedestrians."  *Id.*  However, he also testified at his deposition that LPIs "can make an intersection more challenging for a blind or low vision pedestrian[]" because, during an LPI, "the lack of sound of parallel traffic movement is, you know, mysterious and confusing to someone who is not able to see."  JSF ¶ 147; *see also id.* ¶ 149 (DOT received complaints that LPIs are "unsafe for the visually impaired").  By August 2019, the City had implemented LPIs at 3,951 intersections, only 113 of which also have APS.  *Id.* ¶¶ 158–159.  The presence of an LPI increases an intersection's ranking—*i.e.*, its priority for being upgraded with APS—under the DOT's Prioritization Tool.  *Id.* ¶ 162.

Second, an Exclusive Pedestrian Phase ("EPP"), or "Barnes Dance," is a timing treatment in which pedestrians at all corners of an intersection have an exclusive interval during which to cross using any of the crosswalks within an intersection. *Id.* ¶ 163. In other words, all vehicular traffic has a red light, and all pedestrians at the intersection have a "walk" sign. Similar to LPIs, EPPs can cause confusion and disorientation to blind and low-vision pedestrians who, without APS, generally rely on the sound of parallel traffic to determine when it is safe to cross. *Id.* ¶ 164 (Benson: "My understanding of it is that a lot of people with vision impairments have either learned on their own or received training to use the sound of traffic movements to help navigate. So in the absence of those sounds, it becomes disorienting."). As of June 2019, 98 intersections in New York City have EPPs, none of which also are equipped with APS. *Id.* ¶¶ 168–169. As with LPIs, the presence of an EPP increases an intersection's ranking under the DOT's Prioritization Tool. *Id.* ¶ 170.

"No physical alterations" are performed when implementing an LPI or EPP at a given intersection. Celentano Decl. ¶¶ 9, 14. Rather, each requires only that a new "phasing document" be uploaded to the intersection's traffic controller via a flash drive with the new timing information. *Id.* ¶¶ 8, 13.

### 8.    Regulatory Guidance on the Installation of APS

The U.S. Department of Justice ("DOJ") is responsible for promulgating regulations under the ADA. *See* 42 U.S.C. § 12134(a). However, Congress has also tasked a separate federal agency, the Architectural and Transportation Barriers Compliance Board ("Access Board") with issuing "minimum guidelines" under the ADA, *id.* § 12204(a), with which the DOJ's regulations "shall be consistent," *id.* § 12134(c). These guidelines "do not have any binding effect on their own, but instead help shape the Attorney General's regulations, which

must be 'consistent' with the Board's guidelines." *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 389, 390 (D.D.C. 1996).

In 1999, the Access Board began the rulemaking process for guidelines related to pedestrian facilities in "public rights-of-way," and in 2002 and 2005 released proposed drafts of such guidelines. *See* Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way, 76 Fed. Reg. 44664, 44667 (July 26, 2011) (notice of proposed rulemaking summarizing past draft guidelines and regulatory history).

On July 26, 2011, the Access Board published in the Federal Register a notice of proposed rulemaking, proposing its Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way, or "PROWAG." *Id.*[5]  However, the Access Board has not formally promulgated a final rule adopting the PROWAG.  And the DOJ has never taken action conforming its regulations to the PROWAG's recommendation. *See, e.g.*, *Sarfaty v. City of Los Angeles*, No. 17 Civ. 3594 (SVW), 2020 WL 1078804, at *5 (C.D. Cal. Feb. 7, 2020) ("The Court declines to consider the PROWAG standards in its analysis, because (as noted by the City), they have not yet been adopted by the DOJ, the agency responsible for implementing ADA regulations."); *Scharff v. County. of Nassau*, No. 10 Civ. 4208 (DRH), 2014 WL 2454639, at *12 (E.D.N.Y. June 2, 2014) (noting that Access Board has "proposed, but not yet promulgated, standards for public rights-of-way").

The PROWAG contains some guidance on the installation of APS.  Relevant here, it states at R209.1 that "[w]here pedestrian signals are provided at pedestrian street crossings, they shall include accessible pedestrian signals and pedestrian pushbuttons."  76 Fed. Reg. at 44690.

---

[5] Although the Access Board's guidelines do not use this language, the acronym PROWAG stands for "Proposed Right-of-Way Access Guidelines," and reflects common usage. *See, e.g.*, Def. 56.1 ¶¶ 22–23.

That specification appears to relate only to newly installed pedestrian signals, because R209.2 further states that "[e]xisting pedestrian signals shall comply with R209.1 when the signal controller and software are altered, or the signal head is replaced." *Id.*

### B.    Procedural History

On June 27, 2018, plaintiffs filed their Complaint commencing this action. Dkt. 1 ("Compl."). On September 12, 2018, the City answered. Dkt. 21 ("Answer").

On July 12, 2019, after the close of fact discovery, plaintiffs filed a motion for class certification. *See* Dkts. 65-1, 71. On July 22, 2019, upon the stipulation of the parties, the Court certified a class comprising "all blind or low vision New York City pedestrians with disabilities as defined by the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law, and who use signalized pedestrian street intersections in New York City." Dkt. 81 at 2. Also on July 22, 2019, the Court held a pre-motion conference at which the parties discussed plaintiffs' contemplated motion for partial summary judgment, limited to issues of liability.

On September 20, 2019, the parties filed a joint stipulation of undisputed facts. *See* JSF. On October 21, 2019, plaintiffs filed a motion for partial summary judgment, Dkt. 92; a Local Rule 56.1 Statement, *see* Pl. 56.1; a memorandum of law in support of their motion, Dkt. 94 ("Pl. Mem."); and the declarations of Lori Scharff, Christina Curry, Michael Golfo, and Torie Atkinson, Esq. in support, *see* Dkts. 95–98. On November 18, 2019, the City sought leave to file a cross-motion for summary judgment, which the Court denied as out of time and inconsistent with the briefing schedule set at the July 22, 2019 pre-motion conference, at which the City had not indicated an interest in so moving. *See* Dkts. 100–01. On December 5, 2019, the City opposed plaintiffs' motion for partial summary judgment, *see* Dkt. 106 ("Def. Mem."), and submitted a counter-statement to plaintiffs' Local Rule 56.1 Statement, *see* Def. 56.1, and the

declarations of Pamela A. Koplik, Esq., James Celentano, and Joshua Benson, *see* Dkts. 102–04,

the latter two of which were corrected several days later, *see* Dkts. 107–08.  On December 18, 2019,

plaintiffs filed a reply in further support of their motion.  *See* Dkt. 111 ("Pl. Reply").

On January 16, 2020, plaintiffs notified the Court of an error in their memorandum of law

in support of their motion, and of additional case authority they believed relevant.  Dkt. 112.

The next day, the City responded, arguing that the authority cited was irrelevant.  Dkt. 113.  On

May 29, 2020, plaintiffs again wrote to alert the Court to additional case authority.  Dkt. 117.

On June 3, 2020, defendants responded, arguing that the authority cited was irrelevant.  Dkt. 118.

On October 2, 2020, the Court held argument.  Following argument, the Court requested,

and the parties submitted, limited supplemental briefing on the issue of whether any applicable

limitations period barred plaintiffs' claims based on new construction or alterations the City had

made at certain intersections, and whether the City had waived the right to defend against such

claims on the basis of the applicable statutes of limitations.  Dkts. 122–23, 125.

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The

movant bears the burden of demonstrating the absence of a question of material fact.  In making

this determination, the Court must view all facts "in the light most favorable" to the non-moving

party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). But if the material facts are not in dispute and establish that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005).

## III.    Discussion

Plaintiffs make three distinct arguments in support of their bid for entry of summary judgment in their favor as to liability. First, they argue, the paucity of APS in New York City denies those with vision impairments "meaningful access" to the City's crosswalks and sidewalks, in violation of the ADA and Rehabilitation Act. Second, they argue, the City has violated the ADA and Rehabilitation Act each time it has upgraded crosswalks or pedestrian crossing signals, or installed new traffic signals, without also installing APS. The actions that it contends triggered a duty to add APS include the installation of new crossing signals, changes to the displays on existing crossing signals, and the alteration of the timing of crossing phases. Third, they argue, independent of the outcome under federal law, summary judgment is appropriate under the NYCHRL.

18

For the following reasons, the Court holds that the absence of non-visual crossing information at more than 95% of the City's signalized intersections denies plaintiffs meaningful access to the City's signalized intersections and the pedestrian grid, in violation of the ADA and Rehabilitation Act.  The Court further holds that some, but not all, of the City's projects with respect to traffic signals gave rise to a duty under these statutes to add APS—a duty that the City has largely breached.  Finally, for substantially the same reasons, the Court holds that the City's sparse implementation of APS has excluded plaintiffs from places of public accommodation, in violation of the NYCHRL.

## A.    Meaningful Access to Services, Programs, or Activities Under the ADA and Rehabilitation Act

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  "As the 'standards adopted by the two statutes are nearly identical, [courts] consider the merits of these claims together.'"  *Disabled in Action v. Bd. of Elections in N.Y.*, 752 F.3d 189, 196 (2d Cir. 2014) (quoting *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)).

To establish a violation of these provisions, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the defendant is "subject to one of the Acts"; and (3) the plaintiff was "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of" her

disability. *Id.* at 196–97 (quoting *McElwee*, 700 F.3d at 640); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) (for purposes of Rehabilitation Act, to establish that a defendant is subject to the Act, plaintiffs must establish that the defendant is a recipient of federal funds). A public entity, such as New York City, violates these provisions when it fails to provide "meaningful access" to the benefits of its services, programs, or activities. *Disabled in Action*, 752 F.3d at 197; *see McElwee*, 700 F.3d at 641; *Henrietta D.*, 331 F.3d at 273.

Here, the parties agree that the individual plaintiffs are "qualified individuals" and that the City, as a public entity and recipient of federal funds, is subject to both the ADA and Rehabilitation Act. *See* JSF ¶¶ 3–6. Accordingly, the dispute as to this claim turns on whether the City's provision of crossing information exclusively in a visual format at more than 95% of the City's signalized intersections denies plaintiffs, who are blind and otherwise visually impaired pedestrians, meaningful access to the benefits of a service, program, or activity of the City. *Disabled in Action*, 752 F.3d at 197. For the following reasons, it does. And while ADA regulations provide the City with potential defenses as to these violations, the City has not met— or even attempted to meet—its burden of showing that the installation of additional APS would constitute an undue financial or administrative burden or fundamentally alter the nature of any City service, program, or activity. Accordingly, the Court grants plaintiffs summary judgment as to liability on this claim.

### 1. The Installation and Maintenance of the City's Signalized Intersections and the Pedestrian Grid Is a "Service, Program, or Activity" of the City

Before determining whether plaintiffs have been deprived of meaningful access to the benefits of a service, program, or activity of the City, the Court must identify the service, program, or activity at issue. "The ADA does not explicitly define 'services, programs, or activities.'" *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir. 1997),

*superseded on other grounds as recognized in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171

(2d Cir. 2001).  The Rehabilitation Act, however, defines "program or activity" as "all of the

operations" of any instrumentality of a state or local government.  29 U.S.C. § 794(b)(1)(A); *see*

*Henrietta D.*, 331 F.3d at 272 (treating Title II and Rehabilitation Act claims "identically").  And

the ADA's legislative history confirms that its reach is similar:  "Title II of the bill makes all

activities of State and local governments subject to" the ADA's prohibition on disability

discrimination.  H.R. Rep. No. 101-485, pt. 2, at 151 (1990), *reprinted in* 1990

U.S.C.C.A.N. 303, 434.

Consistent with this history, the Second Circuit has construed "services, programs, or

activities" as a "catch-all phrase that prohibits all discrimination by a public entity, regardless of

the context."  *Innovative Health*, 931 F.3d at 45.  The Circuit has counseled against "hair-

splitting arguments" as to what aspects of a city's operations fall under the ADA's broad

protections.  *Id.*  Instead, it has instructed that any "normal function of a governmental entity" is

properly treated to be a service, program, or activity under the ADA and Rehabilitation Act.  *Id.*

at 44 ("[B]oth the ADA and the Rehabilitation Act clearly encompass zoning decisions by the

City because making such decisions is a normal function of a governmental entity."); *see also*

*Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (holding that Title II covers

"anything a public entity does," and collecting circuit cases holding similarly).

Apposite here, the two circuit courts to consider the question have held that the building,

alteration, and maintenance of city sidewalks constitutes a service within the meaning of Title II.

*See Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011) (en banc) ("Building and

altering city sidewalks unambiguously are 'services' of a public entity under any reasonable

understanding of that term."); *Barden*, 292 F.3d at 1076 ("[M]aintaining public sidewalks is a

normal function of a city and . . . therefore falls within the scope of Title II"). Even more closely

on point, a district court within the Second Circuit has specifically held—in a case concerning

APS—that "[t]he act of installing and maintaining pedestrian crossing signals at crosswalks is a

normal function of the County, and therefore falls within the scope of Title II and the

Rehabilitation Act." *Scharff*, 2014 WL 2454639, at *7.

Measured against these precedents, the parties' debate as to the "service, program, or

activity" at issue here is easily resolved. The City asserts that the Court must assess plaintiffs'

meaningful-access claim by inquiring whether plaintiffs have been denied meaningful access to

New York City as a whole. It argues that plaintiffs, whatever the hazards and challenges they

may encounter navigating pedestrian crossings, cannot make that showing. *See* Def. Mem. at 11.

Plaintiffs counter that the proper point of reference is the City's signalized street crossings, taken

as a whole, on the ground that the City's maintenance of such crossings is a cognizable service,

program, or activity. *See* Pl. Mem. at 14. Plaintiffs contend that they have been denied

meaningful access to these crossings, because, at the vast majority of signalized crossings, they

are unable to access the visual information that the City conveys, for safety purposes, to sighted

pedestrians. *Id.* at 14–16.

On this threshold methodological point, plaintiffs are, clearly, correct. The City's

maintenance of signalized intersections and the pedestrian grid plainly constitutes a service,

program, or activity of a public entity. Constructing, altering, and maintaining such crossings is

"a normal function or operation" of the City, *Innovative Health*, 117 F.3d at 44, every bit as

much as is the construction and maintenance of city sidewalks, *Barden*, 292 F.3d at 1076. The

City and the DOT "have broad authority for the City's streets and oversee, among other things,

the installation, repair, and maintenance of New York City traffic signals, sidewalks, crosswalks,

bicycle lanes, and roadways." JSF ¶ 6. In this capacity, the City acknowledges, the DOT's

Traffic Operations Division oversees "the operation and maintenance of," *inter alia*, "over

13,000 traffic signals in the City," including "supervision over the installation of traffic signals."

Benson Decl. ¶ 1. The City's day-to-day oversight of its street crossings and crossing signals

leaves no room for serious argument that the installation and maintenance of pedestrian street

crossings, like the installation and maintenance of sidewalks, is other than a service, program, or

activity of the City. *See Scharff*, 2014 WL 2454639, at *7. And, tellingly, the City cites—and the

Court is aware of—no case authority for its improbable contrary notion that plaintiffs' grievance

may prevail only if they can show that they have been denied access to the metropolis as a whole.[6]

Accordingly, under the ADA and Rehabilitation Act, the City is required to ensure that it

operates its signalized intersections and the pedestrian grid in a manner that, "when viewed in

[their] entirety, [are] readily accessible to and usable by individuals with disabilities." 28 C.F.R.

§ 35.150(a).

---

[6] *Pascuiti v. New York Yankees*, 87 F. Supp. 2d 221, 223–24 (S.D.N.Y. 1999), the sole case on which the City relies for its claim that the Court must examine the accessibility to plaintiffs of New York City as a whole, rather than the accessibility of its pedestrian crossings, is inapposite. The issue there involved access to Yankee Stadium. The court held that assessing accessibility requires viewing a service, program, or activity—there, the ballpark—"as a whole, not at [its] individual elements." 87 F. Supp. 2d at 223. This aspect of *Pascuiti* might have bearing here were plaintiffs' claim directed to a particular intersection. But that is not plaintiffs' focus. Instead, plaintiffs' consistent allegation has been that the City's pedestrian crossing signals are a "service, program, or activity" of the City, which must itself be viewed "as a whole." *See* Pl. Mem. at 11, 14–16. *Pascuiti* is not contrary to that position. And notably, while the City does not so concede, it does admit that the "NYC DOT's *APS Program*"—one aspect of the City's crossing-signals operations—"constitutes a 'service[], program[], or activit[y] of a public entity." *See* Atkinson Decl., Ex. 20 ("Defs.' Resp. to Pls.' First Set of Requests for Admissions") at 4 (emphasis added).

2.    **The City Has Denied Blind Pedestrians Meaningful Access to its Signalized Intersections and the Pedestrian Grid**

a.    *Applicable Law*

A public entity discriminates against a qualified individual when it fails to provide "meaningful access" to the benefits of its services, programs, or activities. *Disabled in Action*, 752 F.3d at 197. Meaningful access does not mean equal access or equal results, *see Henrietta D.*, 331 F.3d at 277, but it may arise from a public entity's "failure to modify existing facilities and practices," *Disabled in Action*, 752 F.3d at 197. Indeed, the elimination of barriers to access was "one of the central aims of" both the Rehabilitation Act, *Alexander v. Choate*, 469 U.S. 287, 297 (1985), and the ADA, *see Tennessee v. Lane*, 541 U.S. 509, 531 (2004). As the Supreme Court has written of the ADA: "Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility." *Id.*

The DOJ has promulgated regulations implementing these dictates. These prohibit public entities from leaving public services "inaccessible to or unusable by individuals with disabilities." 28 C.F.R. § 35.149. They state that public entities "shall operate each service, program, or activity, so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Id.* § 35.150(a); *see also id.* § 42.521(a) (similar for Rehabilitation Act). Relevant here, given plaintiffs' claim that the City provides safety communications at signalized intersections to sighted pedestrians that are denied to the blind, the regulations also provide that "[a] public entity shall take appropriate steps to ensure that communications with . . . members of the public . . . with disabilities are as effective as communications with others," and "shall furnish appropriate auxiliary aids and services where

necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and

enjoy the benefits of, a service, program, or activity of a public entity." *Id.* § 35.160(a)(1), (b)(1).

To bring an entity into compliance with the ADA and Rehabilitation Act, "reasonable

accommodations . . . may have to be made." *Disabled in Action*, 752 F.3d at 197 (quoting

*Henrietta D.*, 331 F.3d at 273).  As the Second Circuit has put the point:  "It is not enough to

open the door for [those with disabilities]; a ramp must be built so the door can be reached."

*Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir. 1982) (citation omitted).  The public entity

need not "employ any and all means" of making the denied service available; instead, the ADA

and Rehabilitation Act require that the entity make "reasonable modifications." *Lane*, 541 U.S.

at 531–32; *see Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000).  The accommodations need

not (1) "fundamentally alter the nature of the service provided," or (2) "impose an undue

financial or administrative burden." *Id.* (quoting 28 C.F.R. § 35.150(a)(3)).

However, the assertion of either of these circumstances is an affirmative defense on

which the public entity defendant carries the ultimate burden.  *See* 28 C.F.R. § 35.150(a)(3)

("[A] public entity has the burden of proving that compliance with § 35.150(a) would result in

such alteration or burdens.").  And regulations promulgated under the ADA impose specific

requirements on a public entity that seeks to invoke these defenses, and oblige an entity that

successfully defends on these grounds still to take lesser corrective measures:

> The decision that compliance would result in such alteration or burdens must be
> made by the head of a public entity or his or her designee after considering all
> resources available for use in the funding and operation of the service, program, or
> activity, and must be accompanied by a written statement of the reasons for
> reaching that conclusion.  If an action would result in such an alteration or such
> burdens, a public entity shall take any other action that would not result in such an
> alteration or such burdens but would nevertheless ensure that individuals with
> disabilities receive the benefits or services provided by the public entity.

28 C.F.R. § 35.150(a)(3).

25

b.      *Application*

i.      Plaintiffs Lack Meaningful Access to the City's Signalized
        Crossings and the Pedestrian Grid

Plaintiffs have established that the City has deprived the class certified in this action of

meaningful access to its signalized crossings and the pedestrian grid, in violation of the ADA and

Rehabilitation Act.  Plaintiffs are thus entitled to summary judgment as to liability on this claim.

It is undisputed that, as of the time the parties briefed the motion for summary judgment,

the City had installed APS at only 443 out of its roughly 13,200 signalized intersections.  JSF

¶¶ 11, 19.  That amounts to 3.4% of the City's intersections with visually accessible crossing

information.[7]  It is also undisputed that blind pedestrians cannot access "crossing information

from a pedestrian control signal unless it has been equipped with APS."  *Id.* ¶ 138.  It follows

that, at more than 95% of the City's signalized intersections, the blind and visually impaired are

unable to use the visual crossing signals that guide sighted pedestrians safely through those

crossings.  This high incidence of inaccessibility exceeds or matches those in other cases finding

that other services in this City had been denied to classes of disabled persons.  *See, e.g.*, *Disabled*

*in Action v. City of New York*, 437 F. Supp. 3d 298, 308 (S.D.N.Y. 2020) (finding denial of

meaningful access to police stations where "at least a third of stations, and likely more, have

pervasive barriers to access."); *United Spinal Ass'n v. Bd. of Elections in City of N.Y.*, 882 F.

Supp. 2d 615, 624 (S.D.N.Y. 2012) (granting summary judgment where "pervasive and recurring

barriers to accessibility" denied meaningful access to polling places), *aff'd sub nom. Disabled in*

---

[7] At argument on October 2, 2020, counsel for the City represented that, since the close of the
summary judgment record, the City has installed APS at additional intersections, bringing the
total number of intersections equipped with APS to 700, or roughly 5% of all signalized
intersections.  Transcript of October 2, 2020 Oral Argument ("Arg. Tr.") at 39.  However, even
treating this factual representation as correct and cognizable on this motion, the difference
between 3.4% and 5% APS installations at signalized intersection would not affect the
proceeding analysis or outcome.

*Action*, 752 F.3d at 199 (emphasizing barriers to access at "more than 80% of poll sites"); *see also Henrietta D.*, 331 F.3d at 268 (affirming district court's finding of no meaningful access on the basis that, *inter alia*, 77% of cases analyzed showed City failing to timely provide disabled individuals services to which they were entitled under law); *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 837 F. Supp. 2d 268, 278 (S.D.N.Y. 2011) (finding lack of meaningful access where "less than 2% of the city's [taxi] fleet" was wheelchair accessible), *rev'd on other grounds*, 687 F.3d 63 (2d Cir. 2012).[8]

The City does not seriously dispute that this paucity of accessible crossing information deprives blind and vision-impaired persons of access to the benefits—the ability to safely traverse intersections—that the City's maintenance and oversight of signalized pedestrian crossings presently affords to sighted pedestrians. Nor could it. New York City is the highest-density major city in the United States. JSF ¶ 9. "[A]ccess to [its] sidewalks is an important component" of urban life here. *Id.* But as the summary judgment record reflects, the City's density also makes those walkways, and particularly the streets and avenues that separate them, unusually challenging for the blind and visually impaired to navigate. *See* Atkinson Decl., Ex. 4 ("Barlow Report") at 16. Among these unique or heightened challenges are that New York City is one of the loudest cities in the country, limiting the availability of audible cues on which blind pedestrians can otherwise rely, and that the City has implemented various traffic design choices that "render unreliable the traditional street-crossing techniques used by blind pedestrians." *Id.*; *see also* JSF ¶¶ 146–148, 164–166. Accordingly, absent non-visual crossing information such as

---

[8] These cases further reinforce that the proper inquiry under the ADA and Rehabilitation Act is whether the blind have been denied meaningful access to a specific service of the City—not, as the City contends, to the City as whole. *See Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 646–52 (S.D.N.Y. 2013) (finding that disabled individuals were denied meaningful access to the City's emergency-shelter service).

that provided by APS, navigating the City's streets is "very difficult" for blind and low-vision

New Yorkers.  Barlow Report at 16.  Such persons often have difficulty locating crosswalks,

Pl. 56.1 ¶ 9, deciding when it is safe to cross the street, *id.* ¶¶ 13–14, and successfully crossing

streets without veering into traffic, *id.* ¶¶ 11–12.

The evidence adduced in the summary judgment record documents the toll that these

challenges work on those unable to see.  Plaintiffs attest to the harrowing, dangerous, and life-

threatening experiences that blind and low-vision pedestrians frequently experience.  The parties

have stipulated that, absent auxiliary aids, a blind New Yorker seeking to avail herself of the

City's street crossings must risk being hit by cars and bicycles and becoming stranded in the

middle of intersections.  *See, e.g.*, JSF ¶¶ 25, 58, 74; *id.* at 73 (describing plaintiff Golfo's

experience realizing, after reaching the middle of the street, that traffic was rushing past him,

leading him to "run across the intersection with his guide dog," merely "hop[ing] that they were

not killed"); Curry Decl. ¶ 12 ("Without fail, at least once a day, I almost get hit by a

vehicle . . . .").  Often, too, blind pedestrians are grabbed by well-meaning pedestrians attempting

to help.  JSF ¶¶ 59, 77.  Notwithstanding the good intentions of such Samaritans, plaintiffs

describe these and other experiences as "disorienting," "frightening," "frustrating," "stressful,"

and "often humiliating."  Golfo Decl. ¶¶ 3, 9; Curry Decl. ¶¶ 10, 16.

These hazards have led plaintiffs, and presumably the class of individuals who all agree

they adequately represent, to adopt inconvenient and sometimes costly workarounds.  Plaintiff

Golfo, for instance, relies on his guide dog, without which he states he would be incapable of

traversing New York City's streets.  Golfo Decl. ¶ 4.  Plaintiffs further aver that they may wait

up to 20 minutes at an intersection for a sighted individual to appear, to help them safely cross

the street or merely for an indication that the crossing signal has changed to "walk."  JSF

¶¶ 55, 75.  Sometimes, however, the assumption that sighted pedestrians were crossing safely proves wrong.  Plaintiffs recount instances in which they learned only once they had been stranded in the middle of an intersection that the sighted pedestrian whom they followed was jaywalking, thereby placing them in danger.  *Id.* ¶¶ 56, 76.  Plaintiffs also attest to often using taxi or car services "to avoid unknown or unsafe pedestrian street crossings," even though these modes are more expensive than travel by foot.  *Id.* ¶¶ 60, 79.  In other instances, plaintiffs attest, they take longer, more arduous routes on foot, including going blocks out of their way or walking through subterranean subway passages.  *Id.* ¶¶ 57, 61.  Finally, plaintiffs attest, the inaccessibility of the City's pedestrian street crossings, and/or concern about the dangers presented by foot travel, have led some to forgo entirely certain venues or aspects of City life.  *See, e.g.*, Golfo Decl. ¶ 8.

To be sure, plaintiffs cannot claim total exclusion from the City's crossings and streets.  As reflected above, many have found workarounds and alternate means of traversing the City's pedestrian crossings; others have summoned the fortitude to cross busy intersections in spite of the risks presented; and a small fraction of intersections are equipped with APS.  But complete exclusion is not the test of liability under the ADA and Rehabilitation Act.  *See Disabled in Action*, 752 F.3d at 198 ("Plaintiffs need not, however, prove that they have been . . . 'completely prevented from enjoying a service, program, or activity' to establish discrimination under Section 504 or Title II." (quoting *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001))).  And as the case law reflects, conditioning access upon arduous or costly "coping mechanisms" and on the assistance of strangers is "anathema to the stated purpose of the Rehabilitation Act" and the ADA.  *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008) (rejecting, in case brought by blind plaintiffs, argument that plaintiffs had meaningful access to U.S. currency

based on aid from others, as akin to the discredited argument that "merely because the mobility impaired may be able either to rely on the assistance of strangers or to crawl on all fours in navigating architectural obstacles, they are not denied meaningful access to public buildings" (citation omitted));  *see also Disabled in Action*, 752 F.3d at 200 ("[T]he purpose of the Rehabilitation Act is 'to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence*, and inclusion and integration into society.'" (quoting 29 U.S.C. § 701(b)(1) (emphasis in *Disabled in Action*)));  *id.* (access to public services "should not be contingent on the happenstance that others are available to help").  In all events, at 19 out of every 20 signalized intersections, the visual assistance the City provides to sighted pedestrians is entirely unavailable to those who cannot see.

These undisputed facts make it unavoidably clear that the lack of non-visual crossing assistance at more than 95% of the intersections which New York City has outfitted with visual crossing assistance poses a major obstacle to the "smooth integration" of blind individuals into the "commerce of daily life."  *Kinney v. Yerusalim*, 9 F.3d 1067, 1069 (3d Cir. 1993).  The City's widespread failure to provide crossing information in any non-visual format effectively denies blind persons the ready and safe use of signalized intersections, which are a vital means of traversing the City.  Because APS and their equivalents are overwhelmingly absent, for the blind the process of accessing places and events that require crossing busy intersections—quotidian parts of New York City life for those who can see—too often entails frustrating, dangerous, and humiliating ordeals, and deters many from venturing forth at all.  In the parlance of the federal statutes at issue, the City has failed to provide the plaintiff class here with meaningful access to its signalized intersections and the pedestrian grid, within the meaning of the ADA and Rehabilitation Act.

In response to plaintiffs' essentially uncontroverted factual showing as to liability, the City makes only minimal and anemic arguments. Tellingly, the City does not anywhere, in its brief or at argument, contend that the provision of APS at 3.4% of its signalized intersections affords the blind meaningful access to the pedestrian grid.[9]

Instead, the City touts its "steadily increasing commitment to installing APS in and around the City," to wit, the recently enacted Safe Streets Legislation. This commitment, the City contends, meets its obligations under the ADA and Rehabilitation Act. *See* Def. Mem. at 11–12; Arg. Tr. at 40. The City, however, admits that "[i]t is not yet known" how or when DOT will meet the benchmarks set out in this as-yet unfunded enactment. Def. Mem. at 12 n.5. Its commitment to rectifying the present lack of access is merely precatory.

In any event, even if the City had adopted a concrete and funded plan to install APS so as to meet the benchmarks set forth in the Safe Streets Legislation, that enactment, which the City only adopted after discovery was closed and plaintiffs here moved for summary judgment, would not affect the liability question on this motion: whether the City currently affords plaintiffs meaningful access to the City's services. "Although [a] plan is a start, it is not evidence that creates a dispute of material fact regarding current accessibility of the programs and services" offered by the City. *Disabled in Action*, 437 F. Supp. 3d at 311.

And on the question whether the City *presently* affords the blind meaningful access to its signalized intersections, the City, revealingly, all but admitted at argument that the answer is

---

[9] At argument, the Court posed a hypothetical in which, of the side streets crossing Broadway from West 10th Street up to West 90th Street, all crossings were equipped with crossing signals, but only one out of every 20 was outfitted with APS. *See* Argument Tr. at 39–40. City counsel did not contend that this circumstance—in which a blind pedestrian seeking to cross Broadway would either have to do so unaided or to venture potentially many blocks north or south to find a crossing with APS—was consistent with the principle of meaningful access. *See id.* at 40 (noting instead the "steadily increasing commitment to install APS in and around the City").

"no." *See, e.g.*, Arg. Tr. at 43–44 (The Court: "Three times I've asked you [whether the City has achieved meaningful access]. Each time I've gotten a non-answer. If I get a non-answer again, I'm going to take it as the City conceding that there is, as of the status quo, the snapshot of today, a lack of meaningful access. Last chance to answer that question." The City: "I don't know that there is a cohesive answer. . . . The current state of affairs I do not believe rises to that, but there, there may be people that disagree with me."); *id.* at 44 (The Court: Is the City "admitting that there is a lack of meaningful access in some parts of the City?" The City: "That, that is probably accurate, yes.").

The City's only other argument against liability is to note that the meaningful-access inquiry is not to be made crossing by crossing—*i.e.*, whether "each individual intersection is equipped with APS"—but at the level of the overall service or program at issue. *See* Def. Mem. at 11–12. On that point, the City is, largely, correct. The DOJ's implementing regulations provide that the ADA does not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a)(1). And neither the ADA nor the Rehabilitation Act "require[s] perfection." *United Spinal Ass'n*, 882 F. Supp. 2d at 624. But this argument avails the City only insofar as it rebuts a claim that plaintiffs have made and preserved, but do not seriously pursue: that the City could be held liable for a deprivation of meaningful access with respect to every single signalized crossing that lacks APS. It does not, however, contend with plaintiffs' more fundamental claim, reviewed at length above: that, viewing signalized crossings *as a whole*, the scarcity of APS in New York City deprives the blind of meaningful access to the City's signalized intersections and pedestrian grid.

Moreover, contrary to the City's suggestion, the inquiry into the accessibility of a service of a public entity as a whole necessarily considers individual instances in which that service is

inaccessible.  Even *Pascuiti*, on which the City principally relies, recognized:  "While proving that particular barriers exist might not be sufficient to establish Title II liability, each barrier is a building block for a finding that the [service, program, or activity], viewed in its entirety, is not readily accessible."  87 F. Supp. 2d at 224; *see also id.* ("[A]n important part of the program access requirement for the [service, program, or activity] is whether all services available for the use of non-disabled patrons also are available for [the] use of disabled patrons.").

In sum, the City's observation that the ADA and Rehabilitation Act may not require the installation of APS at each of its 13,200 signalized intersections does nothing to defend the status quo.  Whatever the point would be at which the number (and dispersal) of APS at such crossings would afford blind and visually impaired persons meaningful access to the pedestrian grid within the meaning of these statutes, that standard is clearly not met today, with more than 95% of such crossings containing signals accessible only to sighted persons.

At the liability stage, the Court does not have occasion—and the nature of the summary judgment record would not enable it—to resolve the number and placement of additional APS that would bring the City into compliance with its statutory duty to provide meaningful access to blind pedestrians.  Plaintiffs' partial summary judgment motion on liability alone does not present that question, which the Court will take up at the ensuing remedy stage.  *See Disabled in Action*, 437 F. Supp. 3d at 311–12 (reserving questions of compliance and cost for remedial stage); *Brooklyn Ctr. for Indep.*, 980 F. Supp. 2d at 658 ("Because, however, the trial was limited to the question of liability, the Court need not, and does not, address the reasonableness of any specific proposed modification at this time.  Instead, at the remedy stage that will follow this Opinion, Plaintiffs will be given an opportunity to offer proposed accommodations, and Defendants will be given the opportunity to demonstrate that any such accommodations are

unreasonable or fundamentally alter the nature of the City's emergency preparedness program.");
*United Spinal Ass'n*, 882 F. Supp. 2d at 627 (ruling only as to liability and reserving questions
over scope, cost, and details of relief for remedial stage).  If the parties are unable promptly to
resolve this matter, the Court will set an expeditious schedule for any supplemental discovery,
and briefing, on the question of remedy.[10]

ii.     The City Has Failed to Show an Undue Financial or
        Administrative Burden

In its memorandum opposing summary judgment, the City, while all but conceding that it
has failed to furnish plaintiffs with meaningful access to signalized intersections, noted that the
ADA permits an affirmative defense that providing such access would impose an undue financial
or administrative burden on a public-entity defendant.  *See* Def. Mem. at 12.  The ADA allows
such a defendant to forgo providing meaningful access to a service or program where "it can
demonstrate [that doing so] would result in a fundamental alteration in the nature of a service,
program, or activity or in undue financial and administrative burdens."  28 C.F.R. § 35.150(a)(3).

Critically, however, the burden of establishing this defense falls on the public entity.  It
has "the burden of proving that compliance with § 35.150(a) of this part would result in such
alteration or burdens."  *Id.*  Further, for a public entity to do so, the determination that furnishing

---

[10] At argument, plaintiffs properly acknowledged that at the remedy stage, the City—despite
having forgone at the liability stage a defense that compliance with the ADA would cause it
undue financial and administrative burdens, *see* discussion *infra* at pp. 34–40—may submit
evidence as to these factors.  *See* Arg. Tr. at 20 ("[I]t's obviously relevant, when crafting a
remedy, what resources are actually available and what makes sense."); *see also Disabled in
Action*, 437 F. Supp. 3d at 311–12 (considering burden on public entity at remedial stage);
*Brooklyn Ctr. for Indep.*, 980 F. Supp. 2d at 658 (same); *United Spinal Ass'n*, 882 F. Supp. 2d
at 627 (ruling only as to liability and reserving questions over scope, cost, and details of relief for
remedial stage), *aff'd*, 752 F.3d at 203 (at remedial stage, approving balance struck in injunction
between the City's "obligations to modify facilities, policies, and procedures with its practical
resource constraints"); *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 367 (D.C. Cir. 2017)
(holding that "financial burden is a relevant factor" in considering modifications to injunction).

meaningful access to the service or program in question would impose an undue financial or administrative burden must (1) "be made by the head of a public entity or his or her designee"; (2) "after considering all resources available for use" in administering the relevant service, program, or activity; and (3) be accompanied by a "written statement of the reasons for reaching that conclusion." *Id.* And even where an officer of the public entity reaches that conclusion, such is not a complete defense. The entity must still "take any other action" to provide disabled individuals the benefit of the relevant service, program, or activity up to the point at which such action becomes an undue burden or fundamentally alters the nature of the service at issue. *Id.*

The City, despite a host of opportunities to pursue a defense along these lines, abandoned its opportunity to do so. The City did articulate this defense in its Answer. *See* Answer ¶ 135. And, at argument, defense counsel represented that whether to pursue such a defense had been discussed in a complex, multi-agency process involving the Office of Management and Budget and the Mayor's Office. Arg. Tr. at 50–51.

Nonetheless, for reasons unexplained, the City elected not to pursue this defense. It did not meet any of the requirements that § 35.150(a) imposes for such a defense. It did not obtain a decision from the head of the entity that furnishing meaningful access would impose an undue administrative or financial burden. It did not come forward with a "written statement of the reasons for reaching that conclusion." It did not address this defense in its pre-motion letter, submitted in response to plaintiffs' letter announcing their anticipated summary judgment motion. *See* Dkt. 78. And at the ensuing pre-motion conference, after plaintiffs' counsel noted that the City had not created or submitted an analysis of any financial or administrative burden posed by compliance with the ADA, and the Court inquired whether the City was pursuing such a defense, counsel for the City demurred, stating: "I am not aware of a formal statement as to

that. It certainly is not something that I know how we will respond if they put that in their motion at this time." Transcript of July 22, 2019 pre-motion conference ("PMC Tr.") at 30. In connection with the ensuing summary judgment briefing, the parties stipulated that (1) "[t]he City has not issued a written statement that the installation of APS at every signalized intersection in the future would result in an undue financial and administrative burden," JSF ¶ 192; (2) "[t]he City has not performed a formal written evaluation into the possibility of installation of APS at every signalized intersection," *id.* ¶ 194; and (3) "[t]he City has not made a formal written determination that installation of APS at every signalized intersection would result in a fundamental alteration of DOT's APS program," *id.* ¶ 195.[11]

And in its brief opposing summary judgment as to liability, the City paid only lip service to this defense. It stated only that "requiring the City to install APS at every signalized intersection . . . *may* constitute an undue financial or administrative burden based upon current market conditions and DOT's current funding appropriations." Def. Mem. at 12 (emphasis added).[12] But the City again declined to address or establish the procedural prerequisites of this defense set out in 28 C.F.R. § 35.150(a)(3). At argument, the City conceded that "[t]here is no formal written statement," and that the City had not complied with these requirements. This, it alternatively explained, was because of an "oversight," Arg. Tr. at 50, because "the city was . . . relying on common sense," *id.* at 48, and/or because the City, notwithstanding the text of the implementing regulations or the colloquy between Court and counsel about this issue at the pre-

---

[11] The parties further stipulated that the New York City Council has called on the de Blasio Administration to include, in the 2020 City budget, funding sufficient to install "accessible pedestrian signals at every signal intersection." *Id.* ¶ 193.

[12] The City did not contend that a liability finding would require the "fundamental alteration in the nature" of any City service. 28 C.F.R. § 35.150(a)(3).

motion conference, had not understood the written statement to be an "out-and-out requirement to invoke the defense," *id.* at 51; *but see* 28 C.F.R. § 35.150(a)(3) ("The decision . . . *must be made* by the head of a public entity or his or her designee . . . *and must be accompanied* by a written statement of the reasons for reaching that conclusion." (emphasis added)); PMC Tr. at 19–20 (plaintiffs' counsel noting that the "ADA has very specific regulations regarding how a city must assert an undue burden defense, and that requires a high-level official within the Department of Transportation to sign a written statement that an analysis has been done and they have determined by looking at all funding sources available that it is an undue burden, and defendants have admitted that that has never taken place."); *id.* at 30–31 (Court and defense counsel discussing mandatory nature of this requirement).

The Court is thus is constrained to find that the City, by its decision not to comply with the prerequisites that 28 C.F.R. § 35.150(a)(3) imposes on the pursuit of an undue burden defense, has elected to forgo that defense as to liability. *See, e.g.*, *Ewbank v. Gallatin County*, No. 03 Civ. 156 (DLB), 2006 WL 197076, at *8 (E.D. Ky. Jan. 17, 2006) (rejecting undue burden defense where "[t]here is no evidence that Defendant has complied with these requirements"); *Armstrong v. Davis*, No. 94 Civ. 02307 (CW), 1999 WL 35799705, at *36 (N.D. Cal. Dec. 22, 1999) (similar); *cf. Whitfield v. City of Salinas*, No. 05 Civ. 3230 (JF), 2006 WL 2529509, at *5 (N.D. Cal. Aug. 31, 2006) (rejecting defendants' undue burden defense because they "ha[d] not presented any evidence of a 'a written statement of the reasons for'" concluding that ADA compliance would present undue burden). Whatever the evidence on this point might have shown had the City pursued it, the City may not argue, at the liability stage, that adding APS to signalized intersections to the degree necessary to achieve meaningful access would present an undue burden, administrative or financial. The record does not reveal the

37

reason(s) for the choice not to pursue that defense in earnest—including whether the City viewed its coffers as sufficient to fund the expansion of APS necessitated by a finding of liability, whether City leaders welcomed a court order compelling them to furnish such relief, or otherwise. But it is unavoidable that this litigation decision was deliberate, as the City was aware of, from the time of its Answer, the potential availability of this defense, and the question whether to pursue it was, as counsel acknowledged, taken up by ranking municipal decision-makers, including the Mayor's Office. *See* Def. Mem. at 12.[13]

In any event, even if the City had satisfied the procedural prerequisites to this affirmative defense, the sparse data that the City has put before the Court at summary judgment would be inadequate to raise a triable issue of fact as to whether, on the present record, installation of additional APS in the City would constitute an undue financial or administrative burden. That is so for three reasons.

First, the City's limited discussion of this point centers on the qualified assertion that "requiring the City to install APS at every signalized intersection . . . *may* constitute an undue financial or administrative burden." *Id.* (emphasis added). That undertaking, the City stated, could cost it $870 million. *See* Benson Decl. ¶¶ 17–18 (extrapolating from average cost data from APS installations in 2018). But that proposition misapprehends, and likely overstates, the consequences of a finding of liability. As discussed, a finding that providing APS at 3.4% of the City's signalized intersections fails to afford blind pedestrians meaningful access does not

---

[13] After unsuccessfully seeking an explanation from counsel for the City's decision to abandon this defense, the Court stated at argument that "[i]t looks to me like what's happening here is [that] New York City wants to lose this case" and to be "ordered to pay money that there isn't the political will to shell out." Arg. Tr. at 41. City counsel, although not conceding this proposition, did not dispute it, either. *Id.* at 42.

necessarily require installing APS at every such intersection.  The City's invocation of this figure does not consider whether expansions of APS on a lesser scale might achieve meaningful access.

Second, the City's method of calculating the costs of this undertaking is questionable.  To reach its $870 million estimate, the City multiplied the average cost of its 2018 APS installations times 13,200, and added a 10% adjustment to cover miscellaneous additional costs.  *See* Benson Decl. ¶¶ 17–18.  But that back-of-the-envelope calculation leaves vital questions unaddressed. For one, as plaintiffs note, the per-installation APS cost appears to have fluctuated substantially; as recently as 2015, the per unit installation cost was less than half the 2018 cost that the City used to reach the $870 million figure.  *See* Pl. Reply at 10.  For another, the City's tabulation does not consider economies of scale that may inhere from a larger-scale expansion project.  And the City's assessment does not consider the period over which that installation would realistically occur.  Perhaps most important, the City, in reciting its bottom-line cost figure, does not situate it in the context of the DOT's, the City's, or any other relevant budget, or address potential means by which the City could recoup such outlays.  Such makes it difficult, if not impossible, to assess the burden it might impose on the City's other activities.  It is precisely to enable a thoughtful and studied assessment of a claim of an undue financial burden, which requires consideration of broader context and opportunity costs, that 28 C.F.R. § 35.150(a)(3) requires that this affirmative defense be developed comprehensively and accountably, and endorsed by those with ultimate decision-making authority within the public entity.

Third, under 28 C.F.R. § 35.150(a)(3), even where a specific remedy would constitute an undue financial or administrative burden, the public-entity defendant must still take "any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity."

The City's discussion of the undue burden defense fails this command.  It envisions only two options: installing APS at every single intersection or maintaining the status quo.  The City has not demonstrated that there is no other remedial action between those two extremes (*e.g.*, installing substantially more APS than at present, but less than at every signalized intersection) that it could financially bear.

Accordingly, even assuming the City had preserved such a defense, on the summary judgment record, it has failed adduce sufficient evidence of an undue financial or administrative burden to raise a genuine dispute of triable fact on this point.  Summary judgment is therefore warranted as to liability on plaintiffs' claims that the City has denied them meaningful access under the ADA and Rehabilitation Act.

### B.      New Construction and Alterations Under the ADA and Rehabilitation Act

In a separate claim independent of their "meaningful access" claim, plaintiffs argue that the City has violated the ADA and Rehabilitation Act when it installed new traffic signals and made alterations to existing street crossings without installing APS.  *See* Pl. Mem. at 17–23.

Regulations promulgated under both statutes state that, when a covered entity alters any facility or part of a facility "in a manner that affects or could affect the usability of the facility or part of the facility," it shall, "to the maximum extent feasible," do so "in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b)(1) (ADA); *see id.* § 42.522(a) (Rehabilitation Act).  Each also states that any facility "constructed by" a covered entity shall be "readily accessible to and usable by individuals with disabilities."  *Id.* § 35.151(a)(1) (ADA); *see id.* § 42.522(a).  Plaintiffs argue that the City has breached these obligations in four circumstances: each time it (1) installs new pedestrian signals without APS; (2) undertakes capital projects or SIPs without adding APS to the renovated crossings; (3) upgrades pedestrian lenses to include a countdown clock or symbols

without also including APS; and (4) implements LPIs or EPPs without also including APS.  Pl.

Mem. at 17–23.

Defendants counter that the first and second of these claims have been mooted by a new

City policy on APS.  And they argue that the third and fourth claims are invalid because the

changes at issue do not constitute "alterations" of a sort triggering a duty to install APS.  Def.

Mem. at 13–21.

The Court also considers, at the threshold, the extent to which plaintiffs' claims are

barred by the statute of limitations.  The parties did not address the issue in their summary

judgment briefs, but the Court raised the issue at argument, *see* Arg. Tr. at 26–29, 52–55, 64–65,

and thereafter solicited and received submissions from counsel on this question, *see* Dkts. 122–23,

125.  Because many of the alleged alterations at issue took place between 2000 and 2014—

outside the three-year statute of limitations that applies under Title II of the ADA and

Rehabilitation Act—defendants now argue that claims arising from those actions are time-barred.

The Court concludes that all alleged violations occurring before June 27, 2015—three years

before this action was filed—are untimely.

Next, the Court addresses whether the remaining, timely claims are moot in light of the

City's newly adopted APS policy.  The Court holds that they are not.

Last, as to the merits of plaintiffs' timely claims, the Court holds that mere software

updates such as those necessary to implement LPIs and EPPs do not rise to the level of an

alteration under the ADA or Rehabilitation Act.  The Court also denies, without prejudice to

renewal, plaintiffs' motion for summary judgment as to the SIPs and Capital Projects the City

has completed, because the record presented is too factually sparse to enable the Court reliably to

resolve—in either direction—whether and which of such completed projects qualify as or

include "alterations."  However, as to plaintiffs' claim arising from the installation of new traffic signals, the Court enters summary judgment for plaintiffs, finding that when the City installs new such signals, the ADA and Rehabilitation Act require it to make the affected intersections readily accessible to the blind.  The Court's grant of summary judgment as to liability extends to all new traffic signals installed without APS since June 27, 2015.

### 1.    Statute of Limitations

#### a.    Applicable Law

Claims under the ADA and Rehabilitation Act are subject to a three-year limitations period.  *Purcell v. N.Y. Inst. of Tech. - Coll. of Osteopathic Med.*, 931 F.3d 59, 63 (2d Cir. 2019) (ADA); *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992) (Rehabilitation Act).  Neither statute contains an express statute of limitations, *see Purcell*, 931 F.3d at 62–63; *Morse*, 973 F.2d at 125, or is subject to the four-year federal catch-all statute of limitations, as such applies only to federal statutes enacted after December 1, 1990, *see* 28 U.S.C. § 1658.[14]  The applicable statute of limitations is therefore the "most appropriate or analogous state statute of limitations." *Purcell*, 931 F.3d at 62–63 (citation omitted).  For claims under both federal statutes, the Second Circuit has held that the three-year limitations period provided by N.Y. C.P.L.R. § 214(5) applies. *Maccharulo v. Gould*, 643 F. Supp. 2d 587, 592–93 (S.D.N.Y. 2009) (collecting cases).

Although the Second Circuit has not addressed when ADA alteration claims like those in this case accrue, a recent decision from this District provides persuasive guidance.  In *Forsee v. Metropolitan Transportation Authority*, Judge Ramos considered the accrual date in connection with an analogous ADA provision concerning alterations to public-transportation facilities.  *See* No. 19 Civ. 4406 (ER), 2020 WL 1547468, at *9 (S.D.N.Y. Mar. 31, 2020); 42 U.S.C. § 12147(a)

---

[14] The ADA, Pub. L. No. 101-336, 104 Stat. 327, was enacted July 26, 1990, and the Rehabilitation Act, Pub. L. No. 93-112, 87 Stat. 355, was enacted September 26, 1973.

(addressing "alterations of an existing facility or part thereof used in the provision of designated public transportation services that affect or could affect the usability of the facility or part thereof").  On a review of relevant authority, Judge Ramos held that the ADA's text required applying a "construction rule," under which a public entity's act of discrimination by failing to make the facility accessible to the disabled occurs, and a claim thus begins to accrue, "when the alteration is completed." *Forsee*, 2020 WL 1547468, at *9.

To be sure, § 12147(a) contains language not found in the regulations relevant here, and on which *Forsee* relies: "upon the completion of such alterations." *Id.* at *9.  But the ADA and Rehabilitation Act regulations relevant to this case similarly speak in the past tense.  The ADA rule requires that each facility "altered by" or "constructed by" a public entity be altered or constructed "in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a)(1), (b)(1).  Similarly, the pertinent Rehabilitation Act rule states that any facility "constructed by" a recipient of federal funds must be constructed such that the facility is "readily accessible to and usable by" disabled individuals, and any alterations must "be made in an accessible manner."  28 C.F.R. § 42.522(a).

And, as with § 12147(a), absent a construction rule along the lines found by Judge Ramos, public entities "would never have 'the benefit of a statute of repose' as they could be dragged into the courts decades later for non-compliant alterations." *Forsee*, 2020 WL 1547468, at *9 (quoting *De La Rosa v. Lewis Foods of 42nd St., LLC*, 124 F. Supp. 3d 290, 300 (S.D.N.Y. 2015)); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (counseling against "interpretations of a statute which would produce absurd results").  The parties and case law do not offer any coherent alternative to such a rule, beyond plaintiffs' suggestion that the limitations period never begins to run.  And the one alternative that the Court

considered—a rule under which the onset, rather than the completion, of the alteration triggers the public entity's duties under the ADA—is at odds with the regulatory text (which refers to the facility's having already been "altered") and lacks support in case law. Accordingly, finding no reason to depart from *Forsee*'s persuasive analysis, the Court holds that the construction rule applies to plaintiffs' alteration and new-construction claims, which accrue upon the completion of the challenged alteration.

### b.      *Application*

Although the City did not raise the statute of limitations as a defense in its opposition to plaintiffs' motion for summary judgment, *see* Dkt. 125 at 1, that does not preclude the Court's consideration of that issue in deciding whether to grant plaintiffs' summary judgment motion. The City included the statute of limitations as an affirmative defense in its Answer to the plaintiffs' Complaint, *see* Answer ¶ 133, which is sufficient to preserve the defense through trial, *see Colon v. Goord*, 115 F. App'x 469, 470 (2d Cir. 2004) ("Defendants have not waived their statute of limitations defense by failing to raise it in their motion under Rules 12(c) and 56. [The] [s]tatute of limitations is an affirmative defense that is preserved by assertion in a party's first responsive pleading."); *Kulzer v. Pittsburgh-Corning Corp.*, 942 F.2d 122, 125 (2d Cir. 1991) ("bare assertion" of statute of limitations in answer preserved it to be raised again mid-trial, despite defendant's failure to raise it in pretrial dispositive motions). And, so long as the parties are on notice that the statute of limitations is at issue and are permitted a "full and fair [] opportunity to present evidence as to the applicability of the defense," the Court may even *grant* summary judgment on that basis *sua sponte*. *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 97 (2d Cir. 2016); *see Celotex*, 477 U.S. at 326. Having given the parties notice and the opportunity to be heard on this issue, the Court now assesses its impact here.

Under the applicable statutes of limitations and the construction rule, plaintiffs' claims are time-barred to the extent they arise from alterations completed before June 27, 2015—three years before the Complaint in this action was filed.  Because plaintiffs challenge four distinct categories of alleged alterations, each of which took place during different periods, the Court assesses each in turn.

First, plaintiffs argue that the City violates 28 C.F.R. § 35.151(a) each time it installs new crossing signals without also including APS.  Pl. Mem. at 18–19.  The installation of new such signals has occurred both before and after June 27, 2015.  The parties have stipulated that "New York City typically installs between 100 and 120 new traffic signals per year," including since 2015.  JSF ¶ 135.  They have further stipulated that, "[f]rom 1990 to 2014, no intersections where a new traffic signal was installed included APS at the time the new traffic signal was installed."  *Id.* ¶ 133.

Second, plaintiffs argue that Capital Projects and SIPs constitute alterations giving rise to accessibility obligations under 28 C.F.R. § 35.151(b).  Pl. Mem. at 20–21.  The summary judgment record suggests that such projects, too, occurred and were completed both before and after June 27, 2015.  *See* JSF ¶¶ 173, 178.

Third, plaintiffs argue that the replacement of all signal lenses throughout the City to show symbols instead of the words "walk" and "don't walk," and replacement of lenses at roughly 7,500 intersections to include countdown clocks, constitute alterations giving rise to accessibility obligations.  Pl. Mem. at 19–20.  However, the parties have stipulated that the former replacements all occurred "during the period from 2000 to 2004," and that the latter took place "[b]etween 2012 and 2014."  JSF ¶¶ 137, 141.  The summary judgment record does not reflect that any such replacements occurred after June 27, 2015.

Last, plaintiffs challenge the City's implementation of signal timing changes—*i.e.*, LPIs and EPPs—as alterations that the City failed to make accessible under 28 C.F.R. §§ 35.151(b) and 42.522(a).  According to the parties' stipulations, the DOT implemented LPIs at 307 intersections before 2015, 414 intersections in 2015, and 3,230 intersections between 2016 and June 30, 2019.  JSF ¶¶ 151–158.  Only 113 of those intersections are currently equipped with APS.  *Id.* ¶ 159.  The parties' submissions further indicate that, as of June 30, 2019, the City had implemented EPPs at 98 intersections, none including APS, although they do not disclose when those EPPs were implemented.  *Id.* ¶¶ 168–169.

Accordingly, because at least some new signal installations, SIPs and Capital Projects, and implementations of LPIs and EPPs were completed on or after June 27, 2015, there is no dispute that claims arising in these areas are properly before the Court, and the Court will consider, *infra*, whether such projects constitute "alterations" or new construction triggering a duty to install APS.  To the extent, however, that plaintiffs' claims arise from projects completed before June 27, 2015, they are barred by the statute of limitations, and the Court denies plaintiffs' motion for summary judgment as to them.  The Court also denies plaintiffs' motion for summary judgment on claims based on the City's replacements of signal lenses because, on the record before the Court, these replacements occurred either between 2000 and 2004 or between 2012 and 2014, and such claims thus appear time-barred.  Accordingly, there is no occasion to consider whether modifications of this nature rise to the level of "alterations" under the ADA and Rehabilitation Act.

Plaintiffs offer three reasons why the statute of limitations should not restrict their claims based on alterations and new construction.  *See* Dkt. 125.  First, they contend that requests for injunctive relief are not barred by any statute of limitations.  But *Forsee* and the cases it cites

applied the construction rule to claims seeking exclusively injunctive and declaratory relief, and the reasoning discussed above applies equally to such claims.  *See* 2020 WL 1547468, at *9.

Second, plaintiffs argue that their claims arising from projects completed before June 27, 2015 can be rescued as timely under the "continuing violations doctrine."  Dkt. 125 at 3.  "As a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006) (citation omitted).  To establish a continuing violation, a plaintiff must allege "a series of separate acts, some of which occur within the applicable statute of limitations, that collectively constitute one unlawful act."  *Forsee*, 2020 WL 1547468, at *10 (citing *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009)).  In such cases, "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of" the continuing violation.  *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2002) (citation omitted).  However, this doctrine does not apply when plaintiffs "challenges conduct that is a discrete unlawful act," because such acts are "easy to identify" and thus separately actionable. *Shomo*, 579 F.3d at 181; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 144 (2002). Discrete unlawful acts contrast with the paradigmatic claims to which the continuing violations doctrine applies, such as claims of a hostile work environment, in which the unlawful conduct by nature "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Morgan*, 536 U.S. at 115.

The continuing violations doctrine does not apply here because alterations of street crossings, pedestrian signals, and signal timing are, by nature, discrete acts.  Each change is "easy to identify," with a clear end date, as measured by the construction rule.  And each

violation is separately actionable under the ADA and Rehabilitation.  *See Forsee*,

2020 WL 1547468, at *10 (continuing violations doctrine does not apply to ADA claims relating

to subway alterations); *De La Rosa*, 124 F. Supp. 3d at 300 (continuing violations doctrine does

not apply to claims under Title III of the ADA, concerning public accommodations).  Plaintiffs

were at liberty to challenge each allegedly noncompliant alteration when it was completed, and

had three years from the completion date to do so; they are also at liberty to bring alteration

claims based on contemporary projects.  Finally, to the extent plaintiffs cast their alteration

claims as triggered not by discrete projects but by an ongoing unlawful City policy of failing to

abide by the ADA when making upgrades at intersections, Dkt. 125 at 3, that argument also fails.

The Second Circuit, like each of its sister circuits to have considered the issue after *Morgan*, has

squarely held that "an allegation of an ongoing discriminatory policy does not extend the statute

of limitations where the individual effects of the policy that give rise to the claim are merely

discrete acts."  *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012).

In a final effort to salvage their claims based on alterations before June 27, 2015,

plaintiffs argue that the NYCHRL does not apply a statute of limitations to alteration claims.

But plaintiffs' NYCHRL claim does not extend to such claims.  Instead, tracking plaintiffs'

federal meaningful-access claims, plaintiffs' Complaint and ensuing submissions have framed

their NYCHRL claim as challenging the exclusion of blind and visually impaired plaintiffs from

places of public accommodation, on account of the scarcity of APS throughout the City.

Consistent with this, plaintiffs' summary judgment arguments as to alteration claims have not

cited law under the NYCHRL, citing instead case law applying, and DOJ regulations implementing,

the ADA and Rehabilitation Act.  *See* Pl. Mem. at 17–23.  Plaintiffs' argument under the

NYCHRL, by contrast, is only that "the lack of APS at the vast majority of New York City's

intersections unlawfully excludes blind pedestrians from places of public accommodations"; in connection with that argument, they do not mention upgrades, new construction, or alterations. *Id.* at 23–25; *see also* Pl. Reply at 4–7, 9–10.  Plaintiffs' post-argument letter appears to be the first time that they have asserted that their NYCHRL claim extends to the failure to make accessibility upgrades at the time of alterations and new construction.  The Court will not permit plaintiffs to constructively amend their city-law claim at this late date.

In any event, the lone case plaintiffs cite in support of their argument that the NYCHRL does not impose a time-bar on such claims does not address alterations or new construction, or explain how the New York State courts might assess such claims under state law, arising as they do from DOJ regulations.  It instead addresses the discriminatory effects of "lack of access to the subway system" as a whole.  *Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 184 A.D.3d 197, 201 (1st Dep't 2020).  That claim appears to echo plaintiffs' meaningful-access claims—not their alteration and new-construction claims.

Accordingly, the Court holds that, on the present records, plaintiffs' summary judgment motion cannot be granted with respect to claims arising from alterations and new construction that occurred before June 27, 2015.

### 2.  Mootness

As a separate threshold argument, the City contends that plaintiffs' alteration and new-construction claims are largely moot because, as of plaintiffs' motion for summary judgment, the City had adopted a policy that requires "all new pedestrian signal installations, and newly initiated capital projects and street improvement projects ('SIPs') involving existing signals at which signal poles are being relocated or replaced" to include APS.  Def. Mem. at 3.  The policy, the City argues, addresses plaintiffs' grievances arising from its failure to install APS when it replaces or adds pedestrian signals, or undertakes either capital projects or SIPs involving work

on pedestrian crossing signals. *Id.* at 13–14. Plaintiffs disagree on the grounds that (1) as to past ADA violations, the City's new policy does not provide a remedy; and (2) as to the future, the voluntary cessation exception to the mootness doctrine applies; and in any event, the new policy does not provide the full relief required by the ADA. *See* Pl. Reply at 4–9. For the reasons that follow, the Court rejects the City's mootness defense.

### a.    Applicable Law

"It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Dean v. Blumenthal,* 577 F.3d 60, 64 (2d Cir. 2009) (quoting *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992)). Accordingly, "[t]he requisite dispute must persist throughout the litigation." *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of the City of Watervliet,* 260 F.3d 114, 118 (2d Cir. 2001). "[I]f the dispute should dissolve at any time due to a change in circumstances, the case becomes moot," and the Court must dismiss the suit for lack of subject matter jurisdiction. *Id.* at 118–19. However, "a case becomes moot only when it is impossible for a court to grant *any* effectual relief *whatever* to the prevailing party." *Chevron Corp. v. Donziger*, 833 F.3d 74, 124 (2d Cir. 2016) (emphasis in original) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).

The Supreme Court has recognized numerous exceptions to the mootness doctrine. *See Comer v. Cisneros,* 37 F.3d 775, 798 (2d Cir. 1994) ("The mootness doctrine is riddled with exceptions . . . ."). Relevant here is the exception for instances in which a defendant has voluntarily ceased engaging in allegedly unlawful conduct. "The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). Accordingly, when a defendant

cites its own voluntary compliance as the reason that no live controversy exists between the parties, the case is not considered moot unless "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). In the Second Circuit, the voluntary cessation of a challenged activity renders a case moot only "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 110 (2d Cir. 2010) (quoting *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996)). This is a "formidable burden." *Seidemann v. Bowen*, 499 F.3d 119, 128 (2d Cir. 2007) (citation omitted).

> b.   *Application*

As to past ADA violations, plaintiffs are correct that the City's new policy affords them no relief. Plaintiffs bring timely claims that the City has made alterations to its crosswalks and traffic signals that affected the usability of those crosswalks to sighted pedestrians without concurrently enhancing accessibility to the blind. Pl. Reply at 8–9. The City's new policy, however, is entirely prospective in nature, and does nothing to rectify violations between June 27, 2015 and its adoption. *See Gropper v. Fine Arts Hous., Inc.*, 12 F. Supp. 3d 664, 670 (S.D.N.Y. 2014) ("[B]ecause the [Compliance Agreement] consists largely of promises that [Defendant] will fulfill *in the future*, it cannot be contended that [Defendant] has completely and irrevocably eradicated the effects of the alleged ADA violations." (citation omitted) (emphasis in original)). The City's claim of mootness thus fails to the extent that plaintiffs seek relief for past violations. *See Chevron*, 833 F.3d at 124.

For multiple reasons, the policy also does not moot plaintiffs' claims for prospective relief—an injunction obliging the City to install APS when, *inter alia*, a new traffic signal is

installed.  First, the timing of the City's policy change is suggestive, to say the least.  *See United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 676 (2d Cir. 1996) ("[I]t is significant that the change of policy was instituted on the eve of the lawsuit.").  Until July 1, 2019, "the DOT did not have a consistent policy or practice of requiring the installation of APS when a new traffic signal was installed in tandem with the installation of that traffic signal."  JSF ¶ 132.  As plaintiffs note, the City documented its new policy on October 21, 2019, the day that plaintiffs moved for summary judgment, and made it retroactive to July 1, 2019, the first business day after fact discovery closed.  Pl. Reply at 7.  As the Second Circuit has repeatedly held, the suspicious timing of a party's voluntary cessation weighs against finding mootness.  *See, e.g.*, *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 604 (2d Cir. 2016) ("[S]uspicious timing and circumstances pervade the County's decision. . . .  [T]he County announced its decision to build a courthouse on the Social Services Site only on the eve of summary judgment motions."); *N.Y.C. Transit Auth.*, 97 F.3d at 676.  That is because such timing suggests a litigation-driven motivation, as opposed to an authentic, durable commitment on the part of the defendant to mend its ways. Here, the City's adoption of the new policy only when it was facing a formidable motion for summary judgment leaves it far from "absolutely clear" that the City would not abandon its newly announced commitment with respect to APS were plaintiffs' claims denied as moot. *Mhany*, 819 F.3d at 605.

Second, the manner of the City's voluntary cessation counsels against finding plaintiffs' claims moot.  *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574 (2d Cir. 2003), *superseded on other grounds as stated in Mhany*, 819 F.3d at 618–19.  The City set forth its ostensible new policy in a two-page "Memorandum" with the stated purpose of "clarify[ing] the City's policy regarding installation of Accessible Pedestrian Signals."  2019 APS Memo at 1.

The City's couching of its new policy as a mere "clarification" of its existing practices is problematic, insofar as the summary judgment record reflects that the City's practice had not been to add APS when it newly installed or upgraded traffic signals.  And even taking the new policy as announcing a change in that direction, the City has not pointed to any safeguards that would prevent the new policy from being changed, rescinded, or honored in the breach.  *Cf. Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013) (finding case moot where the parties entered "unconditional and irrevocable" covenant that prevented allegedly unlawful activity from recurring).  On the record before the Court, the City is at liberty to reverse or revise this policy through a superseding memorandum or by other means.  The City has also not shown how and whether it has begun implementing the terms its new policy promises.  *See Dunbar v. Empire Szechuan Noodle House Inc.*, No. 18 Civ. 9625, 2020 WL 2132339, at *5 (S.D.N.Y. May 5, 2020) ("Defendant relies on its promise of voluntary compliance with the ADA to argue that Plaintiff's federal claims are now moot.  While it is true that the ADA violations Plaintiff complains of might be addressed in the renovation plans, Defendants have not presented evidence that there is no reasonable expectation that the alleged ADA violations will recur.").  The City therefore has failed to demonstrate that "there is no reasonable expectation that the alleged violation will recur," much less that the policy has "completely and irrevocably eradicated the effects of the alleged violation."  *Clear Channel Outdoor, Inc.*, 594 F.3d at 110.

The Court therefore rejects the City's claim of mootness.[15]

---

[15] The Second Circuit has stated that government entities are owed "some deference" in this mootness analysis, *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 377 (2d Cir. 2004).  *But see City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "Some deference," however, "does not equal unquestioned acceptance."  *Mhany*, 819 F.3d at 604.  Extending some deference to the City, the many factors weighing against finding of mootness here, chronicled above, overwhelmingly carry the day.

### 3.    Merits

The ADA and Rehabilitation Act require that, when a public entity newly constructs a "facility" or makes an "alteration" to an existing "facility" in a manner "that affects or could affect the usability of the facility," it must ensure that any new facility is "readily accessible to and usable by individuals with disabilities," and that any altered facility is "to the maximum extent feasible . . . readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.151(a)(1), (b)(1); *see* 28 C.F.R. § 42.522(a).  "New construction and alterations . . . present an immediate opportunity to provide full accessibility" and it is therefore "discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded."  *Civic Ass'n of Deaf of N.Y.C. v. Giuliani*, 970 F. Supp. 352, 359 (S.D.N.Y. 1997) (quoting *Kinney*, 9 F.3d at 1073–74).  As a result, these regulations are more stringent than those concerning existing facilities, and are not subject to an undue burden defense.  *Kinney*, 9 F.3d at 1071, 1074–75.

#### a.    Facilities

First, the Court must assess whether pedestrian crossing signals are "facilities" under the relevant regulations.  The City's summary judgment brief did not contest that crossing signals are "facilities" under the ADA and Rehabilitation Act, but at argument, it left that issue open. *Compare* Def. Mem. at 14 ("Defendants are not arguing that pedestrian traffic signals and APS are not 'facilities' pursuant to the ADA . . . ." (emphasis in original)), *with* Arg. Tr. at 57 ("We're not conceding that this is a facility . . . ."), *and id.* at 58 ("[I]t was an alteration to a *service* that was provided to the city, and the city should be looked at in the aggregate." (emphasis added)).

In any event, ADA regulations make clear that traffic and pedestrian crossing signals are facilities under both statutes.  Under the expansive definition provided in 28 C.F.R. § 35.104, a "facility" means "all or any portion of buildings, structures, sites, complexes, equipment, rolling

stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." Crossing and traffic signals are, at the very least, "structures," "equipment," and "other real or personal property" and therefore qualify as "facilities." The City does not offer a substantive argument to the contrary. Def. Mem. at 14–15. And the only other court to have considered this issue has found crossing signals to be "equipment provided by" a public entity sufficient to make them facilities under the ADA and Rehabilitation Act. *See Scharff*, 2014 WL 2454639, at *10–11; *see also Civic Ass'n of Deaf*, 970 F. Supp. at 359 (finding emergency call boxes placed throughout the City to be facilities under 28 C.F.R. § 35.151(b)).

### b. Claims Arising from Alterations to Existing Facilities

#### i. Applicable Law

Neither the ADA nor the Rehabilitation Act defines "alteration" in connection with these provisions. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 369 (2d Cir. 2008). Some early cases took a very broad view of the term. *See, e.g.*, *Civic Ass'n of Deaf*, 970 F. Supp. at 359 ("The Court of Appeals held that an 'alteration' is a 'change' to a 'facility.'" (quoting *Molloy v. Metro. Transp. Auth.*, 94 F.3d 808, 811–12 (2d Cir. 1996))); *Kinney*, 9 F.3d at 1072 ("alteration" defined as any "change that affects the usability of the facility involved"). But the Second Circuit's more recent guidance in the context of cases brought under Title III is that not *any* change that affects usability qualifies as an "alteration." *See Roberts*, 542 F.3d at 369–70.[16]

---

[16] Although *Roberts* concerned the interpretation of "alteration" used in Title III, the provision at issue there was, in all relevant respects, coextensive with the Title II provision at issue here. *Compare* 42 U.S.C. § 12183(a)(2) (defining discrimination as, "with respect to a *facility or part thereof* that is *altered* by, on behalf of, or for the use of an establishment in a manner *that affects or could affect the usability of the facility or part thereof*, a failure to make alterations in such a manner that, *to the maximum extent feasible*, the altered portions of the facility are *readily accessible* to and usable by individuals with disabilities, including individuals who use

Instead, *Roberts*—which plaintiffs treat as apposite, *see* Pl. Mem. at 17 n.5, 22—recognized that

the ADA's imposition of similar requirements on "alterations" and on "new construction"

informs the meaning of the former, with "[t]he greater the change made by a modification to a

facility or portion of a facility, the closer it is, in effect, to new construction." *Roberts*, 542 F.3d

at 369. Thus, the Second Circuit explained:

> The concept of alteration seems generally to exclude from "alterations" those
> modifications that essentially preserve the status and condition of a facility, rather
> than rendering it materially "new" in some sense. As the cost, degree, or scope of
> a modification decreases, the likelihood that it approaches the equivalent of "new
> construction" or is therefore an alteration under the ADA also decreases.

*Id.* at 370. At the same time, the Circuit recognized, even a "relatively inexpensive or localized

modification may, however, so fundamentally change the use of a facility that we would regard it

as an alteration, particularly if it affects the purpose, function, or underlying structure of the

facility." *Id.*

To guide courts in determining whether a modification rises to the level of an alteration,

the *Roberts* Court identified four non-exclusive factors, none individually necessary to consider:

(1) the "overall cost of the modification relative to the size (physical and financial) of the facility

---

wheelchairs" (emphasis added)), *with* 28 C.F.R. § 35.151(b) ("Each facility or part of a facility
*altered* by, on behalf of, or for the use of a public entity in a manner that *affects or could affect
the usability of the facility or part of the facility* shall, *to the maximum extent feasible*, be *altered*
in such manner that the *altered* portion of the facility is *readily accessible* to and usable by
individuals with disabilities" (emphasis added)). The Court is unaware of any difference
between these provisions that would make the construction in *Roberts* inapplicable here. More
generally, courts have found Title III's alteration provisions instructive when interpreting 28
C.F.R. § 35.151(b), *see, e.g.*, *Kinney*, 9 F.3d at 1067 & n.6 ("the discussion of the parallel
provision in Title III . . . is helpful in our analysis" of 28 C.F.R. § 35.151(b)), and have applied in
Title II cases *Roberts*'s analysis of the term "alteration," *see, e.g.*, *Bronx Indep. Living Servs. v.
Metro. Transp. Auth.*, 358 F. Supp. 3d 324, 331 (S.D.N.Y. 2019) (discussing Title II
transportation regulations, which plaintiffs here characterize as "analogous" to 28 C.F.R.
§ 35.151(b), *see* Pl. Mem. at 21, under *Roberts*.); *see also Kinney*, 9 F.3d at 1067 n.6 ("The
Committee intends . . . that the forms of discrimination prohibited by [Title II] be identical to
those set out in applicable provisions of Titles I and III of this legislation." (quoting H.R. Rep.
No. 101-485, pt. 2, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 367)).

or relevant part thereof"; (2) the "scope of the modification (including what portion of the facility or relevant part thereof was modified)"; (3) the "reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility)"; and (4) whether "the modification affects only the facility's surfaces or also structural attachments and fixtures." *Id.* The plaintiff bears the burden of making a "facially plausible demonstration" that a modification qualifies as an alteration under the ADA; on such a showing, the defendant then bears the burden of establishing that the modification "is in fact not an alteration." *Id.* at 371.

If a modification rises to the level of an alteration and affects or could affect the facility's usability, then the City must make that alteration in a manner that, "to the maximum extent feasible . . . is readily accessible to" those with disabilities. 28 C.F.R. § 35.151(b). In this context, feasibility refers to technical, not economic, feasibility. *Roberts*, 542 F.3d at 371.

### ii.    Application

Of the four sets of claims that plaintiffs bring asserting that City projects gave rise to obligations to simultaneously install APS, which it failed to do, two are both timely and arise from alleged alterations by the City of existing facilities: those involving (1) SIPs and Capital Projects; and (2) the implementation of signal timing changes, *i.e.*, LPIs and EPPs. A third set of claims, arising from lens replacements, appears untimely for the reasons reviewed above. *See supra* pp. 42–49. The fourth set of claims, arising from the City's installation since June 27, 2015 of new signals, involves new construction, not alterations. The Court analyzes that set of claims below, under the legal framework applicable to new construction. *See infra* pp. 63–65.

For the following reasons, the Court, on the present record, cannot grant summary judgment to plaintiffs as to either of their timely alteration claims.

*SIPS and Capital Projects*:  The summary judgment record does not permit the Court to determine, as a matter of undisputed fact, that any individual SIPs or Capital Projects involved alterations, let alone that such alterations affected usability.  While evidence adduced but not presented to the Court may clarify these issues, the record as presented to the Court is too hazy and equivocal to permit this finding.

As to SIPs, the parties have stipulated that such projects "*can include* redesigning or reconfiguring intersection geometry, as well as adding or removing lanes of vehicle traffic, traffic signals and pedestrian control signals, bike lanes, crosswalks, and other sidewalk or road treatments," and "*may involve* some level of signal work," including the installation of new signals.  JSF ¶¶ 171, 174–176 (emphasis added); Pl. 56.1 ¶ 74.  According to one City deponent, "a good majority of SIPs that are churned out per year, do involve *some level of signal work*." Celentano Tr. at 48–49 (emphasis added) (noting that there are "well over a hundred" SIPs completed each year); *see also* Pl. 56.1 ¶ 75.  But nothing in the record discloses which SIPs involved such signal work, the concrete nature of the signal work involved at any particular SIP, the intersections implicated by those SIPs, or when each SIP was completed.  *See* JSF ¶¶ 171–177; Pl. 56.1 ¶¶ 74–77; Pl. Mem. at 8–9, 20–21.

Similarly, on the record presented, Capital Projects encompass a diverse array of municipal activities, including the following: "milling and repaving to full reconstruction of the roadbed, sidewalks, sewer and water pipes, and other utilities[,] . . . traffic calming, school safety, pedestrian plazas, greenways, Select Bus Service, step streets, retaining walls, sea walls, and bulkheads."  JSF ¶ 178.  Some such projects may entail work on intersections, crossing signals, or roadways.  But the record is silent as to how many, which, and when; and it lacks specifics to the concrete nature and scale of such projects.  *See id.* ¶¶ 178–186; Pl. 56.1 ¶ 74.

On the thinly sketched digest of the factual record presented on plaintiffs' summary judgment motion, the Court cannot conclude that there are no genuine disputes of material fact regarding which of these diverse transportation projects were of a nature that gives rise to an obligation to install APS at an intersection. Plaintiffs imply that, given the scope of work that such projects often entail, *any* DOT project designated as a SIP or a Capital Project inherently rises to the level of an alteration requiring the installation of APS at all affected intersections. *See* Pl. Mem. at 21 ("Where a municipality invests large sums of money to replace or upgrade a facility, as is often the case with transportation facilities, it is obligated to make those alterations accessible."). Many SIPs and Capital Projects do appear to involve new construction under the ADA and Rehabilitation Act. *See infra* pp. 63–65 (addressing new signal installations). But the record does not permit the Court confidently to so find, across the board. Plaintiffs' non-specific evidentiary showing would permit only the unhelpful generalization that, among the SIPs and Capital Projects completed since June 27, 2015, some involved work that qualified as alterations or new construction, triggering obligations to enhance accessibility under the ADA. And although plaintiffs recite evidence that "a good majority" of SIPs involve signal work, *see* Celentano Tr. at 48–49, they do not describe which SIPs did so, the intersections those SIPs involved, which of those SIPs included the installation of APS (as some did), or what the nature of such "signal work" was. As to Capital Projects, the record presented does not reveal even the rough proportion of Capital Projects that involved work on roadways or intersections, let alone traffic signals. *See* JSF ¶¶ 178–186; Pl. 56.1 ¶¶ 74–77.

The Court therefore declines to grant plaintiffs summary judgment, even as to liability alone, on this claim on the evidence presented. The project-specific nature of SIPs and Capital Projects, the fact that APS were installed at some intersections incident to such work, and the

fact-intensive nature of the alteration framework combine to require that the City's liability be determined on an intersection-specific basis. *See, e.g.*, *Roberts*, 542 F.3d at 375 ("[A] decision on this issue requires a fact-intensive determination that cannot be resolved on the existing record."). The Court's denial of summary judgment as to plaintiffs' claims based on SIPs or Capital Projects is without prejudice to plaintiffs' right, drawing on the existing record, to move anew for summary judgment, but with claims regarding such alterations brought at the level of individual intersections.

The cases on which plaintiffs rely in arguing to the contrary are easily distinguished. Two involved, respectively, the renovation of three and one clearly identified subway stations. The records therefore permitted a close review of the precise renovations and costs associated with those particular projects. *See Disabled in Action of Penn. v. Se. Penn. Transp. Auth.*, 635 F.3d 87, 89–90 (3d Cir. 2011) (involving three subway stations); *Bronx Indep. Living Servs.*, 358 F. Supp. 3d at 330 (involving one subway station; defendant did not contest whether the renovation constituted an "alteration" under the ADA). Those cases do not support plaintiffs' grapeshot bid here for a generalized finding of liability. A third case on which plaintiffs rely did involve a citywide initiative, and thus entailed claims on a scale akin to those here. *Civic Ass'n of Deaf*, 970 F. Supp. at 359–60. But the claims there arose from a discrete and repetitive activity—the replacement of one type of emergency call box with another throughout the City— that was easily identified and identical in application at all sites. *Id.* at 360. Not so with the variegated SIPs and Capital Projects at issue here. Similarly, *Kinney*, which plaintiffs also cite, concerned a specific type of municipal project, street resurfacing, whose status as an alteration within the meaning of the ADA was capable of being determined on an across-the-board basis.

9 F.3d at 1070.  Here, by contrast, and as surveyed above, the clusters of projects that fall under the rubric of Capital Projects and SIPs are too diverse to permit such a generalization.

Given the mismatch between plaintiffs' generalized motion for summary judgment as to SIPs and Capital Projects and the project-specific nature of the alteration inquiry, the Court accordingly must deny plaintiffs' summary judgment motion arising from such projects.  The Court authorizes plaintiffs, on a schedule to be set, to move anew for summary judgment as to such projects, with a renewed motion keyed to particular work at particular intersections.

*LPIs and EPPs*:  For a separate reason, the Court cannot grant plaintiffs' summary judgment motion with respect to LPIs and EPPs.  That is because the evidence presented does not establish that the software changes required to implement LPIs and EPPs rise to the level of "alterations."  LPIs and EPPs are "signal timing treatment[s]."  JSF ¶ 145.  An LPI gives pedestrians a short head start before parallel vehicular traffic receives a green light, and an EPP gives all pedestrians at an intersection an exclusive opportunity to cross the street while all vehicular traffic has a red light.  *Id.* ¶¶ 145, 163.  To implement an LPI or EPP at an intersection, no physical changes are required.  *See* Celentano Decl. ¶¶ 9, 14.  To change the signal timing at an intersection, the City merely uploads new software to the intersection's controller box.  *See id.* ¶ 8 (to implement an LPI, a "phasing document is uploaded on-site into the intersection's [traffic controller] via a flash drive containing the updated LPI phasing"); *id.* ¶ 13 (same for EPP).

In contrast, because APS installations generally involve the addition of new poles even at already signalized intersections, the City must do the following to install APS: (1) cut into the roadway to install electrical conduits; (2) excavate the portions of the sidewalk where new poles are needed; (3) fill the space with concrete to support the new poles; (4) install and bolt new poles to the ground; (5) add new APS devices to the new and existing poles, and connect to live

electrical wires; and (6) restore the roadway and roadway markings. *Id.* ¶ 6. While the cost of

installing APS averaged roughly $61,000 per intersection in 2018, Benson Decl. ¶ 17, on the

evidence presented, the cost of implementing an LPI or EPP appears to be no more than the labor

cost of sending a person to upload software containing a new timing plan.

The factors identified in *Roberts* disfavor concluding that the implementation of LPIs or

EPPs qualifies as an alteration. First, the cost and scope of implementing these timing changes

is, essentially, *de minimis* relative to the overall size and cost of the facility. *Roberts*, 542 F.3d

at 370; *see* Celentano Decl. ¶¶ 8, 13. Second, the goal of such modifications is more akin to a

"modification or improvement" than a change in "the purpose or function" of the facility.

*Roberts*, 542 F.3d at 371. Giving pedestrians extra seconds in the crosswalk before vehicles

begin to enter does not change the fundamental way that pedestrians navigate a crosswalk. The

purpose and function of an intersection's crossing signals, with or without LPIs or EPPs, remains

to inform pedestrians when it is safe to cross the street. Changing the timing of crossing signals

at an intersection "essentially preserve[s] the status and condition" of an intersection's crossing

signals, rather than rendering it "materially 'new' in some sense." *Id.* at 370. Third, the steps

needed to effectuate LPIs or EPPs do not make it "easier and cheaper" to integrate the features

that facilitate ADA access, such as APS. The software modifications needed to install LPIs or

EPPs are a far cry from the physical construction needed to support the installation of APS. *Id.*

at 369; *see* Celentano Decl. ¶¶ 6, 8–9, 13–14. Requiring the installation of APS each time the

City installs software to effect such timing changes is not consistent with the Second Circuit's

teaching that the more stringent requirements applicable to alterations should only apply to

changes that render facilities "materially 'new' in some sense." *Roberts*, 542 F.3d at 370.

Resisting this conclusion, plaintiffs note testimony—including from City employees—that LPIs and EPPs can have deleterious effects on blind pedestrians' safety. *See* Pl. Mem. at 22; Pl. Reply at 5; JSF ¶¶ 147, 149, 164. These hazards are germane to the claim on which the Court has found the City liable: for failure to provide the blind with meaningful access to the City's signalized intersections. The switch to LPIs and EPPs is a "traffic design choice . . . that render[s] unreliable the traditional street-crossing techniques used by blind pedestrians." Barlow Report at 16. The remedy necessary to cure the City's present denial of meaningful access may well entail installation of APS at, among others, street crossings where LPIs and EPPs present enhanced dangers to blind pedestrians. But the alteration inquiry is distinct. On the present record, the Court cannot find that these burdens transform otherwise minor modifications to the software controlling signal timing into alterations under the ADA or Rehabilitation Act.

The Court, accordingly, denies plaintiffs' motion for summary judgment as to the claim that the implementation of LPIs and EPPs constitute alterations to an intersection requiring the simultaneous installation of APS.

### c.   *Claims Arising from New Signal Installations*

#### i.   Applicable Law

Finally, the Court addresses plaintiffs' claims arising from new signal installations. These claims implicate the regulations governing new construction promulgated under the ADA and Rehabilitation Act, to wit, that all newly constructed facilities must "be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1) (ADA); *see* 28 C.F.R. § 42.522(a) (similar under the Rehabilitation Act). Although neither provision defines "new construction" or "constructed," and the parties do not dispute its significance, the plain meaning of the terms refers to instances in which the City installs a "facility" where one did not exist before.

63

ii.    Application

The Court has held pedestrian crossing signals to be facilities under both the ADA and Rehabilitation Act.  And, as the parties have stipulated, each year the DOT adds pedestrian crossing signals at between 100 and 120 intersections.  JSF ¶ 135.  Many of these installations, however, do not also include APS.  *Id.* ¶ 133.  As the parties have further stipulated, blind pedestrians cannot access the information provided by the crossing signals at a newly signalized intersection "unless it has been equipped with APS."  *Id.* ¶ 138.

It follows—as discussed in the context of plaintiffs' meaningful-access claims—that such newly constructed facilities are not "readily accessible" to those who cannot see them.  The City does not appear to dispute this aspect of plaintiffs' motion.[17]  *See* Def. Mem. at 20–21; 2019 APS Memo at 1 ("It is legally required that all newly signalized intersections containing a pedestrian signal also include APS.").  Therefore, to the extent that the City has installed new pedestrian crossing signals since June 27, 2015, without making those signals readily accessible to the blind, it has violated the ADA and Rehabilitation Act.[18]

The Court accordingly grants summary judgment to plaintiffs as to liability regarding all such installations.  Because plaintiffs' motion is limited to the liability phase, the Court does not have occasion presently to rule as the appropriate remedy.  As above, however, on claims arising from the failure to make a facility accessible at the time of alterations or construction, a public-entity defendant does not have available the undue burden or fundamental alteration defenses

---

[17] Nor does the City dispute that, given the work entailed, the installation of new traffic signals constitutes "new construction."  Unlike in the context of SIPs or Capital Projects, that determination applies across the board; it does not require a fact-intensive, site-specific inquiry.

[18] Although not necessary to this conclusion, the PROWAG guidelines are consistent with it. They require that "[w]here pedestrian signals are provided at pedestrian street crossings, they shall include accessible pedestrian signals and pedestrian pushbuttons."  76 Fed. Reg. at 44690.

that may be invoked in connection with claims of the denial of meaningful access.  *See Kinney*, 9 F.3d at 1069.

### C.      Claims Under the NYCHRL

The NYCHRL makes it an "unlawful discriminatory practice" for any "owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation, because of the actual or perceived . . .  disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."  *Brooklyn Ctr. for Indep.*, 980 F. Supp. 2d at 642 (alterations in original) (quoting N.Y.C. Admin. Code § 8-107(4)(a)).  It further requires that "any person prohibited by the [law] from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." *Id.* (alterations in original) (quoting N.Y.C. Admin. Code § 8-107(15)(a)).

Although the ADA and the NYCHRL are similar in nature, they are not coextensive. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).  Under the Local Civil Rights Act Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) ("Restoration Act"), the NYCHRL is to be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those with provisions comparably-worded to provisions of this title, have been so construed."  Restoration Act § 7.  As the Second Circuit has recognized, this law imposes a "one-way ratchet":  Federal civil rights laws provide "a floor below which the City's Human Rights Law cannot fall."  *Loeffler*, 582 F.3d at 278 (quoting Restoration Act § 1); *see also Brooklyn Ctr. for Indep.*, 980 F. Supp. 2d at 643 (because City's actions "violate the ADA and the Rehabilitation Act, it follows that Defendants are liable under the NYCHRL as well.").

Judgment for plaintiffs as to liability is required here to the same extent that the Court has entered judgment for plaintiffs on their federal claims relating to meaningful access.[19]  The City does not dispute that it is a "provider of public accommodations" or that the public streets, including signalized intersections, are places of public accommodations under the NYCHRL. *See* Pl. Mem. at 24–25; Def. Mem. at 21–22.  And while the City disputes whether the NYCHRL's protections are any broader than the federal protections relevant here, *see* Def. Mem. at 21, it acknowledges that the NYCHRL's protections are no less so.  As a result, in light of the Court's findings for plaintiffs under the ADA and Rehabilitation Act as to the denial of meaningful access, "it follows that Defendants are liable under the NYCHRL as well." *Brooklyn Ctr. for Indep.*, 980 F. Supp. 2d at 643; *see also id.* (noting that NYCHRL has a "broader notion of which accommodations are reasonable" than the ADA and Rehabilitation Act).  Accordingly, the Court enters summary judgment as to liability on plaintiffs' NYCHRL claim.

## CONCLUSION

For the foregoing reasons, the Court grants in principal part, but not in its entirety, plaintiffs' motion for summary judgment as to liability.

The Court grants plaintiffs' motion for summary judgment as to liability on their claims under the ADA and Rehabilitation Act that the City—which has installed APS at fewer than 5% of signalized intersections—presently denies the certified class of blind and low-vision pedestrians meaningful access to a service, program, or activity of the City, to wit, the City's signalized intersections and pedestrian grid.

---

[19] As discussed above, the Court construes plaintiffs to have pled and pursued under the NYCHRL only the claim that the scarcity of APS throughout the City excludes them from the City streets.  *See* Compl. ¶¶ 112–126; Pl. Mem. at 23–25 (arguing only that "the lack of APS at the vast majority of New York City's intersections unlawfully excludes blind pedestrians from places of public accommodations," without mentioning upgrades, new construction, or alterations).

The Court also grants plaintiffs' motion for summary judgment as to liability on their claims under the ADA and Rehabilitation Act that the City's failure to provide non-visual street-crossing information when it has installed new traffic signals after June 27, 2015, violates the ADA and Rehabilitation Act.

The Court grants plaintiffs' motion for summary judgment as to liability, coextensive with that under the ADA and Rehabilitation Act, under the NYCHRL, as to the accessibility to the blind of the City's signalized intersections and pedestrian grid as a whole.

The Court otherwise denies plaintiffs' motion for summary judgment. As discussed above, this denial is without prejudice to plaintiffs' right to move anew for summary judgment on their claims that the City has failed to make required alterations in the context of SIPs and Capital Projects. Any such renewed motion, however, must be keyed to particular intersections.

This litigation will now move promptly forward to a remedy stage, and to consideration of renewed motions, if any, for summary judgment as to liability on open claims. An order will issue shortly in which the Court will, *inter alia*, commission a joint letter from counsel addressing the timetable for next steps in this litigation.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 92.

 SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: October 20, 2020
       New York, New York